IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

STEVEN BARTLETT,

       Petitioner,

v.                                     CIV 06-0564 JH/KBM

JAMES JANECKA, Warden, et al.,

       Respondents.

# PROPOSED FINDINGS
# AND
# RECOMMENDED DISPOSITION

Petitioner Steven Bartlett is serving more than two life sentences for the murder of Jeff Unser and Lee Benjamin;[1] tampering with evidence by disposing the bodies and the murder weapon; and attempting to cover up evidence of the murders at his trailer.  He was acquitted of the charge of bribing a witness.  *E.g.,* *Doc. 12,* Exh. C (hereinafter "*Answer*"); *Record Proper* at 168-76, 252-54.

This matter is before the Court on Bartlett's habeas petition under § 2254

---

[1]  This victim's name appears as "Lee Benjamin" in the indictments, but in some parts of the state records he is referred to as "Benjamin Lee." *E.g., Record Proper* at 1, 101, 168; *Transcript Vol. XI* at 31.  I will use the name from the indictments and, as with others, refer to him by his last name – "Benjamin."

and the supplemental materials he filed in response to the Court's request, Respondents' Answer and motion to dismiss all claims on the merits, and the state court record proper and transcripts. *See Docs. 1* (and addenda thereto), *12, 13, 23, 24.* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") standards apply to this case. *E.g., Michael Williams v. Taylor,* 529 U.S. 420, 429 (2000); *Lindh v. Murphy,* 521 U.S. 320, 326-327 (1997).

The length of this document should not be construed as an indication that the merits of the allegations are difficult or close. It is long simply because of Plaintiff's determination to create an extraordinary number of claims and my desire to provide the reviewing court a more concise but comprehensive path through the maze. Based on careful review of every submission of this voluminous matter, I recommend that Bartlett's § 2254 petition be dismissed. Because all of the issues can be resolved on the federal record, an evidentiary hearing is unnecessary. *E.g., Schriro v. Landrigan,* ___ U.S. ___, 127 S. Ct. 1933, 1940 (2007); Rule 8(a), RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS.

# I.  Overview

The victims' bodies were found in the small community of Sandia Knolls, which is located in the East Mountain area of Albuquerque. A bar and restaurant

called "Pete's" is located on North Route 14, approximately a five to ten minute drive from Sandia Knolls. *See, e.g., Transcript Vol. X* at 39, 73-74; *Transcript Vol. XI* at 10. During the relevant time period, Pete's was a "rough bar . . . a rough place," where patrons on occasion had been relieved of firearms and a bayonet. *Transcript Vol. XIII* at 85. According to one former employee, for example, Pete's employees had access to a gun stowed in the waitress station while they worked. *See id.* Also, some trial witnesses were candid about alcohol and drug use either by themselves or by others who lived near, worked at, or patronized Pete's. *See, e.g., id.* at 52-53, 171; *Transcript Vol. XIV* at 81-82. Finally, Pete's had a reputation among police officers as an area where drugs were used, and they often responded to calls there. *See, e.g., Transcript Vol. X* at 84, 89.

The Jojola family owned Pete's and the surrounding property. At least a year prior to the murders, Pete Jojola, his wife Ruthanne Jojola, and their two children lived on the property in a double-wide trailer. By the time the murders occurred, the Jojola family had moved to a home in Sandia Knolls, approximately two miles from Pete's. *See, e.g., Transcript Vol. XIII* at 86; *Transcript Vol. XIV* at 75, 83, 85. They allowed others to stay on the property surrounding the bar and descriptions of the place give the impression of a communal or camp atmosphere as numerous people lived in several small residences and shared the facilities in

3

others.

For example, Pete Jojola leased the then-deteriorated double-wide trailer to Bartlett (also known as "Shadow") several months before the murders.  The trailer was located near the restaurant, just past the parking lot and a little arroyo, and was accessible by a narrow trail through some small trees.  Bartlett made significant improvements to the trailer in the short time he resided there, and he rented one of his bedrooms to Scott Baird during the month in question.  The trailer was the only residence on the property that had laundry facilities.  *See, e.g., Transcript Vol. X at 19, 79-80, 97-98; Transcript Vol. XIII at 4, 9, 53, 101-02, 148; Transcript Vol. XIV at 84-86, 89-90, 94.*

Dave Roberts (also known as "HB" or "Hard Body" or "Ninja Dave") was a waiter/bartender/handyman for Pete's.  Roberts lived in the "tenant house" on the property rent free, along with two to three other roommates.  The tenant house was located next door to Bartlett's trailer.  Roberts' residence had a shower but no laundry facilities, so Roberts used Bartlett's trailer to do his laundry and had a key to the trailer to do so.  Roberts was accomplished in karate, as was his friend Tim Clabaugh.  *See, e.g., Trial Transcript Vol. X at 84-85, 97; Transcript Vol. XIII at 22, 25-26, 28, 50-52, 72, 84, 101-02, 109-10; Transcript Vol. XIV at 93.*

Clabaugh was a waiter/busboy for Pete's and lived in the "storage shed" on

4

the property with a roommate.  Because the storage shed did not have a shower, Clabaugh showered at Dave Roberts' residence.  *See, e.g., Transcript Vol. XIII* at 6, 20, 27-28, 51; *Transcript Vol. XIV* at 94.

The victims were regular patrons of Pete's and known to the people who lived and/or worked there.  Unser owned property in the East Mountains a few miles from Pete's, was building a house there and his close friend Benjamin was helping him.  The home had electricity and a roof, but no water or septic system. Despite being so rustic, Unser allowed Dallas Labrum and his girlfriend and her toddler to stay there for three weeks, until Unser's girlfriend insisted that he make them leave.  One of the items Labrum left behind on the Unser property as payment for rent was a Triumph motorcycle.  Benjamin later gave this same motorcycle to Petitioner in exchange for drugs.  *See, e.g., Transcript Vol. X* at 19; *Transcript Vol. XIII* at 70-71, 161; *Transcript Vol. XIV* at 44-47, 57-60, 71-73, 94-95.

## II.  Sufficiency of the Evidence Is Not At Issue

The State's case against Bartlett was entirely circumstantial, but a web of evidence connected him to the victims.  This included that different guns were used to kill the victims and the bodies were dumped with orange chairs.  At the

5

place where the bodies were found, one victim was missing a sock and one of the chairs was missing a cushion.  Nearby, a gun with missing parts was found. Benjamin's truck, with its distinctive dually tires, was parked in the lot at Pete's. Tracks from these tires matched those near the bodies and in front of Bartlett's trailer.  The bed of the truck contained the victims' blood, a tarp and blanket with their blood, and a cushion matching the chairs found near the victims' bodies.  A sock matching one on Benjamin's body was found by Bartlett's trailer, and drops of blood were found leading toward his front door.  *See, e.g., Answer,* Exh. L at 2-3; *Record Proper* at 1756-60; *Transcript Vol. X* at 7-10; *Transcript Vol. XV* at 47-66.

Petitioner himself was found in the house, unresponsive to the officers' pounding and shouts.  The inside of the trailer contained:  copious blood from the victims around imprints of the missing chairs; shell casings and bullets and part of the missing mechanism from the gun; Bartlett's roommate's gun of a different caliber; and the remnants of an attempt to clean the trailer.  Petitioner's boots, jeans and bedding had small blood spots that matched the blood type of one of the victims.  *See, e.g., Answer,* Exh. L at 2-3; *Record Proper* at 1756-60; *Transcript Vol. X* at 7-10; *Transcript Vol. XV* at 47-66.

It was indisputable that the victims were slain in Bartlett's trailer, loaded into Benjamin's truck, and driven a short distance to be dumped.  Yet, there was no

6

eyewitness to any event surrounding the murders.  Evidence pointing to Bartlett as the responsible party came from Clabaugh and Roberts.  Clabaugh testified that the evening before the discovery of the bodies, Bartlett asked him for body bags and made a threatening gesture that indicated he shot someone in the head.  Roberts testified that the same evening, Bartlett asked him for a shovel.  He also testified that later that evening, he saw Bartlett and others in Bartlett's trailer along with two dead bodies, and Benjamin's corpse was lying face upward, identifiable even through all of the blood.  *See, e.g., Answer,* Exh. L at 2-3; *Record Proper* at 1756-60; *Transcript Vol.* X at 7-10; *Transcript Vol.* XV at 47-66.

The prosecution emphasized that the "trail of blood" constituted sufficient circumstantial evidence to convict Bartlett, regardless of whether others may have been involved.  *See, e.g. Transcript Vol.* X at 7,10; *Transcript Vol.* XV at 47-51, 55-59, 107-30.[2]  The defense emphasized that the circumstantial evidence pointed in

---

[2]  Specific examples of the prosecutor's arguments are:  "You heard testimony that there were two different caliber bullets that were used, a .25 and possibly something from a .380 to a .38 Special, or even a 9mm. Members, that's why the other instruction, hopefully, will make your job easier, and this is the aiding and abetting instruction, that even though the Defendant did not do the acts constituting a crime, if the Defendant intended the crime to be committed, the crime was committed.  The Defendant helped, encouraged or caused the crime to be committed, this means that he is just as responsible," *Transcript Vol.* XV at 66; "Let's suppose there is a second person. . . .  It doesn't really matter either way.  He's still involved, and that you can see from everything else that has been going on in this case and from all the evidence you've got here.  He's still involved. . . . [the other prosecutor] told you about aiding and abetting," *id.* at 126-27; and "you do know he was there.  You do know he was involved.  You do know he at least aided and abetted in disposing of the bodies," *id.* at 130.

all sorts of different and conflicting directions, but did not answer who killed and

disposed of the victims.  *See e.g., Transcript Volume* X at 11-12, 23-24, 28-33;

*Transcript Vol. XV* at 72-73.  In a nutshell, the defense argued that although the

victims were shot in Bartlett's trailer:

- Bartlett was in Albuquerque when the victims were last seen alive and at the time the murders supposedly took place;

- the police not only failed to preserve or collect important and potentially exculpatory physical evidence, they also failed to follow-up on leads from informants that relayed someone other than Bartlett murdered the victims;

- Pete's was the kind of establishment where a number of different people could have been responsible for the victims' deaths;

- Roberts' and Clabaugh's renditions of the events were incredible; and,

- Roberts' story was especially suspicious given that he was unexpectedly carrying a gun on the night in question, was in the house where (and around the time) that the murders took place, and was the person who initially reported the bloody truck, yet he had a different statement for the police after he and Clabaugh had time to confer.

*See Transcript Vol. X* at 11-38; *Transcript Vol. XIV* at 79; *Transcript XV* at 72-107.

        After conviction, the State proceedings were protracted in part because

Bartlett was not satisfied with how his attorneys were presenting issues, and counsel

was substituted several times.  *See, e.g., Doc. 21* at 2.  His last state habeas petition,

8

filed by Timothy Rose on September 15, 2004,[3] presented nine categories of forty-nine separately numbered claims, exactly as Bartlett had requested. The federal petition incorporates this lengthy and confusing State Petition by reference. *See, e.g., id.* at 2-3.[4]

In the rare instance where Bartlett uses the word "sufficient" to describe the State's evidence, he is referring to what lies at the heart of all of his claims – that had the police officers, his attorneys, and the trial judge performed better, no rational juror would have convicted him:

> Clearly there is insufficient evidence to convict beyond a reasonable doubt. . . . Petitioner did in fact have a sound alibi, and a fundamental miscarriage of justice has occurred in this case at bar, with the State destroying/withholding evidence, coupled with inadequate representation, had counsel been effective surely would have provided a different result. The facts contained in Grounds [1-5, 9, 14, 39-41] . . . clearly show constitutional violations to a fair and impartial trial, and there has been a fundamental miscarriage of justice in the conviction of an innocent man.

*State Petition* at 68-69. But the one thing Petitioner had not argued in any of his

_____

[3] The document is attached as Exhibit FF to Respondents' Answer, attached as "Cert. Exhibit 1" to the federal petition and appears at pages 1754-1829 of the Record Proper. For ease of reference I will refer to it as "State Petition" throughout these recommended findings.

[4] For the most part throughout these findings I cite to the number of the "ground" or "claim." For a list describing the forty-nine "grounds" raised in the State Petition and the nine categories of "claims" raised in the federal petition, see the Appendix to these proposed findings.

hundreds of assertions is that the evidence was legally insufficient for the jury to have convicted him.  Indeed, in his State Petition he faulted appellate counsel for raising a sufficiency of the evidence claim on direct appeal – a claim he says his attorney raised to appease him, but that he never wanted raised because it "was one of the weakest issues one could raise, *'meritless,' and that is why it is not being raised in this petition.*"  *Id.* at 143 (emphasis added).

It is obvious that Bartlett went through each trial transcript and other document line by line, generating multiple and overlapping issues, and asserting the same alleged misconduct under different legal theories.  In deciphering the allegations, the trial judge entered an order that set briefing on a dozen ineffective assistance of counsel claims and the related cumulative error claim.  In that same order, he summarily disposed of the remaining clams.  He dismissed the Confrontation Clause claim, five ineffective assistance of counsel claims, and a related cumulative error claim, as "duplicative" of the claims that were to be briefed.  He dismissed many of the prosecutorial conduct claims and one claim of trial court error as procedurally defaulted.  He then dismissed a number of other claims as merely asserting prejudice from ineffectiveness.  *See Record Proper* at 1712-1718.  After briefing, the trial judge did not hold an evidentiary hearing and dismissed the state petition as without merit.  Even with addressing only a fraction

10

of the claims, the trial court's decision is seventy-four pages long. *See id.* at 1754-1829.

For the sake of brevity in what will necessarily be a long opinion, I attempt to manage the volume of overlapping *pro se* assertions by arranging the claims topically. I first discuss the claims that are not cognizable in federal habeas. I then address claims by subject matter under the appropriate AEDPA standards.

## III.  Noncognizable Claims

### A.  Allocution At Sentencing

When the defense was given an opportunity to address the court at sentencing, Bartlett's attorney did not mention whether his client wished to make a statement. The trial judge did not inquire and pronounced sentence. Bartlett said nothing. *See Sentencing Transcript April 21, 1997* at 7-8. In Claims 3 and 7 of the federal petition, Bartlett asserts his trial attorney was ineffective and the trial court erred in denying him the opportunity to allocute. *See Doc. 1* at 9A6, 10D3.

"A trial court's failure to afford a defendant the right of allocution raises neither a jurisdictional nor a constitutional error cognizable in habeas." *Scrivner v. Tansy,* 68 F.3d 1234, 1240 (10th Cir. 1995), *cert. denied,* 516 U.S. 1178 (1996); *see also, e.g., Hill v. United States,* 368 U.S. 424, 428 (1962); *Harvey v. Shillinger,* 76

F.3d 1528, 1534, 1537 (10th Cir.), *cert. denied,* 519 U.S. 901 (1996); *Lynn v. Roberts,*

195 Fed. Appx. 736, 739, n.3 (10th Cir. 2006).  Bartlett's allocution claims

appearing in Claims 3 and 7 should be dismissed accordingly.

## B.  Alleged Errors During Direct Appeal

Claims 4, 6, and 8 of the federal petition focus on the proceedings on direct

appeal and are interrelated.  Bartlett asserts in Claim 8 that the New Mexico

Supreme Court "erred" because it "misconstrued" certain facts.  *Doc. 1* at 10E-

10E2.[5]  He attributes the court's error in part to what the prosecutor and defense

counsel did on appeal.  In Claim 6, for example, he asserts that the prosecutor's

appellate briefs argued facts Bartlett believes are "unreliable" or "false."  *Id.* at 10C-

10C1.  In a portion of Claim 4, he asserts that his appellate attorney:  failed to

communicate with him; did not raise all of the claims he wanted; did not mention

all of the facts he wanted; raised a sufficiency of the evidence claim that he did not

want raised; did not secure a complete record for the appeal; misstated some facts

that the New Mexico Supreme Court relied upon; and failed to correct the

misstatements, move for rehearing, or petition the Supreme Court for certiorari.

---

[5]  When a life sentence is imposed, the direct appeal is filed in the New Mexico Supreme
Court, instead of the New Mexico Court of Appeals.  *See, e.g., State v. McClaugherty,* 133 N.M.
459, 461, 64 P.3d 486, 488 (N.M. 2003); N.M. CONST. art. 6, § 2; N.M. R. APP. P. 12-102(A)(1).

*See id.* at 10A-10A2; *State Petition* at 138-54.

The claims concerning the New Mexico Supreme Court's decision and the prosecutor appellate brief are not cognizable.  The Federal habeas courts have no jurisdiction to sit as a "'super state supreme courts.'"[6]  Rather than sitting "to correct errors of fact or to relitigate state court trials," the jurisdiction of a federal habeas court "is limited to ensuring that individuals are not imprisoned in violation of the Constitution."  *Thompson v. Oklahoma,* 2000 WL 14404 at * 6 (10th Cir.) (citing *Herrera v. Collins,* 506 U.S. 390, 400 (1993)), *cert. denied,* 530 U.S. 1265 (2000); *see also, e.g.,* 28 U.S.C. § 2241(c)(3); *id.,* § 2254(a).

In fact, the federal Constitution does not require States to provide appeals from criminal convictions.  *E.g., Lackawanna County Dist. Attorney v. Coss,* 532 U.S. 394, 402-0 (2002); *Evitts v. Lucey,* 496 U.S. 387, 393 (1985); *Abney v. United States,* 431 U.S. 651, 656 (1977).  If a State does create an appellate court system, however, the Supreme Court has held that the "procedures used in deciding

---

[6]  *Bowser v. Boggs,* 20 F.3d 1060, 1065 (10th Cir.) (quote in parenthetical from *Smith v. McCotter,* 786 F.2d 697, 700 (5th Cir. 1986)), *cert. denied,* 513 U.S. 926 (1994); *see also e.g., DiGuglielmo v. Smith,* 366 F.3d 130, 137 (2nd Cir. 2004) (same quote in parenthetical from *Johnson v. Rosemeyer,* 117 F.3d 104, 110 (3rd Cir. 1997)); *Burrus v. Young,* 808 F.2d 578, 584 (7th Cir. 1986) (same, directly quoting *Skillern v. Estelle,* 720 F.2d 839, 852 (5th Cir. 1983)), *cert. denied,* 469 U.S. 873 (1984)); *Payne v. Janasz,* 711 F.2d 1305, 1310 (6th Cir.) (same, directly quoting *Martin v. Wainwright,* 428 F.2d 356, 357 (5th Cir. 1970), *cert. denied,* 400 U.S. 918 (1970)), *cert. denied,* 464 U.S. 1019 (1983).

appeals must comport with Due Process and Equal Protection." *Evitts,* 469 U.S. at 393.  Those procedures include a free transcript of the trial for indigents and effective assistance of counsel.  *Id.* at 393-94, 397.  But the Supreme Court has never held there is a constitutional right to a particular decision or a decision entirely free of misstatements by a state court on appeal.[7]

Similarly, if prosecutorial misconduct does not implicate denial of a specific constitutional right, it can amount to a violation of due process only if the conduct renders a **trial** fundamentally unfair.  *See Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974).  I have not found, however, any decision that extends *Donnelly* to the direct appeal or post-conviction arena.

Therefore, I find that Claims 6 and 8 in their entirety and portions of Claim 4 do not present cognizable independent claims and recommend they be dismissed.  That does not necessarily mean the substance of the claims will go unaddressed.

---

[7]  *See Cleveland Surgi-Center, Inc. v. Jones,* 2 F.3d 686, 690-91 (6th Cir. 1993) ("Substantive due process has never been held to extend to wrong decisions of state courts and we will not be the first to so rule."), *cert. denied,* 510 U.S. 1046 (1994); *c.f., Bodine v. Warden of Joseph Harp Correction Center,* 2007 WL 534449 at * 1 (10th Cir. 2007) ("blanket attack on the manner in which the OCCA reviewed his direct appeal . . . does not state a cognizable claim for federal habeas relief"); *Dennis v. Mitchell,* 68 F. Supp. 2d 863, 876-77 (N.D. Ohio 1999) ("central to our system is the general rule that state court determinations are not subject to appellate review . . . .  The United States Supreme Court has consistently enforced this statute by giving preclusive effect to state court judgments [and] in *Allen v. McCurry,* the Supreme Court rejected the position that the Constitution requires an independent federal judgment on a question passed upon in state court. . . .  With the AEDPA, Congress has made such an exception, albeit a narrow one."), *aff'd,* 354 F.3d 511 (6th Cir. 2003), *cert. denied,* 541 U.S. 1068 (2004).

Most of the underlying arguments to these claims are repetitive of Bartlett's other

claims and are addressed elsewhere in these proposed findings.

## C.  *Post-Conviction Counsel*

There is no right to counsel on state post-conviction review.  *See Coleman v.*

*Thompson,* 501 U.S. 722, 757 (1991).  Consequently, claims of ineffective

assistance of post-conviction counsel are not cognizable in federal habeas.

> States are not obligated to provide defendants with
> post-conviction review.  *Pennsylvania v. Finley,* 481 U.S.
> 551, 557 (1987).  As such, "constitutional error [that]
> focuses only on the State's post-conviction remedy and
> not the judgment which provides the basis for . . .
> incarceration . . . states no cognizable federal habeas
> claim."  *Sellers v. Ward,* 135 F.3d 1333, 1339 (10th Cir.
> 1998); *see also* 28 U.S.C. § 2254(i) (expressly barring
> relief for claims alleging ineffective assistance of counsel
> in state collateral post-conviction proceedings); *Steele v.*
> *Young,* 11 F.3d 1518, 1524 (10th Cir. 1993).

*Fitzgerald v. Zenon,* 136 Fed. Appx. 209, at 211 (10th Cir. 2005); *see also United*

*States v. Dago,* 441 F.3d 1238, 1248-49 (10th Cir. 2006) (and cases cited therein).

"Ground 34(A)-(F)" of the State Petition asserts that Brian Pori of the

Public Defender's Office rendered ineffective assistance during post-conviction

proceedings.  *See State Petition* at 148-54.  Bartlett recognizes the above federal

habeas principle though, because he specifically did not carry over this claim from

15

his State Petition to the federal petition. *Compare id.* at 148-54, *with Doc. 1.*

Bartlett does assert in his federal petition, however, "trial court error" in Claim 7

related to Pori's conduct. *See Doc. 1* at 10D3-10D4 ("Judge Sanchez erred when he

appointed Mr. B. Pori . . . to amend Petitioner Writ, @ this time the court knew

Petitioner was claiming ineffective assistance of counsel against the Public

Defenders Department"); *see also State Petition* at 238-39 (Ground 47(K) – same).

This may have been an oversight. If not, I also recommend that the post-

conviction counsel portion of Claim 7 be dismissed as noncognizable.

### D. *Newly-Discovered Evidence/Actual Innocence*

In both his state and federal petitions, Claim 2 asserts that "newly discovered

evidence" demonstrates Bartlett is "actually innocent" of murdering Unser or

Benjamin. *See State Petition* at 50-55; *Doc. 1* at 7. He points to three pieces of

"new" evidence. The first is the affidavit from an inmate who, in Bartlett's view,

claims that the police said Pete Jojola "was responsible for ***coordinating*** the

murders." *See State Petition* at 50 (emphasis added).[8] Next is the assertion that one

of his attorneys interviewed an individual who stated his uncle, Labrum, carried out

---

[8]   This is a misrepresentation of the affidavit, which provides the police at most made the
vague statement that Jojola "was ***involved*** in these murders." *See State Petition* (attached Exhibit
"Hab.O") (emphasis added).

the murders as payback for the victims stealing his motorcycle. *Id.* at 50-51. His final piece of evidence comes from yet another inmate who is the husband of one of the State's witnesses. This inmate claims Jojola gave his wife drugs to make a false statement to the police. *Id.* at 51-52.

In *Herrera v. Collins*, the majority opinion reasserted that "freestanding" claims of "actual innocence" are not cognizable in federal habeas. Instead, such showings can be used as a gateway to permit a petitioner to raise an otherwise barred claim. *See* 506 U.S. 390, 400-01, 404-05 (1993). It assumed, "for the sake of argument . . . that ***in a capital case*** a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Id.* at 417 (emphasis added). But the "threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.*

Recently the Court declined to "answer the question left open in *Herrera*" and decide whether "freestanding innocence claims are possible." *House v. Bell,* 547 U.S. 518, ___, 126 S. Ct. 2064, 2086-87 (2006). The circuits are split whether *Herrera* and *House* permit a habeas court to entertain these claims and under what

17

circumstances.[9]  In this circuit, such claims are not recognized.[10]  Therefore, I

recommend that Claim 2 be dismissed as noncognizable as an independent claim.

As before, however, the substance of these arguments will be addressed below

because they are also the basis for other claims.  *See, e.g., Doc. 1* at 7.

---

[9]   In making this "free standing" claim of actual innocence,
Montgomery relies on *Herrera* . . . .  The circuit courts are split on
whether *Herrera* recognizes such a claim.  Several courts have read
*Herrera* as invalidating free-standing actual innocence claims in
habeas.  *Creel v. Johnson,* 162 F.3d 385, 395 (5th Cir. 1998); *Sellers
v. Ward,* 135 F.3d 1333, 1338-39 (10th Cir. 1998); *Guinan v. United
States,* 6 F.3d 468, 470 (7th Cir. 1993); *Meadows v. Delo,* 99 F.3d
280, 283 (8th Cir. 1996).  Other courts have read *Herrera*  as
authorizing a free-standing claim of actual innocence, or have at
least assumed for the sake of argument that habeas courts could
consider free-standing claims of actual innocence.  *Carriger v.
Stewart,* 132 F.3d 463, 476 (9th Cir. 1997) (*en banc*) (holding that
"free-standing" actual innocence is a proper claim but not finding
sufficient evidence of it); *Cornell v. Nix,* 119 F.3d 1329 (8th  Cir.
1997); *O'Dell v. Netherland,* 95 F.3d 1214, 1246 n.25 (4th Cir.
1996) (assuming for the sake of argument that "free standing"
actual innocence states a claim but noting that the *Herrera*
opinion . . . seems to dictate otherwise.)

*Montgomery v. Bagley,* 2007 WL 1038972 at *60 (N.D. Ohio 2007).

[10]   *See LaFevers v. Gibson,* 238 F.3d 1263, 1265 n.4 (10th Cir. 2001) ("an assertion of
actual innocence, although operating as a potential pathway for reaching otherwise defaulted
constitutional claims, does not, standing alone, support the granting of the writ of habeas
corpus."); *Sellers v. Ward,* 135 F.3d 1333, 1338-39 (10th Cir.) (noting that although the *Herrera*
decision does not recognize an independent constitutional claim of this sort, it can serve as a
"gateway" for procedurally-barred claims), *cert. denied,* 525 U.S. 1024 (1998); *but see Pettit v.
Addison,* 150 Fed. Appx. 923, 926-27 & n.3 (10th Cir. 2005) (pre-*House* case, assuming without
deciding that exceptions to general rule announced in *Herrera* would apply to non-capital cases
and would apply where state clemency proceedings were unexhausted, but finding new evidence
was not "truly persuasive" in light of other evidence).

# IV.  Standards Of Review Under AEDPA

Under AEDPA standards, if a state court addresses a claim on the merits, a federal court cannot grant an "application for a writ of habeas corpus" unless the state decision was (1) "contrary to" or an "unreasonable application" of "clearly established" Supreme Court precedent or (2) an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The Supreme Court and Tenth Circuit have discussed these deferential AEDPA standards in detail in many opinions.[11]

Under 28 U.S.C. § 2254(d)(1), a federal habeas court may not substitute its "'own judgment for that of the state court.'"[12]  Only federal constitutional principles that were clearly established are relevant for habeas purposes.  Thus, this Court's first inquiry is whether the "'principle of federal law invoked by the petitioner was clearly established by the Supreme Court at the time of the state

---

[11] *E.g., Panetti v. Quarterman,* ___ U.S. ___, 127 S. Ct. 2842, 2858-59 (2007); *Fry v. Pliler,* ___ U.S. ___, 127 S. Ct. 2321, 3326-27 (2007); *Young v. Sirmons,* 486 F.3d 655, 662-63 (10th Cir. 2007), *petition for cert. filed 12/13/07; Snow v. Sirmons,* 474 F.3d 693, 696-97 (10th Cir. 2007); *Maynard v. Boone,* 468 F.3d 665, 669-71 (10th Cir. 2006), *cert. denied,* ___ U.S. ___, 127 S. Ct. 1819 (2007); *Stevens v. Ortiz,* 465 F.3d 1229, 1234-35 (10th Cir. 2006), *cert. denied sub nom, Zavaras v. Stevens,* ___ U.S. ___, 127 S. Ct. 1833 (2007).

[12] *Snow,* 474 F.3d at 696 (quoting *Woodford v. Visciotti,* 537 U.S. 19, 25 (2002)).

court judgment.'"[13]

A state court's decision is "contrary to" if it "'arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts.'"[14]  Conversely, a state court's decision "is not contrary to clearly established federal law even if a state court has no awareness of controlling Supreme Court precedent, 'so long as neither the reasoning nor the result of the state-court decision contradicts [that] precedent.'"[15]  In applying the "contrary to" AEDPA standard to "a summary disposition by a state court, [the] focus [is] on its result rather than any reasoning."[16]  "However, when applying AEDPA to fully reasoned

---

[13]  *Young,* 486 F.3d at 662 (quoting *Turrentine v. Mullin,* 390 F.3d 1181, 1189 (10th Cir. 2004)).

[14]  *Id.* at 662-63 (quoting *Torres v. Lytle,* 461 F.3d 1303, 1311 (10th Cir. 2006)).  In one decision, the Tenth Circuit stated the test this way:  "to repeat the Seventh Circuit, the state court decision must be 'at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary as to be unreasonable.'"  *Maynard,* 468 F.3d at 671 (quoting *Badelle v. Correll,* 452 F.3d 648, 655 (7th Cir. 2006)).

[15]  *Stevens,* 465 F.3d at 1235 (quoting *Early v. Packer,* 537 U.S. 3, 8 (2002)).  For example, if a state court does not refer to federal law but applies "a state standard 'equally or more favorable to [petitioner] relative to the federal standard,'" then the federal habeas court will treat "the state court's adjudication of [the petitioner's] federal constitutional claims as an adjudication on the merits and accord its decision AEDPA deference."  *Lamb v. Oklahoma Cty. Dist. Ct.,* 229 Fed. Appx. 690, 692-93 (10th Cir. 2007) (quoting *Harris v. Poppell,* 411 F.3d 1189, 1196 (10th  Cir. 2005)).

[16]  *Stevens,* 465 F.3d at 1235 (citing *Saiz v. Ortiz,* 392 F.3d 1166, 1176 (10th Cir. 2004), *cert denied,* 545 U.S. 1146 (2005) and *Aycox v. Lytle,* 196 F.3d 1174, 1177 (10th Cir. 1999)).

opinions by state courts, this circuit has not focused solely on the result 'where the state court's explicit *reasoning* contravenes Supreme Court precedent.'"[17]

A state court's legal conclusion is an "unreasonable application" of clearly established federal law "only 'if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'"[18]  As such, this Court is "precluded from granting habeas relief where . . . the state court was merely erroneous or incorrect in its application of federal law" and may only grant relief if "convinced the state court's application of federal law goes beyond being erroneous and instead becomes objectively unreasonable."[19]

Under § 2254(d)(2), a state decision rests on an "unreasonable determination of the facts" if Petitioner shows by "clear and convincing evidence" that the factual finding is erroneous.  Otherwise, the factual findings are presumed

---

[17]  *Stevens,* 465 F.3d at 1235 (emphasis original in quote from *Brown v. Uphoff,* 381 F.3d 1219, 1225 (10th Cir. 2004), *cert denied,* 543 U.S. 1079 (2005)).

[18]  *Young,* 486 F.3d at 663 (quoting *Torres,* 461 F.3d at 1311).

[19]  *Snow,* 474 F.3d at 696 (citing *McLuckie v. Abbott,* 337 F.3d 1193, 1197 (10th Cir. 2003)).

21

correct.[20]

Even if the state court does decide claims on the merits, in some instances *de novo* review of a claim is appropriate.  If, for example, a claim was presented to the state court but was not decided and is not procedurally barred, then the AEDPA deferential standards are not applicable.[21]  If the state court only addressed one prong of the *Strickland* ineffectiveness test but the federal court must decide the unaddressed prong, then review of that prong is *de novo*.[22]  Likewise, if the state court does not employ the correct legal standard under § 2254(d)(1) thus making its decision "contrary to," then this Court decides the claim *de novo*.[23]

Finally, even if the state court decision was "contrary to" or "unreasonable" and even if the federal court further finds a constitutional violation, habeas relief may not issue unless the violation is of a sort that warrants such relief:

> In 1867, Congress enacted a statute providing that
> federal courts shall have power to grant writs of habeas

---

[20]  *E.g., Rice v. Collins,* 546 U.S. 333, 339 (2006); *Miller-El v. Dretke,* 545 U.S. 231, 240 (2005); *Allen v. Reed,* 427 F.3d 767, 771 (10th Cir. 2005); 28 U.S.C. § 2254(e)(2).

[21]  *E.g., Sperry v. McKune,* 445 F.3d 1268, 1274-75 (10th Cir.), *cert. denied,* 127 S. Ct. 597 (2006); *Chrisman v. Mullins,* 213 Fed. Appx. 683, 686 (10th Cir.), *cert. denied,* 127 S. Ct. 3012 (2007).

[22]  *E.g., Rompilla v. Beard,* 545 U.S. 374, 390 (2005).

[23]  *E.g., Trammell v. McKune,* 485 F.3d 546, 550 (10th Cir. 2007); *Stevens,* 465 F.3d at 1235.

> corpus . . . .   Over the years, the federal habeas corpus
> statute has been repeatedly amended, but the scope of
> that jurisdictional grant remains the same.  It is, of
> course, well settled that the fact that constitutional error
> occurred in the proceedings that led to a state-court
> conviction may not alone be sufficient reason for
> concluding that a prisoner is entitled to the remedy of
> habeas.

*Terry Williams v. Taylor,* 529 U.S. 362, 374-75 (2000) (internal quotations and

citations omitted).[24]

# V.  Certain Pretrial/Preliminary Issues

## A.  *Change of Venue*

In one of the many assertions in Ground 3 of the federal petition, Bartlett

faults his attorney for failing to move for a change of venue.  He raised the same

issue in Ground 13 of the State Petition, which the trial judge summarily dismissed

as without a showing of prejudice.  *See Doc. 1* at 9A2; *State Petition* at 106-07;

*Record Proper* at 1715.

Bartlett asserts that he "repeatedly asked counsel to pursue a motion for a

---

[24] *See also, e.g., Terry Williams,* 529 U.S. at 375 (errors that undermine confidence in fundamental fairness and ineffective assistance of counsel qualify for habeas relief); *Turrentine v. Mullin,* 390 F.3d 1181, 1189 (10th Cir. 2004), *cert. denied,* 125 S. Ct. 2544 (2005); *Valdez v. Bravo,* 244 Fed. Appx. 864, 867 (10th Cir. 2007) ("Habeas relief will not be granted for non-structural constitutional error unless the error 'had substantial and injurious effect or influence in determining the jury's verdict'" under *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993)), *petition for cert. filed 12/5/07.*

change of venue because of the prominence of Jeff Unser's family in the

Albuquerque area and the news media coverage." *State Petition* at 106.   In support,

he points to a comment made by a grand juror and repeated by the prosecutor that

"everyone knows the Unser name," and the fact that one grand juror was

acquainted with Unser's father during high school.  *See id.* at 106.  He submitted

the page of the grand jury proceedings that reveal this exchange, but not the pages

where the conversation would logically follow-up on the topic.  *See Petitioner's*

*Supplements* (partial grand jury transcript dated 11/27/97, containing page 1

followed by page 5).

　　　　During voir dire of the petit jurors, after the trial judge read the indictment

specifying the victims by name, he asked whether any jurors "know of any of the

facts or circumstances about the incident or the occurrences set forth in the

indictment?"  *Transcript Vol. IX* at 7; *see also id.* at 2-5 (indictment previously read

in full).  None of the jurors responded that they knew the victims or had heard of

the case.  *See id.* at 7-19.  When the prosecutor asked whether any potential juror

knew or heard of Unser or Benjamin, again no one responded.  *Id.* at 21 ("Let me

indicate for the Record that no one has.").  The prosecutor also mentioned that

there "was some publicity in the newspapers about the bodies and two chairs," and

asked if "anyone recall[ed] hearing anything or any publicity about this case."  *Id.*

24

at 26.  Three of the forty-eight member panel – Ms. Ball, Ms. Burnett, and Ms.

Hammer – raised their hands in response.  *See id.* at 26-27, 44; *Record Proper* at

164-66.[25]

Ms. Ball and Ms. Burnett could not remember any details and had not

formed an opinion about the case, but Ms. Burnett was acquainted with the person

who discovered the victims' bodies in his yard.  *See id.* at 27, 44.  Ms. Hammer

remembered hearing "something about the case, and I remember they said

something that the Unser wasn't related to Al Unser."  *Transcript Vol. IX* at 27; *see

also id.* at 44.  All three stated they would be fair and impartial.  *See id.* at 44.

To prevail on an ineffectiveness claim for failure to move for a change of

venue, Bartlett "must show, at a minimum, that the trial court would have or

should have granted a change of venue motion.  This, in turn, requires him to show

actual or presumed prejudice on the part of jurors," meaning the petit jurors who

sat on his case.  *Tafoya v. Tansy,* 9 Fed. Appx. 862, 871 (10th Cir. 2001) (citing

*Hale v. Gibson,* 227 F.3d 1298, 1332 (10th Cir.), *cert. denied,* 533 U.S. 957 (2001),

and *Meeks v. Moore,* 216 F.3d 951, 961 (11th Cir. 2000), *cert. denied,* 531 U.S. 1159

---

[25]  Defense counsel did not ask about media coverage, and focused on other lines of
questioning during voir dire.  *See Transcript Vol. IX* at 88-121.

(2001)).

Bartlett's case does not present one of the few rare instances where the Supreme Court will presumed prejudice. *See, e.g., Hale,* 227 F.3d at 1332-33 (and Supreme Court cases discussed therein). Furthermore, prejudice would not be presumed even if Bartlett could demonstrate "'that **all** the potential jurors knew about the case and that there was **extensive** pretrial publicity.'" *Id.* at 1332 (quoting *Stafford v. Saffle,* 34 F.3d 1557, 1567 (10th Cir. 1994), *cert. denied,* 514 U.S. 1099 (1995)) (emphasis added).

To establish "actual prejudice," Bartlett must show "that one or more jurors believed before trial that petitioner was guilty and that they could not set these pre-formed opinions aside at trial." *Tafoya,* 9 Fed. Appx. at 872 (citing *Hale,* 227 F.3d at 1333). Conversely, there is no error of constitutional dimension where "the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd,* 366 U.S. 717, 723 (1961); *see also Hale,* 227 F.3d at 1333.

None of the three panel members who had some recollection of publicity believed Bartlett was guilty and could not set aside that belief. This is certainly

true for Ms. Ball, the only one of the three who was seated on Bartlett's jury.[26]

Indeed, Bartlett makes no assertion that she was biased, and any attempt to do so

would be pure speculation, which is insufficient as a matter of law to establish

counsel's ineffectiveness for failing to either change venue or failing challenge her

being seated as a juror.  *Tafoya*, 9 Fed. Appx. at 871.  Therefore, I find that the trial

judge's summary decision is neither "contrary to" nor "unreasonable" under

AEDPA, and that this aspect of Claim 3 should be dismissed.

## B.  Fourth Amendment – "Exigencies"

After the police arrived on the scenes where the victims' bodies and gun

were found, they were sent to Pete's Bar parking lot where the bloody truck was

discovered.  From there they went to Petitioner's trailer, where they also found

blood and the distinctive tire patterns, but received no response when they yelled

and pounded on the door.  Rather than wait for a warrant to search, the situation

was deemed an emergency and they went into the trailer.  There they found

Bartlett and the bloody scene of the slaying.

One theme that underlies several of Bartlett's claims is that there was no

---

[26]   Both Ms. Burnett and Ms. Hammer were challenged and dismissed from the panel.
*See id.* at 129, 131, 134; *Record Proper* at 165-66.  Another juror requested to be dismissed as
"unqualified" because she had been the victim of a crime and a witness in a criminal trial, and
she too was excused.  *Id.* at 43.

"exigency" for the warrantless entry into his home or for his arrest.  Over the course of many claims, he repeatedly cites the examples of what he believes are conflicting officer testimony or reports that undermine whether an emergency situation actually existed:

- Whether blood was "dripp*ing*" from the truck as one officer stated, or whether it had "dripp*ed*" as another stated.  In Bartlett's view, the difference between actively flowing blood and a settled pool of blood is significant because the New Mexico Supreme Court relied on "dripp*ing* blood" in upholding the finding of exigency.[27]

- How much time elapsed between when the officers first arrived on the scene of either the truck or his trailer, what they did and observed, and when they finally entered the house.  Bartlett maintains that the officers were on the scene at 1:00 p.m., but did not decide an exigency existed until 3:00 p.m.  He further maintains that the prosecutor on the scene originally wanted to secure a warrant to enter the trailer, but was persuaded not to wait until it arrived.[28]

- What the officers were doing outside of the house and specifically, whether the television was on such that it could be heard.  Bartlett believes this is a significant fact because the New Mexico Supreme Court "relied" on the volume of the

---

[27] *See State Petition* at 87-88, 95 (Ground 9); *id.* at 112 (Ground 15); *id.* at 163-64 (Ground 37); *id.* at 171 (Ground 38); *see also id.* at 244-45 (Ground 48(B)).

[28] *See id.* at 90 (Ground 9); *id.* at 110-12 (Ground 15); *id.* at 155 (Ground 35); *id.* at 160-69 (Ground 37); *id.* at 170 (Ground 38); *id.* at 213 (Ground 44).

television to support his conviction.[29]

- Whether Bartlett was sitting up in bed with his eyes open or with them closed.[30]

- Whether Bartlett noticed his chairs missing when he was arrested and asked an officer about them.[31]

He claims that these situations illustrate that: his attorneys were ineffective at all stages of litigation (from pretrial proceedings to lack of an interlocutory appeal, through appeal and failing petition the Supreme Court of the United States on the failed Fourth Amendment issues); the prosecutor committed misconduct during trial; and the New Mexico Supreme Court's decision was erroneous.[32]

The record reveals that defense counsel moved to suppress all of the physical evidence taken from Petitioner and his trailer, all of his statements given to police while in custody, and any other "fruits" evidence, on the ground that the warrantless entry into his home and warrantless arrest were unconstitutional. *See*

---

[29] *See id.* at 89-91 (Ground 9); *id.* at 167 (Ground 37); *id.* at 171 (Ground 38); *id.* at 224-25 (Ground 46(D)); *id.* at 245 (Ground 48(C)).

[30] *See id.* at 87 (Ground 9); *id.* at 167 (Ground 37); *id.* at 171 (Ground 38).

[31] *See id.* at 85-86 (Ground 9).

[32] *See, e.g., supra* notes 27-31; *see also State Petition* at 112 (Ground 15 re: trial counsel failing to take interlocutory appeal of Fourth Amendment issues); *id.* at 145-46 (Ground 31 re: failure to petition Supreme Court re: Fourth Amendment issues).

*Record Proper* at 73-75.  After holding an evidentiary hearing, the trial judge denied

the motion.  *See id.* at 76-77; *Transcript Vol. VII* at 86-87.  His written rationale

concluded "that the officers had probable cause and exigent circumstances justified

a warrantless entry into the house," presumably holding that the same applied to

the warrantless arrest.  *Record Proper* at 119.

On appeal, counsel for the defense argued that the trial judge erred in

finding that exigent circumstances justified a warrantless arrest and thus the

evidence should have been suppressed.  *See Answer,* Exh. F at 21-24.  The New

Mexico Supreme Court rejected this argument.  *See id.,* Exh. L at 3-4.

It is well established under Fourth Amendment principles that exigent

circumstances will permit a warrantless entry into a home or seizure of a person,

and the key inquiry is the objective reasonableness of the officers' beliefs and

conduct.  *E.g., Brigham City, Utah v. Stuart,* 547 U.S. 398, ___ 126 S. Ct. 1943,

1947 (2006); *United States v. Layman,* 244 Fed. Appx. 206, 210-11 (10th Cir. 2007),

*petition for cert. filed 10/23/07.*  Those are the standards the New Mexico Supreme

Court applied – it held that to justify a warrantless arrest the officer must have had

probable cause, exigent circumstances such as imminent danger to life or

destruction of evidence, and that the officer's conduct must be reasonable.  *See*

*Answer,* Exh. L at 3-4.

30

After reciting background facts that included "[b]lood was dripping out of the tail gate onto the bumpers and tail pipe [and] Sheriff's deputies learned that the truck belonged to Bartlett" and he lived nearby, *id.,* at 2, the New Mexico Supreme Court found "[a]bundant evidence existed to show probable cause and exigent circumstances," *id.* at 3. It reasoned:

> Here, the evidence deputies found in connection with Bartlett's truck appeared to match evidence at the murder scene. The orange seat cushions in Bartlett's truck appeared to match the chairs found at the murder scene and the dually tire tracks at the murder scene appeared to match those behind Bartlett's truck. This evidence along with the blood trial leading to Bartlett's trailer supported deputies' concern for possible additional injured persons. Deputies also heard a television set when they approached Bartlett's residence, suggesting that someone was inside the house, either someone injured or someone who might destroy evidence if the deputies did not enter the premises immediately. Moreover, the police found one decommissioned gun, also suggesting that the suspect might destroy evidence.

*Id.* at 3-4.

Federal courts have no authority to grant habeas relief from a state conviction on Fourth Amendment grounds if the defendant had a full and fair opportunity to litigate the constitutional issue in the state courts. *Stone v. Powell,* 428 U.S. 465, 482 (1976). "The opportunity for full and fair litigation 'includes, but is not limited to, the procedural opportunity to raise or otherwise present a

Fourth Amendment claim,' a 'full and fair evidentiary hearing contemplated by *Townsend . . . ,*' and state court 'recognition and at least colorable application of the correct Fourth Amendment constitutional standards.'" *Anderson v. Kansas,* 221 Fed. Appx. 762, 765 (10th Cir. 2007) (internal citations omitted).

Bartlett was afforded this procedural opportunity, as well as an evidentiary hearing, and the New Mexico Supreme Court's application of the law was not contrary to Fourth Amendment principles.  Therefore, I find the above Fourth Amendment claims are barred under the *Stone* rationale.[33]

The *Stone* limitation on federal habeas review does not extend to the ineffective assistance of counsel context.[34]  Nonetheless, I also find that none of the factual issues and alleged errors Petitioner raises are sufficient, either alone or in combination, to render the New Mexico Supreme Court's decision on the merits unreasonable.

It is true that the New Mexico Supreme Court was completely wrong when, in the factual background section, it mentioned the bloody truck belonged to

---

[33] *See, e.g., Cappeli v. Zavaras,* 2007 WL 2733714 (10th Cir. 2007) ("the record reflects that [petitioner] raised his Fourth Amendment claim in the state courts [and] was afforded two hearings [and the] trial court determined that probable cause existed . . .  Accordingly, the district court correctly determined that [*Stone* barred] habeas corpus relief on his Fourth Amendment claim.").

[34] *E.g., Kimmelman v. Morrison,* 477 U.S. 365, 397, 382-83 (1986).

Petitioner.  *See, e.g., State Petition* at 112.  There was absolutely no basis for the finding.  Nothing in the briefs supports it, nor was there any evidence of the same during an evidentiary hearing.[35]  But I do not find that the ownership of the vehicle was critical, or even material, to the New Mexico Supreme Court's decision.  Instead, at the time the officers were investigating, the crucial facts were these:  the truck was bloody; it contained cushions connected with the victims; the same tire tracks were found outside the trailer; there was blood outside the trailer; no one was answering their shouts and pounding; and a partially dissembled gun had already been found a short distance from the victims.[36]

---

[35]  *See, e.g., Answer,* Exh. D at 2 ("The truck, which was registered to Lee Benjamin"); *id.,* Exh. F at 7 ("Roberts told Sergeant Frazee that he knew the owner of the truck, and was afraid that he was the next to be killed," but brief does not identify Bartlett as the owner); *id.,* Exh. G at 2-4 (does not identify who is the owner of the truck); *id.* at 4-5 ("The truck was connected to Defendant's residence by its distinctive tracks"); *id.,* Exh. H at 6 ("There were no fingerprints, palm prints, or DNA found at the scene at which the bodies had been discovered, or the scene at which the pick-up truck had been discovered, which was connected with Mr. Bartlett."); *Transcript Vol. VII* at 33 (at the time dispatched to scene where truck located officer did not "know who the owner of the truck was"); *id.* at 34-35 (at scene requested other officers to run a search for the truck owner, later they were given that someone other than the victims owned the truck, but that name was not Petitioner's and it was wrong in any event).

[36]  Although Petitioner disputes whether a television could be heard, there was some evidence at the evidentiary hearing and in the briefs on appeal to support that finding.  Detective Ortiz was not certain, but thought Detective Marquez said he heard a television, but admitted that officers' report did not mention a television.  *See Transcript Vol. VII* at 39 ("I believe one of the [other] detectives . . . may have heard a T.V."); *id.* at 63 (admitting report makes no mention of having heard something); *Answer,* Exh. G at 4 ("Det. Ortiz believed that one of the officers heard a television inside.").  Even assuming that none of the officers heard a television, and they were instead acting only on the lack of response to their calls and pounding, for the same reasons above there is no prejudice from the New Mexico Supreme Court's reliance on this as a fact.

33

These undisputed facts are legally sufficient in my view to establish exigency. All of the other facts or matters Petitioner focuses on are immaterial because they do not impact or change these crucial facts. Thus, I find that the state decision is not "unreasonable," either under AEDPA or under a *de novo* review of the Fourth Amendment claims.[37]   Accordingly, I recommend that the Fourth Amendment "exigency" aspects of Claims 3, 4, and 5 be dismissed. *See Doc. 1* at 9A1, 9A4, 10A2, 10B1-10B3.

## C.  *Speedy Trial & Discovery Delays*

Bartlett was arrested on November 19, 1995, and trial commenced approximately sixteen months later on March 11, 1997. *See, e.g., Record Proper* at 1; *Transcript Vol. IX* (at cover). He claims the prosecutor "intentionally" delayed trial by withholding discovery and misleading the judge on how long it would take the crime laboratory to complete testing. He faults the trial judge for not strictly enforcing his discovery orders and for not imposing sanctions when they were

---

[37]  *See, e.g., Goble v. Saffle,* 188 Fed. Appx. 723, 733 (10th Cir. 2006) ("The rejection of the argument by the state courts at each stage may indicate that the argument would have been rejected even with the additional evidentiary material that appellant contends should have been provided. . . .  But we do not base our holding on the second prong of *Strickland* concerning prejudice.  We are convinced that appellant was provided adequate assistance of counsel."); *Griffin v. Lemaster,* 179 Fed. Appx. 555, 560-62 (10th Cir.) (meritless Fourth Amendment claims cannot form basis for claims of ineffectiveness of trial and appellate counsel), *cert. denied,* 127 S. Ct. 687 (2006).

ignored.  He also faults his trial attorney for complaining about the delay but not

filing a motion to dismiss based on speedy trial grounds.  Bartlett asserts that as a

result of the delay, the defense learned on the eve of trial that the gunshot residue

tests "exculpated" him; witness memories faded; one of his alibi witnesses moved;

the prosecution had time to "fabricate" a case by either altering, destroying, or

losing evidence, or giving the perpetrators "time to confer;" and he became

disheartened and desperate.[38]

The speedy trial claim was not raised on direct appeal, but was raised in post-

conviction proceedings.  The trial judge issued a comprehensive analysis of the

speedy trial issue, finding that although the sixteen-month delay was presumptively

prejudicial, the case involved intermediate complexity, and the balance of the four

*Barker* factors did not establish a constitutional violation.  *See Record Proper* at

1811-19; *see also Barker v. Wingo,* 407 U.S. 514, 530-32 (1972).

The legal approach the trial judge employed is not "contrary to" clearly

established Supreme Court precedent because he followed a state decision that

follows the Supreme Court's decision in *Barker.*[39]  In addition, the finding that a

---

[38] *See State Petition* at 102-104 (Ground 12); *id.* at 191-201 (Ground 41); *id.* at 207-08
(Ground 43(B)); *id.* at 226-29, 235-36 (Grounds 47(A), (G)).

[39] *See, e.g., Record Proper* at 1812 (citing *Salandre v. State,* 111 N.M. 422, 425-30, 806
P.2d 562, 565-70 (N.M. 1991), which in turn follows the Sixth Amendment principles

delay of more than one year qualifies for presumptive prejudice is consistent with the Supreme Court's decision in *Doggett* and the finding of presumptive prejudice means that the four *Barker* factors must be evaluated and weighed.[40]

Nor do I find the trial judge's application of the four factors[41] and ultimate decision "unreasonable."  As to the reasons for the delay, he found that they weighed against the State because:  it needed several continuances to finish investigating and preparing its case; it was "negligent" in completing testing; and it needed to postpone the trial because an officer was on his honeymoon.  He found this first factor did not weigh "heavily" against the State, but rather, only "slightly."  *See Record Proper* at 1813-16.  The degree to which the factor weighs against the State fluctuates with the length of delay.  Because the delay here was relatively

---

announced by Supreme Court decisions, including *Barker*)); *Jackson v. Ray,* 390 F.3d 1254, 1260 (10th Cir. 2004) ("The OCCA cited *Stohler,* which refers to the *Barker* . . . test; hence it identified the appropriate legal principles for adjudicating this claim."), *cert. denied,* 546 U.S. 834 (2005).

[40]   *See Doggett v. United States,* 505 U.S. 647, 652 n.1 (1992) (generally lower courts hold delay approaching one year presumptively prejudicial); *Jackson,* 390 F.3d at 1261 (same); *Elston v. Roberts,* 232 Fed. Appx. 824, 827 (10th Cir. 2007) (delays of four, five, and seven and a half months are not presumptively prejudicial); *Metoyer v. Scott,* 70 Fed. Appx. 524, 530 (10th Cir. 2003) ("For purposes of this case, we assume presumptive prejudice for the fifteen-month delay.").

[41]   The four factors are "(1) the length of the delay, (2) the reason for the delay, (3) whether the defendant asserted his right to a speedy trial, and (4) whether the delay prejudiced the defendant." *Jackson,* 390 F.3d at 1262 (citing *Barker,* 407 U.S. at 530).

short – just over a year – I cannot conclude that assigning a "slight" weight to this factor is unreasonable.  At most, the weight should have been only "moderate."[42]

The trial judge weighed the "assertion of the right" factor "slightly" against Bartlett.  He assumed as true Bartlett's assertion that he asked his attorney to move to dismiss the case on speedy trial grounds, and that counsel refused to do so saying the case "was high profile" and elections were "right around the corner."  *Record Proper* at 1816.  The trial judge thus found that Bartlett knew of his right but failed to "assert it on the record (or at least his disagreement with counsel . . . ) particularly as he apparently believed an appellate claim . . . would prevail if it was preserved."  *Id.*  However, finding a waiver and weighing this factor against a defendant appears contrary to *Barker* when the defendant claims the reason why the right was not asserted was ineffective assistance of counsel.

It is true that the *Barker* decision provides that "[t]he more serious the deprivation, the more likely a defendant is to complain," 407 U.S. at 531, and that a defendant's "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial," *id.* at 532.  But the *Barker* decision also

_____

[42]  *See Jackson,* 390 F.3d at 1262 (if no assertion of deliberate delay or that defendant caused delay, "courts must conclude negligence on the part of the government and weigh the second *Barker* factor **moderately** against the state.  *See Doggett,* 505 U.S, at 656-57; *Barker,* 407 U.S. at 531, 533-35; *Strunk v. United States,* 412 U.S. 434, 436 (1973).") (emphasis added).

specifically noted that it is impermissible to presume a waiver of the right to speedy

trial from silence in the record – "Such an approach, by presuming waiver of a

fundamental right from inaction, is inconsistent with this Court's pronouncements

on waiver of constitutional rights." *Id.* at 525.  In finding that the *Barker* defendant

"did not want a speedy trial," the Court specifically observed that there was "[n]o

question is raised as to the competency of [his] counsel." *Id.* at 534.[43]

    In addition, the record does not completely support the trial judge's finding

of waiver.  Although counsel did not file a motion to dismiss on speedy trial

grounds, he argued on several occasions that his client's speedy trial rights were

prejudiced by the State's repeated delays in completing the case and providing the

requested discovery to the defense.  Indeed, counsel insisted that the State provide

discovery without delay from the outset.  *See Record Proper* at 63, 71; *Transcript Vol.
I* at 3-4 (motion to compel hearing 1/10/96); *Transcript Vol. II* at 2 (motion to

---

[43] The approach the trial judge took is also directly contrary to the case he cited as
"analogous" support – *Pelletier v. Warden,* 32 Conn. App. 38, 50, 627 A.2d 1363, 1370 (Conn.
App. 1993).  He cited *Pelletier* for the proposition that if lack of assertion of right is blamed on
ineffective assistance of counsel, then the factor does not weigh against the State or Bartlett.  In
other words, the factor is neutral as to both parties.  *See Record Proper* at 1816-17.  In *Pelletier,*
however, the judge concluded that because the defendant asked counsel to pursue a speedy trial
motion, the factor weighed in favor of the defendant.  *Pelletier,* 32 Conn. App. at  50, 627 A.2d
at 1370 ("there is sufficient information in the record from which it may be concluded that the
petitioner **had requested** and legitimately expected that counsel was pursuing enforcement of his
constitutional rights to a speedy trial.  Consequently, for purposes of our analysis, we consider
this factor to weigh in favor of the petitioner.") (emphasis added).

compel hearing 4/3/96); *Transcript Vol. III* at 1-3; *Transcript Vol. IV* at 4-5, 10.

Nevertheless,

> the fact that [a state court] has made findings regarding the *Barker* factors that are contrary to clearly established Supreme Court precedent is insufficient to grant habeas relief. Habeas relief is only available if there is no possible balancing of the factors that both supports [the state court's] ultimate decision and is not contrary to clearly established Supreme Court precedent.

*Jackson*, 390 F.3d at 1266-67. And, in the ineffective assistance of counsel context, Bartlett must show that a motion to dismiss on speedy trial reasons would have been granted.[44] Neither is the case here.

The trial judge held both that there was no speedy trial violation and that any such motion "would likely not have prevailed," because Bartlett demonstrated "no prejudice" – "nil" – and that factor "weighs heavily against him." *Record Proper* at 1817-18. In finding no prejudice, the trial judge held that the loss of one alibi witness would have been cumulative and the defense made no assertion of what

---

[44] *E.g., United States v. Clingman*, 288 F.3d 1183, 1187 (10th Cir. 2002) ("defendant's claim that he was prejudiced by his trial counsel's failure to move to dismiss the indictment on speedy trial grounds is without merit"); *Hurn v. McGuire*, 2005 WL 1076100 at *7 (D. Kan. 2005) ("Even assuming that trial and appellate counsels' failure to raise a speedy trial claim constituted sufficient "unprofessional error," Hurn has failed to establish prejudice. It certainly cannot be said that "but for" counsels' failure to raise a speedy trial claim, Hurn would have been successful in overturning his conviction. Instead, as the foregoing review of the factors set forth in *Barker* indicates, any speedy trial motion brought by Petitioner's trial counsel would most likely have been unsuccessful.").

other unidentified alibi witnesses would have said. *Id.* at 1817. He also held

Bartlett did not provide "facts" showing he was "desperate and disheartened such

that his psychological state hampered his defense" or that the prosecutor and

prosecution

> fabricated the case against him. . . . The asserted
> prejudice resulting from the alleged fabrication as
> discussed below as to Grounds 14 [presumably referring
> to stains on Petitioner's pants not present on arrest], 15
> [same, warrantless entry based on asserted emergency],
> and 17 [same, portions of videotape of Petitioner's
> interrogation missing] of the Petition moreover is nil.
> Finally, to the extent Bartlett argues that dimming of
> witness memory resulted from delay in his case being tried
> prejudice him, Bartlett provides no base for habeas relief
> [because under] *Humphrey v. Cunningham,* 584 A.2d 763,
> 768-69 (N.H. 1990) [the] dimming of witness' memories
> alone is insufficient to establish prejudice resulting from
> delay in speedy trial.

*Id.* at 1818.

Where, as here, the substance of missing alibi witnesses' testimony is before

the jury through other witnesses,[45] I cannot conclude the trial judge's finding of no

prejudice is unreasonable. *See Jackson,* 390 F.3d at 1266. A "possibility of

prejudice" is not sufficient to find a violation of speedy trial rights. *See United States*

*v. Loud Hawk,* 474 U.S. 302, 315 (1986).

---

[45] The subject of alibi is discussed in depth later in these proposed findings.

Even if I independently concluded that the "assertion of the right" factor should weigh heavily in Petitioner's favor, it does not follow that the trial judge's ultimate result is unreasonable given that he found that the prejudice factor weighed heavily against Bartlett and found the other factors did not weigh heavily against the State. *See Jackson,* 390 F.3d at 1267 (although prejudice is not essential, "there is . . . reluctance to find a speedy trial deprivation where there is no prejudice.") (internal quotations and citation omitted); *see also, e.g., Campbell v. Greene,* 440 F. Supp. 2d 125, 145 (N.D.N.Y. 2006) (Second Circuit holds the same, and decision from that court specifically held that "'[i]n the absence of a showing of prejudice, courts generally will not find a speedy trial violation unless all of the remaining *Barker* factors weigh heavily in favor of the [petitioner],'" quoting *Dunavin v. Leonardo,* 1997 WL 151771 at * 3 (N.D.N.Y. 1997)).

Finally and "[m]ost importantly, there is no clearly established Supreme Court law mandating a balancing that reaches a result contrary to the [trial judge's] decision." *Jackson,* 390 F.3d at 1267; *see also LaVoy v. Snedeker,* 2004 WL 3778602 at *17 (D.N.M. 2004) ("The Supreme Court has never issued a decision involving materially indistinguishable facts to the [Petitioner's] speedy trial issue.").

Accordingly, I recommend that the speedy trial aspect of Claims 3, 4, and 7 be rejected. *See Doc. 1* at 9A1-9A2, 10B5-10B6, 10B9, 10C2, 10D, 10D2-10D3.

41

### D.  *Procedurally-Defaulted Claims*

In his State Petition Bartlett raised eleven separately-numbered claims of

prosecutorial misconduct during trial and one multi-faceted claim of trial court

errors during trial.  *See State Petition* at 153-223, 226-244 (Claims 35-45, and 47(A-

O)).  The state court summarily dismissed all of these claims as procedurally

defaulted because, under *Duncan v. Kerby,* 115 N.M. 344, 851 P.2d 466 (1993), a

state "habeas proceeding does not substitute for direct appeal, and claims based on

facts known or available to petitioner at time of trial are precluded from such a

proceeding, except for claims of fundamental error and ineffective assistance,"

*Record Proper* at 1716-17.

The state rule asserted by the trial judge is generally considered to be

"independent" and "adequate" for federal habeas procedural default purposes.  *See,*

*e.g., Jackson v. Shanks,* 143 F.3d 1313, 1318-19 (10th Cir.), *cert. denied,* 525 U.S. 950

(1998); *Tisthammer v. Williams,* 49 Fed. Appx. 757, 764 & n.4 (10th Cir. 2002), *cert.*

*denied,* 538 U.S. 928 (2003).  Yet, the trial judge did not discuss the applicability of

the exceptions to Bartlett's state claims, and in federal court ineffective assistance

of counsel can also constitute cause for a procedural default.

I need not address these difficult issues further, however, because below I

have considered the heart of the assertions that underlie Bartlett's overlapping

claims.  As a practical matter then, I have addressed the prosecutorial misconduct

and related trial court error claims below.

## VI.  State Court's Use Of *Strickland* Is Not "Contrary To," But Characterizing All Of Bartlett's Assertions Of Prejudice As "Conclusory" Is Unreasonable

Almost every issue the state judge addressed in his summary and merits

decisions involved the application of the two-prong test from *Strickland v.*

*Washington,* 466 U.S. 668 (1984).  The judge's decisions disposed of the claims on

either or both of the *Strickland* prongs while giving deference to counsel.  *See Record*

*Proper* at 1715-16 (summary disposition of claims Claim 13, 16, 17, 18, 23, 25-32);

*id.* at 1761- 1828 (decision on merits of claims 3-7, 9, 12, 14, 15, 22).

Under *Strickland,* Petitioner must show that counsel's conduct was

constitutionally deficient and that but for the conduct, the result of the proceeding

would have been different.  The inquiry is highly deferential.  Failure to meet either

prong defeats an ineffectiveness claim, and if it is easier to dispose of a claim on the

prejudice prong, that is the course the court should follow.  *E.g., Strickland,* 466

U.S. at 689, 697; *Smith v. Robbins,* 528 U.S. 259, 286, n.14 (2000).

Petitioner at times cites the *Strickland* standard, but also cites *United States v.*

*Cronic,* 466 U.S. 648 (1984), and frequently contends that his attorney provided "no adversarial testing" of the State's case. *See, e.g., Doc. 1* at 9A, 9A1, 9A6; 10F1; *State Petition* at 55-56, 66, 69, 95, 131. *Cronic* was decided the same day as *Strickland* and discusses examples where the Court believed prejudice from counsel's ineffectiveness could be presumed. The presumption may apply where "counsel ***entirely*** fails to subject the prosecution's case to meaningful adversarial testing." *Cronic,* 466 U.S. at 659 (emphasis added). To qualify for this exception, however, counsel must fail to oppose the State's case throughout the proceeding as a whole, and not just at certain points. *See Bell v. Cone,* 535 U.S. 685, 697 (2002) ("this is a difference of kind, not degree"); *see also Wright v. Van Patten,* ___ S. Ct. ___, 2008 WL 59980 at *3 ("it does not necessarily follow that mere telephone contact amounted to total absence or 'prevented [counsel] from assisting the accused,' so as to entail application of *Cronic.*").

Although Bartlett uses practically every page of every transcript to illustrate counsel's asserted errors, he is still citing specific instances of claimed ineffectiveness. His arguments are thus "plainly of the same ilk as other specific attorney errors [that are] held subject to *Strickland*'s performance and prejudice components." *Bell,* 535 U.S. at 697-98. Accordingly, I find that the trial judge's use of the two-prong deferential framework under *Strickland* for all of the

ineffectiveness claims was not "contrary to" under § 2254(d)(1).  *See, e.g., id.* at 698.

The state court dismissed many of Bartlett's ineffectiveness claims wholesale on the ground that Bartlett did not provide "specific" facts showing how he was "prejudiced."  In essence, the trial judge considered many of Bartlett's assertions "conclusory."  It is not entirely clear whether he did so as a matter of state law or substantive federal constitutional law.  Two of the cases the trial judge relied upon, for example, do not involve the *Strickland* inquiry.[46]

A number of federal courts, including the Tenth Circuit, hold that conclusory allegations or speculation are insufficient to establish federal habeas

---

[46]  In summarily dismissing claims 13, 16, 17, 18, 23, and 26 through 30, the trial judge cited *In re Ernesto, Jr.,* 121 N.M. 562, 566, 915 P.2d 318, 322 (Ct. App. 1996), for the proposition that an "assertion of prejudice is not a showing of prejudice."  *See Record Proper* at 1715-16.  The prejudice inquiry in *Ernesto* concerned New Mexico's statute that permits juveniles to be sentenced as adults, not *Strickland.*  The case relied on by *Ernesto,* and the case it relied on, and the case it relied on, do not involve *Strickland* or ineffectiveness.  In the merits discussion, the trial judge dismissed various Claim 3, Claim 5, and Claim 9 assertions by citing the Ninth Circuit's decision in *Cooks v. Spalding,* 660 F.2d 738, 740 (9th Cir. 1981), *cert. denied,* 455 U.S. 1026 (1982), for the proposition that "speculation as to prejudice resulting from trial counsel's action, even if such action was erroneous, does not merit habeas relief."  *Record Proper* at 1767-68, 1774, 1783, 1789, 1794, 1797, 1799, 1803, 1805, 1810.  *Cooks* was decided prior to *Strickland.*  The extensive discussion in the Ninth Circuit case relied on by the *Cooks* panel illustrates that whether prejudice was required and the nature of that test was not conclusively settled prior to *Strickland.  See Cooper v. Fitzharris,* 586 F.2d 1325, 1331-32 (9th Cir. 1978), *cert. denied,* 440 U.S. 974 (1979).  The other two decision involve a lack of specificity in the ineffective assistance context and apply *Strickland*-like standards.  *See Record Proper* at 1783, 1811; *State v. Hernandez,* 115 N.M. 6, 17-18, 846 P.2d 312, 323-24 (N.M. 1993); *State v. Torres,* 137 N.M. 607, 613, 113 P.2d 877, 883 (Ct. App.), *cert. denied,* 137 N.M. 522, 113 P.3d 345 (N.M. 2005).

relief, whether under *Strickland* or otherwise.[47]  There is no clearly established

Supreme Court precedent addressing the precise issue, much less holding

differently.  In fact, the Supreme Court did indicate long ago that if a conviction is

to be "be set at naught, it is not asking too much that the burden of showing

essential unfairness be sustained by him who claims such injustice and seeks to

have the result set aside, and that it be sustained not as a matter of speculation but

as a demonstrable reality."  *Adams v. U.S. ex rel. McCann,* 317 U.S. 269, 281

(1942).  I therefore conclude that the trial judge's general legal approach on the

prejudice prong is not "contrary to" under AEDPA.

However, I disagree with the trial judge's characterizations of Bartlett's

assertions of prejudice as "conclusory."  This case does not present the situation

where Bartlett merely recites the *Strickland* prongs as a basis for relief.  Nor does it

present the situation where a court is left to guess about the connection between

counsel's alleged errors and prejudice flowing from them.  Instead, Bartlett's

---

[47]  *E.g., Cummings v. Sirmons,* 506 F.3d 1211, 1229 (10th Cir. 2007) ("these allegations amounted to little more than speculation . . .  Cummings has not presented any evidence . . . remotely establishing that David Potter or Daniel Chick participated in the murders or in disposing of the bodies. Thus, we conclude that Cummings has failed to satisfy either of the *Strickland* prongs"); *Colbert v. Ward,* 183 Fed. Appx. 704, 706 (10th Cir. 2006) (decision not "contrary to" or "unreasonable" under AEDPA because petitioner made "conclusory and vague allegations regarding his trial counsel's professionally unreasonable conduct" and he "presented no evidence that would demonstrate there is a reasonable probability he would not have entered into the guilty plea but for the alleged errors of his counsel.  As such there is no prejudice.").

assertions provide in painstaking detail and by constant repetition why he believes

he was prejudiced.  The bulk of 250-page State Petition is devoted to his view that

if counsel had only done a better job investigating, handling witnesses during trial,

and establishing the faults of officers and prosecutors, then the defense theory of

showing an alibi for Bartlett, exculpatory physical evidence and motive of others

would have prevailed and the jury would have acquitted him.  This is precisely the

inquiry under *Strickland* prejudice prong – "the question is whether there is a

reasonable probability that, absent the errors, the factfinder would have had a

reasonable doubt respecting guilt."  *Strickland,* 466 U.S. at 695.  By isolating single

assertions from the larger context of Bartlett's overall arguments, the trial judge

appears to have imposed a burden of pleading and proof that is too high as a matter

of federal law.[48]  Consequently, in my discussion below, I include the claims that

_____

[48]   The burden of proof for prejudice is a "reasonable" probability.  *See Terry Williams,* 529 U.S. at 406 (2000) (*Strickland* burden of proof is not higher standard of preponderance of the evidence, but rather, "the prisoner need only demonstrate a 'reasonable probability that . . . the result of the proceeding would have been different.'"); *see also Holland v. Jackson,* 542 U.S. 649, 655 (2004) ("use of the unadorned word 'probably' is permissible shorthand when the complete *Strickland* standard is elsewhere recited").  All that is required to plead prejudice in the federal system is a short plain statement.  *See Erickson v. Pardus,* ___ U.S. ___, 127 S. Ct. 2197, 2200 (2007) (under FED. R. CIV. P. 8(a), "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.") (internal quotations and citations omitted); *Price v. Reid,* 161 Fed. Appx. 773, 774 n.2 (10th Cir. 2006) ("Although Rule 2 of the Rules Governing Section 2254 Cases does address to some extent what a habeas petitioner should include in his § 2254  petition, that Rule is not inconsistent with Fed.R.Civ.P. 8(a)'s requirement of 'a short and plain statement" of the petitioner's claim.'").

were summarily dismissed on the prejudice prong as conclusory.

# VII.  Overall, The State Court's Conclusions That Counsel Was Not Ineffective And/Or That Bartlett Was Not Prejudiced Are Reasonable

Having found the state court's characterization unreasonable does not mean the AEDPA standards are entirely inapplicable to the claims that were dismissed summarily.  In his decision on the merits, the trial judge found either that counsel was not ineffective, or Bartlett was not prejudiced, or both.  In so doing, he addressed many of the of factual arguments that are common to almost all of Bartlett's claims.  For the reasons below, I do not find any of the trial judge's ultimate conclusions unreasonable.  For the same reasons I would not reach a different result under a *de novo* standard of review on any claim.

## A.  *Overview & Preliminary Issues*

The trial judge found that a number of counsel's alleged failings were "tactical" decisions.  I agree.  Not only are the tactical reasons evident for the reasons discussed below, but it is proper to presume counsel's conduct was tactical given the defense presented by Bartlett's attorneys:

> When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect.  *See*

48

> *Strickland* . . . .  That presumption has particular force
> where a petitioner bases his ineffective-assistance claim
> solely on the trial record, creating a situation in which a
> court "may have no way of knowing whether a seemingly
> unusual or misguided action by counsel had a sound
> strategic motive." *Massaro v. United States,* 538 U.S. 500,
> 505 (2003).  Moreover, even if an omission is
> inadvertent, relief is not automatic.  The Sixth
> Amendment guarantees reasonable competence, not
> perfect advocacy judged with the benefit of hindsight.
> *See Bell . . . Kimmelman v. Morrison,* 477 U.S. 365,
> 382 (1986); *Strickland . . . Cronic.*

*Yarborough v. Gentry,* 540 U.S. 1, 8 (2003).

The trial court also found that Bartlett suffered no prejudice because the

State's circumstantial evidence against Petitioner was "substantial,"[49] and the

------------------------------------

[49]  To illustrate but a few examples, see *Record Proper* at 1769 ("Bartlett apparently
ignores the substantial circumstantial evidence the State marshaled against him at trial."); *id.* at
1770 ("Bartlett . . . does not demonstrate how the omission if it was introduced at trial would
have created a reasonable probability that Bartlett would not have been found guilty,"); *id.* at
1774 ("the State's evidence compared against the evidence of Bartlett's defense even with the
alleged testimony of Elliott hardly creates a reasonable probability the jury would not have found
Bartlett guilty."); *id.* at 1775 ("Bartlett provides no facts that demonstrate how the testimony, if
introduced at trial, would have created a reasonable probability the jury would not have found
him guilty"); *id.* at 1781 ("the alleged conversation . . . compared against the evidence at trial . . .
hardly creates a reasonable probability that it would have resulted in Bartlett not being
convicted"); *id.* at 1783 ("such expert testimony, if produced, would not necessarily exculpate
Bartlett given all of the evidence the State marshaled at trial . . . and it thus would not produce a
reasonable probability that Bartlett would have been acquitted"); *id.* at 1789 ("the record does
not indicate cross as to either of those facts would have introduced evidence or established a lack
of Roberts' credibility that would have raised reasonable probability that Bartlett's trial result
would have been different"); *id.* at 1794 ("even if the facts Bartlett argues counsel should have
introduced were true[,] the lack of their introduction hardly constitutes prejudice given all the
evidence at trial.  That is, their introduction would not necessarily create a reasonable probability
that Bartlett's trial result would have been different."); *id.* at 1807 ("the lack of a match between
the lifted print and Bartlett, does not necessarily constitute exculpatory evidence, and would

testimony or evidence counsel purportedly should have pursued did "not

necessarily exculpate" Bartlett of either carrying out, or at least participating in, the

murder and disposal of the victims.[50]   Again, I agree.

The factual cornerstones to almost every one of Petitioner's claims are the

assertions that the physical evidence was "exculpatory," the victims were killed at

midnight, he has a solid alibi for that time, others had motive to murder the

victims, State witnesses lied, and prior bad acts were admitted at trial, and he was

not permitted introduce his own version through testimony or videotape.  Yet,

these assertions in large part misrepresent the record, are logically flawed, or are

simply challenge credibility and weight of the evidence, something this Court could

not reweigh even if sufficiency of the evidence were at issue.  *See, e.g., Jackson v.*

---

hardly introduce a reasonable probability, considering all the evidence at trial, that the jury
would conclude Bartlett did not commit or participate in the murders.").

[50]   Again, to illustrate but a few examples, see *id.* at 1762 ("the physical evidence and
expert testimony introduced at trial did not establish and exact time of death . . . therefore the
testimony . . . as to Bartlett being at the Wine Cellar does not necessarily exculpate him."); *id.* at
1774 ("Elliot's testimony [would] not exculpate Bartlett given all the evidence that State
marshaled"); *id.* at 1775 ("the testimony itself does not necessarily exculpate Bartlett of the
murders"); *id.* at 1776 ("Stebelton's alleged testimony, however, . . . does not necessarily
exculpate Bartlett based on all the evidence at trial."); *id.* at 1781 ("the alleged conversation the
anonymous caller overheard . . . does not exculpate Bartlett"); *id.* at 1786 ("none of that
evidence Bartlett argues about necessarily exculpates him such that his trial without that
evidence was unfair"); *id.* at 1803 ("Bartlett . . . fails to demonstrate how this testimony . . .
would have created a reasonable probability the jury would have entertained reasonable doubt as
to [his] guilt"); *id.* at 1807 ("The version of facts that Bartlett argues the impeachment would
have introduced does not necessarily exculpate Bartlett").

*Virginia,* 443 U.S. 307, 319, 324-26 (1979).

Moreover, a legal cornerstone that is central to Bartlett's claims is erroneous and should be rejected at the outset. The jury was instructed that Bartlett could be found guilty "even though he himself did not do the acts constituting the crime" if the State proved beyond a reasonable doubt that he intended the crime to be committed, it was committed, and he "helped, encouraged or caused the crime to be committed." *Record Proper* at 205. Even though he concedes in his federal petition that there was no prejudice from this instruction, Bartlett claims that the State could not hold him liable unless the grand jury had charged him as an "aider and abetter" prior to trial. He also claims that his attorney was ineffective for failing to challenge the instruction for lack of notice by the prosecution to seek accessory liability.[51]

---

[51]   Ground 18 of the State Petition and asserts that:

> the State never disclosed an intention to try Petitioner as an aider and abettor. Instead, the State's theory of this case as revealed in grand jury testimony and the discovery provided by the prosecution was that Petitioner was the person who actually killed Lee and Unser. Defense counsel was ineffective for failing to request any bill of particulars. As a result, it was not until the prosecution's closing argument that the prosecution – for the first time – advanced a theory that Petitioner could be found 'guilty' as an aider and abettor. Petitioner contends that this belated notice deprived him of this state and federal constitutional right to due process, and that his counsel had a duty to object to any aiding and abetting instructions on the grounds of inadequate notice.

Like the federal system, however, New Mexico long ago abolished the distinction between principal and accessory liability.  As such, criminal proceedings comport with due process if an indictment simply alleges principal liability, but an accessory liability instruction is also given at the close of trial.[52]  Thus, the instructions were neither improper, nor was counsel ineffective for failing to challenge them.  Accordingly, I recommend at that this aspect of Claim 3 of the federal petition be rejected.

The above discussion may be sufficient in itself to reject Bartlett's federal petition in its entirety.  Nevertheless, what follows is a discussion of each subject area of claims.

_____

*State Petition* at 121.  The concession in the federal petition cites Ground 18 and states: "Even though **there is no prejudice,** this is a continuing act of recklessness on part of counsel.  Petitioner was not indicted for aiding and abetting, objecting to this was mandatory for inadequate notice." *Doc. 1* at 9A5.

[52]  *See, e.g., Tapia v. Tansy,* 926 F.2d 1554, 1561-62 (10th Cir. ) ("Under New Mexico law, Tapia had sufficient notice to be convicted on the accessory theory, even though the information did not charge him as an accessory.  New Mexico, like many other states, long ago abolished the distinction between conviction as a principal and an accessory, so that the charge as principal includes a corresponding accessory charge. . . .  Given the clarity of the New Mexico case law on this issue, "[the defendant] was on notice that he could be charged as a principal and convicted as an accessory or vice-a-versa."), *cert. denied,* 502 U.S. 835 (1991); *State v. Roque,* 91 N.M. 7, 8-9, 569 P.2d 417, 418-19 (Ct. App.) (an indictment need only allege the offense, not necessarily charge defendant as accessory), *cert. denied,* 91 N.M. 4, 569 P.2d 414 (1977); N.M. STAT. ANN. § 30-1-13 (LexisNexis 2004 & Supp. 2007) ("A person may be charged with and convicted of the crime as an accessory . . . although he did not directly commit the crime and although the principal who directly committed such crime has not be prosecuted or convicted.").  There is no question that the indictment gave Bartlett sufficient notice of the principal offenses. *E.g., Hamling v. United States,* 418 U.S. 87, 117 (1974).

## B.  Failure To Present "Exculpatory" Physical Evidence
## &
## Related Claims

Bartlett contends that counsel failed to properly present physical evidence that "exonerated" him in various ways.  A common theme for some of these claims is that the officers failed to "preserve" certain "exculpatory" evidence and/or the prosecution failed to disclose it.  The clearly established Supreme Court precedent in this area of preserving and disclosing exculpatory evidence are the *Brady/Bagley* and *Trombetta/Youngblood* line of cases.  *E.g., Snow,* 474 F.3d at 711-16; *see also, e.g., Illinois v. Fisher,* 540 U.S. 544 (2004) (per curiam); *Kyles v. Whiteley,* 514 U.S. 419 (1995); *Arizona v. Youngblood,* 488 U.S. 51 (1988); *United States v. Bagley,* 473 U.S. 667 (1985); *Califormia v. Trombetta,* 467 U.S. 479 (1984); *Brady v. Maryland,* 373 U.S. 83 (1963).  The primary distinctions between the two lines of cases are the type of evidence and whether the petitioner is required to show bad faith to establish the constitutional violation.

If the State has "material exculpatory evidence" in its possession and "suppresses or fails to disclose" it, then "the good or bad faith of the prosecution is irrelevant."  *Fisher,* 540 U.S. at 547; *see also e.g., Snow,* 474 F.3d at 710-11.  On the other hand, "the police do not have a constitutional duty to perform any particular

tests." *Youngblood,* 488 U.S. at 59.  Hence, if the State fails to "preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant . . . the failure to preserve this 'potentially useful evidence' does not violate due process," unless Bartlett shows that the police acted in bad faith.  *Fisher,* 540 U.S. at 547-48; *see also e.g., Snow,* 474 F.3d at 716.  No evidence was withheld in Bartlett's case, and all of his assertions fall into the latter category of "potentially useful" evidence rather than "exculpatory" evidence.  Yet, he has not asserted, and certainly has not shown the requisite bad faith.

Another common theme for some of the claims is that the prosecutor should have introduced the allegedly "exculpatory" evidence to the grand jury but did not and, therefore, counsel should have moved to dismiss the indictment based on the prosecutor's failure.  Assuming any of the evidence could properly be characterized as "exculpatory," the Supreme Court has never held that the federal constitution requires a prosecutor to submit such evidence to the grand jury.  In rejecting the argument that the Fifth Amendment requires "[j]udicial supervision of the quantity and quality of the evidence relied upon by the grand jury," *United States v. Williams,* 504 U.S. 36, 51 (1992), the Supreme Court held:

> To the contrary, requiring the prosecutor to present

exculpatory as well as inculpatory evidence would alter
the grand jury's historical role, transforming it from an
accusatory to an adjudicatory body.

It is axiomatic that the grand jury sits not to
determine guilt or innocence, but to assess whether there
is adequate basis for bringing a criminal charge. . . .
neither in this country nor in England has the suspect
under investigation by the grand jury ever been thought
to have a right to testify or to have exculpatory evidence
presented. . . .

Imposing upon the prosecutor a legal obligation to
present exculpatory evidence in his possession would be
incompatible with this system. . . .

. . . the "common law" of the grand jury is not
violated if the grand jury itself chooses to hear no more
evidence than that which suffices to convince it an
indictment is proper. . . .  We reject the attempt to
convert a nonexistent duty of the grand jury itself into an
obligation of the prosecutor. . . .  If the grand jury has no
obligation to consider all "substantial exculpatory"
evidence, we do not understand how the prosecutor can
be said to have a binding obligation to present it.

*Id.* at 51-53.

Furthermore, a grand jury indictment cannot be challenged on the basis that

there was insufficient evidence to support the indictment, the very grounds Bartlett

contends his attorney should have used:

There is yet another respect in which respondent's
proposal not only fails to comport with, but positively
contradicts, the "common law" of the Fifth Amendment

55

grand jury.  Motions to quash indictments based upon the sufficiency of the evidence relied upon by the grand jury were unheard of at common law in England . . .

\* \* \* \* \*

. . . in *Costello v. United States*, where we held that "[i]t would run counter to the whole history of the grand jury institution" to permit an indictment to be challenged "on the ground that there was inadequate or incompetent evidence before the grand jury." . . .  And we reaffirmed this principle recently in *Bank of Nova Scotia*, where we held that "the mere fact that evidence itself is unreliable is not sufficient to require a dismissal of the indictment," and that "a challenge to the reliability or competence of the evidence presented to the grand jury" will not be heard. . . .  It would make little sense, we think, to abstain from reviewing the evidentiary support for the grand jury's judgment while scrutinizing the sufficiency of the prosecutor's presentation.  A complaint about the quality or adequacy of the evidence can always be recast as a complaint that the prosecutor's presentation was "incomplete" or "misleading."  Our words in *Costello* bear repeating:  Review of facially valid indictments on such grounds "would run counter to the whole history of the grand jury institution[,] [and] [n]either justice nor the concept of a fair trial requires [it]."

*Id.* at 53-55.[53]

---

[53]  Bartlett seems to believe that he could not have been prosecuted had his attorney successfully moved to dismiss the indictment.  Neither federal nor state law mandate that result.  "[C]ertain constitutional protections afforded defendants in criminal proceedings have no application before [a grand jury]. The Double Jeopardy Clause of the Fifth Amendment does not bar a grand jury from returning an indictment when a prior grand jury has refused to do so." *Williams*, 504 U.S. at 49.  The same is true under New Mexico law.  A failure of the grand jury to indict is not the same as an acquittal, and New Mexico prosecutors are not prohibited from pursuing charges via a criminal complaint after a grand jury fails to indict.  *See State v. Issac M.*,

Another common theme that Bartlett raises about the prosecutor is alleged presentation of "false" evidence to the grand jury. As discussed below, this characterization is of the evidence is inaccurate. Even assuming the evidence could be characterized as such, it would not be sufficient to dismiss a federal indictment after a jury verdict, much less warrant federal habeas relief for a state conviction.[54] Finally, Bartlett casts some of his "counsel failed to impeach" assertions as both ineffectiveness and Confrontation Clause claims. *See, e.g., Doc. 1* at 6; *State Petition* at 40-45; *id.* at 55 (referring to facts set out in Confrontation Clause claim for facts for ineffective assistance of counsel claim). The trial judge dismissed the Confrontation Clause claim wholesale as duplicating the

_____

131 N.M. 235, 34 P.2d 624 (Ct. App.), *cert. denied,* 131 N.M. 221, 34 P.3d 610 (N.M. 2001).

[54] *See, e.g., United States v. Mechanik,* 475 U.S. 66, 70 (1986) (" we . . . hold that the supervening jury verdict made reversal of the conviction and dismissal of the indictment inappropriate"); *Goodrich v. Hall,* 448 F.3d 45, 49-50 (1st Cir. 2006) ("the Supreme Court has not defined the circumstances in which impropriety involving even a federal grand jury can ever lead to dismissal of an indictment once a petit jury has returned a verdict of guilt. . . . [In the First Circuit] [t]he circumstances justifying dismissal of the indictment after conviction must be so severe, the prosecutorial misconduct so 'blatant,' as to 'call[ ] into doubt the fundamental fairness of the judicial process.' . . . The final straw is that the petit jury was unaware of the allegedly improper testimony and its verdict is unassailable.") (internal citations omitted); *Williams v. Stewart,* 441 F.3d 1030, 1042 (9th Cir. 2006) ("any constitutional error in the grand jury proceedings is harmless because Williams was ultimately convicted of the offenses charged"); *Tisthammer v. Williams,* 49 Fed. Appx. 757, 765 (10th Cir. 2002) ("the jury's finding that Tisthammer was guilty beyond a reasonable doubt alleviates the concern that the grand jury's finding of probable cause to charge was tainted by the shackling" and concluding that even if issue was justiciable, petit jury finding of guilt "leads us to conclude that the shackling did not have a "substantial and injurious effect" on the grand jury proceedings"), *cert. denied,* 538 U.S. 928 (2003).

ineffectiveness claims that would be briefed.  *See State Petition* at 1712-14.

Under clearly established Supreme Court precedent, Confrontation Clause claims fall into two categories: (1) hearsay statements admitted during testimony, or; (2) legally-imposed or judge-imposed limitations on cross-examination.  *E.g., Delaware v. Fensterer,* 474 U.S. 15, 18 (1985) (per curiam).  Bartlett's "failure to impeach" claims fall into the first category.  They do not concern limitations imposed on cross-examination, they concern counsel's choices about how to conduct cross-examination during trial.  "Generally speaking, the Confrontation Clause guarantees an ***opportunity*** for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  *Id.* at 20 (emphasis original) (citing *Ohio v. Roberts,* 448 U.S. 56, 73 n.12 (1980)).[55]  Thus, the Confrontation Clause is not applicable and the

---

[55]  The Supreme Court's decision in *Crawford v. Washington,*541 U.S. 36 (2004) does not change this aspect of a Confrontation Clause analysis, and the *Fensterer* general rule about the opportunity vs. scope of cross-examination continues to apply.  *See, e.g., United States v. Owens,* 484 U.S. 554, 558 (1988) (reiterating this observation); *United States v. Ghilarducci,* 480 F.3d 542, 548 (7th Cir. 2007) ("Confrontation Clause . . . right is realized by affording defendants an opportunity for effective cross-examination.  *Crawford . . . Owens . . .*  Importantly, 'the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' . . . *Fensterer*") ; *Smith v. Pennsylvania,* 2007 WL 2729902 at *8  (E.D. Pa. 2007) ("In *Crawford,* the Supreme Court did not address the extent of cross-examination required in order to avoid a Confrontation Clause violation.  However, in . . . *Fensterer* . . . the Court set out the following general standard for cross-examination"); *Phillips v. Miller,* 2006 WL 2271158 at *15 (W.D. Okla. 2006) (same).

constitutional inquiry falls under the *Strickland* analysis.  With respect to those claims, then, the trial judge's ruling was not "contrary to."[56]

I turn now to Bartlett's specific claims about "exculpatory" physical evidence.

## 1.  Finger Prints On Various Items

Bartlett faults the police and/or prosecutor for not taking fingerprints from the gun found a few houses away from the bodies that was identified as the murder weapon.  He also faults them for not taking fingerprints from the wheelbarrow, shovel and shell casings found in his living room.  In addition to the issues already discussed in § VII.B above, Bartlett contends that counsel should have moved to suppress the murder weapon and effectively impeached State witnesses, because the lack of prints "exonerated" him of the crimes.[57]

---

[56] *See, e.g., Pennsylvania v. Ritchie,* 480 U.S. 39, 63 n.1 (1987) (Blackmun, Justice, concurring) ("when, as in *Fensterer,* simple questioning serves the purpose of cross-examination, a defendant cannot claim a confrontation violation because there might have been a more effective means of cross-examination"); *Tapia,* 926 F.2d 1554, 1558 (10th Cir. 1991) ("We hold that de la Rosa's availability for unlimited cross-examination satisfies Tapia's Sixth Amendment Confrontation rights.").

[57] *See State Petition* at 43 (Ground 1 – Confrontation Clause, counsel failed to call Detective Ortiz to question him about "the (reckless) shoddy investigation, e.g., . .. why the murder weapon was never dusted for fingerprints); *id.* at 55 (Ground 3 – counsel's failure to impeach claims, incorporating facts from Ground 1); *id.* at 68 (Ground 6 – counsel failed to properly present alibi defense by pointing out State failed to take fingerprints of murder weapon, specifically incorporating Grounds 39, 40); *id.* at 73 (Ground 8 – counsel failed to investigate by not following up on print evidence "which did not match Petitioner," incorporating Grounds 1(B)#8, 39); *id.* at 78 (Ground 9 – counsel failed to effectively impeach prosecution witnesses on issue of fingerprints on shovel and wheelbarrow); *id.* at 92 (Ground 9 – counsel failed to

The trial judge discussed the fingerprint claims in the portions of his opinion that deal with Grounds 3, 9, and 17 of the State Petition.  He rejected them, finding that the evidence either could not be secured or was not "exculpatory."  The most detailed discussion provides:

> Bartlett argues the failure to test the weapon for prints resulted in the loss of "one of the most vital pieces of evidence."  [State Petition at] 187.  Bartlett, however, provides no specific facts demonstrating such prints were lost.  [As the State noted in briefing], Detective King testified at trial that he inspected the weapon when he collected it . . . and his inspection did not reveal any finger prints that were sufficient in order to attempt to recover them, that is, preserve them by having the weapon "glued," and then dusted in order that such prints could be photographed or impressions of them lifted. [*Transcript Vol. XII*] at pp. 49-53.
>
> Given the record provides no proof that prints were lost, a motion to suppress the weapon because the

---

effectively impeach prosecution witnesses on issue of fingerprints on murder weapon); *id.* at 115 (Ground 16 – counsel failed to file motion to dismiss indictment based on "exculpatory evidence" that "Petitioner was not connected to the murder weapon"); *id.* at 120 (Ground 17 – counsel failed to file motion to suppress murder weapon on ground State was "negligent" in failing to test it for fingerprints, incorporating Grounds 39, 40); *id.* at 156 (Ground 35 – prosecutorial misconduct before grand jury by not introducing the "exculpatory" evidence of "an absence of Petitioner's prints on the murder weapon); *id.* at 187 (Ground 40 – prosecutorial misconduct for police failure to dust murder weapon, shell casings, wheelbarrow or shovel).

The trial judge dismissed Grounds 1 and 8 as duplicative of Grounds 3-6 and 9.  *See Record Proper* at 1714.  When he addressed Ground 6 on the merits, he did not address the fingerprint aspect of the claim.  *See id.* at 1784-1786.  He summarily dismissed Ground 16 under *Ernesto* for no showing of prejudice.  *See id.* at 1715.  He summarily dismissed the prosecutorial misconduct claims as procedurally defaulted.  *See id.* at 1716-17 (Grounds 35 through 45).

State negligently failed to test it for prints would not
prevail, and moreover Bartlett does not demonstrate that
any prints recovered from the weapon would have
created a reasonable probability upon their introduction
into evidence at trial that the jury would not have found
him guilty. *Compare Stenz,* 109 N.M. at 538-39 . . .
(counsel is not ineffective for not filing suppression
motion unsupported by the record) *with State v. Ware,*[58]
118 N.M. 319 . . . (holding suppression motion based
upon failure of police to collect evidence must
demonstrate evidence was material, that is, if available
the result of trial would have been different, and that
such failure to collect evidence resulted from bad faith on
the part of the police).

Moreover, even if there were prints on the weapon,
if they were Bartlett's the prints would have tended to
inculpate him as evidence indicated two missiles (fired
bullets) found in Bartlett's home could have been fired
from the weapon, *[Transcript Vol. XII at]* 13 (on redirect
Larry Warehim testified two "missiles" found in Bartlett's
home were .25 caliber, the same caliber as the weapon).
Warehim also testified that two missiles recovered from
Unser's body ("John Dow B.") (Dr. McFeeley testified
Benjamin's body was designated "John Doe A.,"
*[Transcript Vol. XI at 33]*) were fired from the weapon,
*[Transcript Vol. XI at]* 146-149 (Warehim direct
testimony), and five shell casings apparently found in
Bartlett's home could have been fired by the weapon, *id.*

---

[58] As I have noted in another case, unlike federal law, the *Ware* decision distinguishes
between "collection" and "preservation" of evidence, and did not apply the *Youngblood* or
*Trombetta* decisions in reaching its conclusion as a matter of state constitutional law. *See Daniels
v. Lytle,* CIV 01-1321 MV/KBM (Doc. 13 at 6-7); *see also Pena v. State,* 226 S.W.3d 634, 646 n.
17, 652-53 (Ct. App. Tex. 2007) (surveying state cases on issue of whether federal standards
apply to state constitutions, finding New Mexico is among the states that applies a different test
than the *Youngblood* bad faith requirement).

61

at pp. 142-143 (Warehim direct testimony).  In addition,
the absence of Bartlett's prints on the weapon would not
necessarily exculpate him.

*Record Proper* at 1824-25 (in connection with Ground 17).[59]

The trial court's result is neither "contrary" nor "unreasonable."  The State did not contend that Bartlett was the lone perpetrator of the crimes.  In closing, the prosecutor mentioned the "mystery issues" included that bartender Hooven saw Bartlett in the bar with someone she did not know, that Roberts saw two people in the house with Bartlett and the bodies, and that the victims were killed with two different guns.  That is why the prosecution included an aiding and abetting instruction:  if Bartlett "helped, encouraged or caused the crime to be committed, [then] he is just as responsible."  *Transcript Vol. XV* at 66.

Thus, as the trial court held and contrary to what Bartlett maintains, the lack of his fingerprints or the presence of someone else's on the murder weapon or

---

[59]  *See also id.* at 1767-68 (Ground 3:  "Detective King testified at trial that . . . he visually examined the murder weapon and noted it lacked prints that could be lifted in order to check for a match. [*Transcript Vol. XII* at] 47-53.  Bartlett's argument is thus inapposite because it speculates about prejudice. . . .  Moreover, a lack of Bartlett's prints on the weapon would not necessarily exculpate him."); *id.* at 1804 (Ground 9:  argument "is without merit because it speculates about the prejudice that resulted from counsel's alleged error. . . .  Moreover, Detective King testified that he examined the weapon and determined there were not prints apparent on it, which merited attempting to lift such prints from the weapon. [*Transcript Vol. XII* at] 49-53.").

other incriminating evidence did not necessarily "exonerate" him.[60]

I also find that the reason why defense counsel did not further "investigate" the lack of fingerprints is evident, a finding implicit in the trial court's decision. If Bartlett is suggesting his attorneys should have retained experts to test the materials themselves, that strategy could have backfired entirely. By the police conduct that Petitioner characterizes as "negligent," *State Petition* at 120, the police had handed arguments for counsel to make in Bartlett's favor. The very fact of a lack of fingerprints allowed the defense to argue that the evidence could not be tied to Petitioner, and that the police work was lackluster, focusing solely on Bartlett, the one person they had in custody within hours into their investigation.

For example, counsel began opening argument by emphasizing that the State would produce:

an awful lot of evidence [that] isn't going to tie things up

---

[60] *See e.g., United States v. Beckstead,* 500 F.3d 1154, 1158 n.5 (10th Cir. 2007) (presence of others' fingerprints or absence of defendant's fingerprints on lab equipment not exculpatory where testimony was others were in apartment); *Torres v. Mullin,* 317 F.3d 1145, 1161 (10th Cir.) ("Simply because a point of dissimilarity on ridges might show that a fingerprint was not [defendant's] would not make the exculpatory value of a fingerprint smudge apparent given that several people lived in the victims' home"), *cert. denied,* 540 U.S. 1035 (2003); *Russell v. Watkins,* 112 Fed. Appx. 721, 723 (10th Cir. 2004) ("evidence relating to latent finger prints, palm prints, and a hammer . . . does not possess the exculpatory value required by *Brady.* Instead, the evidence is more properly categorized as "potentially useful." . . . Because the exculpatory value of this evidence was not apparent before it was destroyed, establishing a due process claim requires showing bad faith on the part of the police in their failure to preserve such evidence. . . . Mr. Russell, however, does not allege any instances of bad faith").

in neat packages.  It's not going to answer all the questions that you're going to have about how these two people died, why they died, questions that you really need to know the answer to.  Most of all, you're not going to have the answer to the question of who killed [the victims].

* * * * *

You're going to see trails that lean in sort of tantalizing ways, then sort of stop, aren't followed.  You're going to see evidence that points toward different people that might be involved . . . . Some of that evidence is going to point to Steven Bartlett, but it's going to point to him in a very unusual, very calculated way.

* * * * *

[After Roberts and Claybaugh gave their second statements to the police Detective Ortiz] was convinced that he had his killer.  So he did a few more witness interviews, and basically, by the end of January, he had done all he was going to do on this case.  There was virtually no effort to locate this other mystery man. . . .

An that's pretty much where the investigation stands today.  The problem is that Roberts, the Robert/Clabaugh story is a lie.

*Transcript Vol. X at 11-12, 33-34.*

Detective Mike King, was an investigator trained in crime scene processing and fingerprinting at the time, and helped process all of the scenes.  *See Transcript Vol. XI at 5-7.*  He testified that he took "elimination" prints from the people who found the gun, anticipating "processing the firearm for latents," however when he

64

"quickly" looked at the gun at the scene, he "did not visually see any noticeable rich characteristic fingerprints" so he did not say anything to the effect that "we've got something good on this firearm." *Transcript Vol. XII* at 51; *see also id.* at 133. The gun was not later tested for prints because "[the violent crimes detectives . . . felt it was more important to have serology and firearms testing done." *Id.* at 51; *see also id.* at 134. On cross-examination of Detective King, counsel elicited the concession that although smooth hard surfaces such as a gun, bullets, and shell casings are the "best areas" to test for prints and any such prints would indicate who handled the items, the officers did not dust the gun for fingerprints. *Id.* at 133-34.

Counsel also cross-examined then-Lieutenant Dennis Nasci, about the lack of fingerprinting. At the time of the investigation, he was the sergeant in charge of criminalistics, and to avoid confusion I will refer to him as "Sergeant" because that is how he is designated in the transcript and other parts of the record. *See id.* at 20-21. Sergeant Nasci likewise admitted on cross-examination that "caution is taken to preserve . . . evidence and one of the thing [they are] probably looking for is fingerprints," but that no fingerprints were "lifted" by his investigators. *Id.* at 32.

In closing argument, counsel emphasized that despite the "200-some odd pieces of evidence" the State introduced, the State considered physical evidence

that did not match Bartlett or was not tested to see if it matched Bartlett "unimportant," including fingerprints. *Transcript Vol. XV* at 101; *see also id.* at 101-03.

Even though the trial court did not consider whether counsel's conduct was constitutionally deficient with regard to the fingerprint evidence, I independently find counsel's conduct was objectively reasonable. There was no constitutional basis to exclude the evidence on the ground that the officers failed to take the prints. *See* supra, § VII.B (*Brady/Bagley* and *Trombetta/Youngblood* discussion and analysis). There also was no good strategic reason to eliminate the fact that the State lacked fingerprint evidence tying Bartlett, or to conduct independent tests that may have contradicted that fact. And, notwithstanding Bartlett's assertions, the defense *did* use the lack of fingerprints, and did so to its advantage, through cross-examining State witnesses. Finally, I agree with the trial judge that Bartlett suffered no prejudice in connection with any of his fingerprint claims.

Accordingly, I recommend that the fingerprint aspects of Claims 3 and 5 be dismissed. *See Doc. 1* at 9A, 9A1, 9A4, 9A5, 10B, 10B4, 10B5.

## 2. Gunshot Residue Test & Gun Registration

Also in connection with the murder weapon, Bartlett faults his attorney for "waiting until the eve of trial to seek an order from the Court . . . for the State to

produce the primer residue test" of his hands.  *State Petition* at 68.[61]  In addition to

the issues already discussed in § VII.B above, Bartlett characterizes the results of

the test as "exculpatory" and contends his attorney should have had an expert

testify for the defense about the results of the test at trial.  Similarly, he faults

counsel and the trial court for failing to introduce evidence of the fact that the

murder weapon was not registered to him, even though a juror specifically asked for

that information.[62]

---

[61]  Unless Bartlett is referring to one of the earliest trial settings, it is a gross
mischaracterization to assert the defense waited until the eve of trial.  Bartlett was arrested on
November 19, 1995.  On January 10, 1996, one of Bartlett's first attorneys asked for the
gunpowder residue testing results, and the trial judge asked the prosecutor to make inquiries and
provide whatever discovery was then available on an expedited basis.  *See Transcript Vol. I* at 4-5.
By March 5, 1996, the attorneys who would serve throughout the rest of the district court
proceedings had been appointed and moved to compel discovery arguing that the State should be
barred from using any test results that had been in the State crime lab for four months but had
not been processed.  *See Transcript Vol. II* at 1-2.  In May 1996, defense counsel interviewed
Detective Oritz, who confirmed Sergeant Nasci conducted a gun residue test the night Petitioner
was arrested and believed that the swabs had been sent for testing.  *See Petitioner Supplement,*
Ortiz Interview at 11-12 (date of interview supplied by Petitioner).  When Sergeant Nasci was
interviewed by defense counsel in January 1997, he again confirmed that he conducted the test
the night of arrest, as well as on the victims.  *Id.,* Nasci Interview 1/8/97 at 8; *see also id.,* Nasci
Official Report 11/19/95 at 2.  On March 6, 1997, the trial judge signed a stipulated order that
the police "shall immediately process the primer residue sampled . . . and provide the results of
such testing" to counsel.  *Record Proper* at 154.  Given the crime lab delay, the trial judge's
consistent position that the State and prosecutor should move as quickly as possible in processing
the evidence and turn over the results to the defense, and the stipulated order, if counsel did not
receive the results until the eve of trial, it appears to this Court that was inadvertent, either by
the State or defense counsel.  *See also e.g., Transcript Vol. III* at 4; *Transcript Vol. IV* at 12;
*Transcript Vol. V* at 7-8; *Transcript Vol. VI* at 74-81.

[62]  *See State Petition* at 44 (Ground 1 – a query imbedded in the Confrontation Clause
claims asking "why wasn't the primer residue test completed to eliminate the fact that Petitioner
had not fired a weapon, when up to 13 rounds were dispensed in this case?"); *id.* at 63 (Ground 5

The trial judge held that any prejudice due to counsel's ineffectiveness with

the gunshot residue results was speculative, *Record Proper* at 1768, because:

> Sergeant . . . Nasci who investigated physical evidence at
> the crimes scene concerning the murder of Unser and
> Benjamin provided undisputed testimony at trial that a
> primer residue test, given the use of "modern"
> ammunition and that the test, if done approximately a
> day after when the murder weapon was fired, would not
> likely produce anything as to such residue, that is,
> "probably very slim." [*Transcript Vol. XII* at] 40-41.

*Id.* at 1770.  The trial judge concluded the expert testimony claim was likewise

speculative:

> Bartlett's argument fails because he speculates that such
> expert testimony would have produced a reasonable

---

– counsel "failed to consult or retain expert witnesses to emphasize exonerating evidence, such as the absence of gunshot residue on the Petitioner's hands or body"); *id.* at 68 (Ground 6 – counsel "negligently" waited "until the eve of the trial," incorporating Grounds 39 and 40); *id.* at 72 (Ground 8 – counsel did not investigate the results of the test "until eve of trial" and did not present this "material exculpatory evidence" to the jury); *id.* at 115-16 (Ground 16 – counsel failed to file motion to dismiss indictment on ground prosecutor failed to submit "exculpatory" evidence that included gunshot residue test or that murder weapon was not registered to him); *id.* at 156 (Ground 35 – prosecutor did not provide "exculpatory" gunshot residue test result to grand juror who asked about it); *id.* at 181-82 (Ground 39 – prosecutor did not disclose gunshot residue test until after trial started, even though judge originally ordered it completed in March 1997); *id.* at 216 (Ground 44, State failed to disclose gunshot residue test early in case); *id.* at 235 (Ground 47 – trial court error to not enforce its early order to disclose results of gunshot residue testing); *id.* at 241 (Ground 47 – trial court error to fail to answer juror question about gun registration).

The trial judge dismissed Ground 8 as duplicative of Grounds 3-6.  *See Record Proper* at 1714.  He summarily dismissed Ground 16 under *Ernesto* for no showing of prejudice.  *See id.* at 1715.  He dismissed the prosecutorial misconduct and trial court error claims as procedurally defaulted.  *See id.* at 1716 (Grounds 35 through 45); *id.* at 1717 (Ground 47).

> probability the jury would have acquitted him, that is,
> Bartlett does not allege facts in his Petition which
> demonstrate such expert testimony could have been
> produced. . . .
>
> Moreover, such expert testimony if produced,
> would not necessarily exculpate Bartlett given all of the
> evidence the State marshaled at trial . . . and it would
> thus not produce a reasonable probability that Bartlett
> would have been acquitted.

*Id.* at 1782-83 (citations omitted).

I cannot conclude that the trial court's result is "contrary" because speculation regarding what an expert would have testified will not suffice.[63] Also, the test results were not available to the prosecution in the eight days between when Bartlett was arrested and the grand juror asked whether the police performed a "residue test." *See Petitioner Supplement,* Grand Jury Transcript at 1, 12. For this reason and those provided in Section VII.B, the prosecutorial misconduct/grand juror claim is without merit.

Nor do I find the trial judge's result "unreasonable." Although the trial court did not consider whether counsel's conduct was constitutionally deficient, I independently find counsel's conduct was not. Foremost, the results were

---

[63] *See Tafoya,* 9 Fed. Appx. at 871 ("Petitioner's claims rest on his speculation that such experts would have aided his defense . . . and speculation does not satisfy his obligation to demonstrate a reasonable probability that the outcome would have been different"); *see also generally, supra* page 45 & n.47.

"negative" for Bartlett's left hand and the palm of his right hand, but

**"inconclusive"** for the back of his right hand.  *See State Petition* (attached Exhibit

"Hab.B," dated 3/11/97).  Notwithstanding Sergeant Nasci's disclaimer about the

reliability of the test, the "inconclusive" result was not wholly "exculpatory" and

suggested the possibility that there in fact may have been residue present on

Bartlett's right hand.  Luckily for Bartlett, neither the defense nor the State

introduced the test results into evidence at trial so they were **not** made known to

the jurors, and he avoided suffering the potential prejudice that would have

resulted.[64]

---

[64]  *See Herrera v. Lemaster,* 149 Fed. Appx. 791, 797 (10th Cir. 2005) ("Herrera attempted to counter the eyewitness testimony with expert testimony showing he had not recently fired a gun.  Anticipating this evidence, the state presented expert testimony to explain the result of the gunshot residue analysis conducted on samples taken from Herrera's hands after the shooting.  According to the state's expert, the test was inconclusive-he could not say whether Herrera had or had not fired a gun recently.  The expert, however, did testify that the absence of gunshot residue on Herrera's hands could be explained by the fact that such residue wears off easily and the time lapse between the shooting and the test.  Herrera's expert agreed that the samples taken from Herrera's hands three hours after the shooting showed no sign of gunpowder residue.  In addition, he explained how Herrera's hands could not have been washed in close temporal proximity to the test.  However, in the end, both experts testified that gun shot residue wears off rapidly.  And both agreed the residue test here was at best inconclusive."), *cert. denied,* 546 U.S. 1200 (2006); *Powers v. Shanks,* 1999 WL 100880 at *7 (10th Cir. ) ("We find no prejudice.  The prosecution admitted no evidence regarding the results of the Harrison primer residue test, making it unnecessary for the defense to call a witness to rebut the results.  In any event, the residue primer test results were inconclusive, probably because soot, smoke, and water stemming from the fire that had been set at the crime scene contaminated the residue collected from the decedent's hands.  It is hard to imagine that any expert testimony regarding the primer residue test results, under these circumstances, would have assisted petitioner's case.  In fact, such testimony would likely have constituted pure speculation, making it inadmissable. . . .  N.M. R. Evid. 702"), *cert. denied,* 528 U.S. 850 (1999); *Pettinato v. Eagleton,* 2007 WL 3992494 at *26

However, Sergeant Nasci mentioned the test during direct examination.  *See*

*Transcript Vol. XII* at 23.  Instead of ignoring the testimony, defense counsel was

able to use the fact of a primer residue test to its advantage.  On cross-examination

counsel asked about the test to focus the jury on the officer's conduct and attempt

to minimize the State's evidence that the crime scene in the trailer had been

partially cleaned with Clorox.

> Q.   What's a primer residue test?
> A.   It's a test in which we have a prepared packet with
>       some cotton swabs, use an acid on those swabs.
>       We swab the palms of the hands and the top strap
>       of the hand between the first finger and the thumb.
>       It's to check for barium antimony on the hands
>       which could be present with some ammunition
>       once it's been fired.
> A.   And why is a primer residue test performed?
> Q.   It's a standard practice in an attempt to see if we
>       can identify whether or not an individual has fired
>       a weapon recently.
> Q.   And you performed that test on Mr. Bartlett; is

(D.S.C. 2007) ("the court finds Pettinato is unable to establish the prejudice prong of *Strickland*. The gunshot residue test was inconclusive-while the quantities of metals detected in samples submitted from Pettinato's hands were insufficient to determine the presence of gunshot residue, the results of the test did not indicate that Pettinato could not have been the shooter."); *Diggs v. Pliler,* 2006 WL 2642526 at 11 (N.D. Cal. 2006) (Petitioner argued that there was no physical evidence linking him to shooting, but court found state test result was not unreasonable because the absence of gunshot residue "did not exculpate petitioner;" the test was taken within a five-hour window and inspector testified "'that actually five hours is one of the outside windows" and ballistics expert testified that the lack of gunshot residue was due "'variables [including] delay in sampling;'" district court concluded that "the gunshot residue tests, like the lack of a weapon found, while providing the prosecution no help in proving its case, were simply inconclusive, rather than exculpatory of petitioner.").

71

that correct?

A.    Yes, sir.

Q.    And did you perform that test on Mr. Bartlett
      before or after you collected his clothes?

A.    I performed that test, I believe, before I collected
      his clothing.

Q.    All right.  I see on those pants, there's these yellow
      stains.  Do you know where they came from?

A.    No, sir.

                    * * * * *

Q.    Could those stains be caused from the primer
      residue test that you conducted?

A.    No, sir.

Q.    What type of acid is used, if you know?

A.    It's not coming to me right now.

Q.    This acid though, is it like caustic?  Have you ever
      spilled any on your clothes?

A.    No, sir, it's only done – it's used with a dropper.
      You just put a drop on the end of a Q-tip.

Q.    So there's no way that the amount of acid you use
      could have caused the size of those yellow stains?

A.    No sir.

*Transcript Vol. XII* at 32-34.

        Despite Sergeant Nasci's testimony on redirect that he did not hold the acid

over a suspect while putting in on the Q-tip, this line of questioning allowed

defense counsel to argue in closing, but without introducing the results of the test,

that:

        the state's tried to indicate that [certain of its evidence
        was] unimportant. . . .  As far as the primer residue tests,
        you will recall [Sergeant Nasci] basically apologizing for

72

> those and talking about how basically useless those
> primer residue tests are.
>
> I can assure you that if there were a primer residue
> test for Mr. Bartlett it would have been turned all over
> this courtroom and you would have heard about it and it
> wouldn't be a perfectly useless test.

*Transcript Vol.* XV at 101.   Since the defense's primary theme was that someone

else committed the murders and the State had not met its burden of proof, the

prosecutor's later observation that it was the defense's choice to present evidence

was not particularly the strongest rebuttal argument.  *See id.* at 121-22.

The trial court did not address the gun registration claim, but I find it also

without merit.  At the end of one day of trial, after the State's crime lab ballistics

and firearms expert testified, a juror passed a question to the judge asking: "'Has

gun been checked for registration in the State of New Mexico if he has elsewhere,

and where[?]'"  *Transcript Vol.* XI at 152.  During the ensuing bench conference

about the note, the prosecutor noted that the expert was not able to testify to the

question and said the State would try to "get somebody to do that.  Let's face it

there's a lot of guns that we're never going to find."  *Id.*  The court decided to take

up the issue the next morning, and dismissed the jurors without any comment

about the question.  *See id.* at 152-53.

The transcript does not show any off-the-record discussions the following

morning, nor did any of the witnesses discuss gun registration.  It appears the question was left unanswered, at least directly, and the jurors did not ask it again. *See Transcript Vols. XI - XV.*

Defense counsel had little to gain by trying to ascertain precisely who the gun was registered to, if anyone because lack of registration in Bartlett's name is not "exculpatory."  The fact of registration is largely immaterial given the ease with which one can obtain firearms.  Moreover, there was a second unrecovered weapon used in the murders.  In any event, the weapons did not have to belong to Bartlett for him to have been involved in the crimes.

More importantly, the defense argued that Bartlett did not own any weapons whatsoever – he had a prior felony conviction, was not allowed to possess weapons, and had given up all of his weapons prior to the murders.  The evidence at trial was the only people who were armed and in Bartlett's trailer were Bartlett's roommate and Roberts, and the gun in question matched the one Bartlett's roommate left behind.  This is the testimony the jurors heard after their question was submitted and probably explains why they did not re-ask the question, and why neither counsel nor the trial judge revisited the subject.  *See, e.g., Transcript Vol. XIII at 153-55; Transcript Vol. XIV at 68-69; Transcript Vol. XV at 78-82, 95-97.*

Therefore, I find counsel was not ineffective and Bartlett was not prejudiced

by counsel's failure to move to dismiss the indictment because the one recovered

murder weapon was not registered to him.  I further find the trial court did not

"err" in failing to follow up on the jury question.  Accordingly, I recommend that

the gunshot residue and registration aspects of Claims 1, 3 and 5 be dismissed.  *See

Doc. 1* at 6, 9, 9A, 9A1, 9A4, 10B, 10B4, 10B10.

### 3.  Bloody Palm Print On Benjamin's Truck

Detective King processed the crime scenes.  *See Transcript Vol. XI* at 5, 7.

Detective Flores helped him, and King's report noted that Flores "lifted" a palm

print from the tailgate of Benjamin's truck.  *See Transcript Vol. XII* at 99; *Petitioner

Supplement,* King Supplement (at page 3 if separately paginated).

Prior to trial the defense interviewed many witnesses including Detectives

Flores and King.  Petitioner submitted the tapes of counsel's January 8, 1997

interviews with these officers.  The tapes are of very poor quality and this Court has

listened to them carefully in full more than once.

Toward the end of his interview, Detective King was explaining that the

fingerprints recovered from the house were of "no value," meaning there was not

enough print to make a match.  This conversation then took place:

> Q:    So, did you get any significant fingerprints from any
>        items in connection with this case?
> A:    No.  Well, oh, I shouldn't say that.  Off the bed of

> the pickup truck we did – Larry Flores did get a
> good palm print off of there.  Um, but that has,
> um, um, not been matched.
>
> Q:    Okay.
>
> A:    It was a good palm print . . .
>
> Q:    . . . But it didn't match either the victims or, uh,
> Bartlett?
>
> A:    As far as I know, it – okay, it hasn't been matched.
>
> Q:    Was it bloody?
>
> A:    I don't – I – You'd have to ask [Flores].  I'm, I'm
> not sure [unintelligible].  As far as I know, I – I
> don't believe it was.

*Petitioner Supplement*, Tape A, side "B."

Flores' report does not mention the palm print.  *See Petitioner Supplement,*

Flores Supplement.   Nor did he initially mention it during his interview when

counsel kept asking him to describe what he did and prompting him with questions

of whether there was anything else.  Finally, at the very end of the interview,

counsel specifically asked Detective Flores about the palm print.  At some points

the attorney and Flores kept interrupting each other and speaking disjointedly.

Leaving most of that insignificant exchange out, the conversation was as follows:

> Q:    Tell us – the, um – palm print – that you – on the,
> uh, pickup truck . . .
>
> A:    Okay, yeah.
>
> Q:    . . . that you photographed that?
>
> A:    We photographed it and attempted to lift it, I
> believe.
>
> Q:    Was there any blood on that . . .
>
> A:    Yes.

> Q:     . . . and how did it stand out?  Because it had blood
>        on it?
> A:     Yes, uh huh.
> Q:     Okay . . .

*Petitioner Supplement,* Tape B, side "A."

Taken together, from these interviews defense counsel had reason to believe that the State took a palm print from the truck but did not bother to match it with Bartlett's palm print.  In opening statement, counsel alluded to sloppy police work in this regard by saying that:

> there was lots of blood in the back, lots of blood on the
> tail bed and there's a big bloody palm print there on the
> tailgate that one of the reports said they lifted, yet is
> appears that either nobody's preserved this palm print or
> nobody processed it or compared it with anything.

*Transcript Vol.* X at 26.

At trial, however, Detective King contradicted not only counsel's comment but also his interview  by testifying that the palm print was "partial" and that Detective Bill Webb "tried to compare that against palm prints taken of Mr. Bartlett [and] said it was not enough of a print to make an identification." *Transcript Vol.* XII at 99.  Furthermore, he testified that he "d[i]dn't know" whether "blood was intermingled with the palm print."  *Id.* at 135.

The trial judge sustained defense counsel's hearsay objection to this

testimony, *id.* at 99, and at a sidebar conference counsel explained that he "would not have done my opening the way that I did if we had been given notice" that someone had performed comparison of the prints, *id.* at 119. He explained that he "interviewed Detective King two or three weeks ago [and] he indicated that the only thing he had lifted, they never compared," *id.* at 119, and this was the first time defense counsel had heard a Detective Webb mentioned, *id.* at 120. Defense counsel wanted to "make sure that there isn't anything else like this that is either written or unwritten in the way of testing or comparison . . . that the State is planning to introduce that we haven't been apprised of." *Id.* at 121.

The prosecutor thought that in pretrial interviews "King said . . . there wasn't enough to compare," *id.* at 120, consequently, the prosecution did not "have a report of the actual testing," and "so . . . never tried to indicate that it was in fact or quite possibly [Bartlett's] palm print or anything else." *Id.* at 121. The trial judge granted the defense request for the State to produce the appropriate person for defense counsel to interview. *See Transcript Vol. XIII* at 1-4. Later, discussions were held off the record between the court and counsel, *id.* at 147, 210, but the record does not show that anyone brought up the subject again throughout the remainder of the trial.

In addition to the issues already discussed in § VII.B above, Bartlett faults

the officers for not analyzing what he calls the "nonmatching bloody palm print,"
*e.g., State Petition* at 63, and believes that he was "prejudiced to no end" by the
events surrounding the "big bloody palm print," *id.* at 131, because this piece of
evidence was "exculpatory" and "exonerated" him, *e.g., id.* at 63, 182.   He faults
the police for not analyzing the print and defense counsel for not investigating,
calling an expert, or impeaching King on the subject.   He asserts the prosecutor
engaged in misconduct by not revealing Detective Webb's comparison prior to trial
and by eliciting testimony about the same from King during trial.[65]

---

[65]   *See State Petition* at 42 (Ground 1 – Confrontation Clause; counsel mentioned lack of
palm print during opening, Detective Flores could have testified that he recovered the bloody
palm print, Detective King said print was a "good" print during an interview but at trial said it
was a partial print that Detective Webb could not analyze); *id.* at 63 (Ground 5 – counsel "failed
to consult or retain expert witnesses to emphasize exonerating evidence, such as . . . the non-
matching bloody palm print recovered from the tailgate of Lee's truck."); *id.* at 73 (Ground 8 –
"counsel failed to follow up on the numerous fingerprints and a bloody palm print, which did not
match Petitioner," incorporating Grounds 1 and 39); *id.* at 92 (Ground 9 – counsel could have
impeached Detective King's "false" testimony about the partial palm print, incorporating
Grounds 12, 15, 37, 38, 39, 40, 41); *id.* at 131 (Ground 21 – prejudiced by counsel's handling of
palm print, incorporating Grounds 1, 4, 6, 8, 9, 15, 39); *id.* at 173 (Ground 38, prosecutor's use of
Detective King's "false" testimony at trial, incorporating Ground 39); *id.* at 182 (Ground 39
–"State failed to disclose Bill Webb and the results of the scientific testing on the bloody palm
print that was recovered from the tail gate of Lee's pickup. Det. King testified, '. . . It was a
partial print and not enough to make an identification.' . . . Then [the prosecutor] misled the
Court [saying:] 'Larry Flores got a good palm print.  It was not a match – they could not tell if it
was the Petitioner.' . . . This evidence was exculpatory because it demonstrated that someone
other than Petitioner was responsible for the murders or at least the transportation of the dead
bodies of Lee and Unser.") (internal emphasis and citations omitted); *id.* at 209 (Ground 43 –
prosecutor misled the court regarding whether print was good or only partial and not enough to
compare); *id.* at 216 (Ground 44 – prosecutor did not disclose results of palm print).

The trial judge dismissed Grounds 1, 8, and 21 as duplicative of Grounds 3-6, and 9.  *See*

The trial judge rejected the ineffectiveness claim for failing to impeach King on his above testimony about the palm print because:

> Bartlett . . . fails to demonstrate prejudice . . . . That is, given the evidence at trial, Bartlett does not demonstrate that the impeachment he argues counsel should have performed would have raised a reasonable probability the jury would have reached a different result. The version of the facts that Bartlett argues the impeachment would have introduced does not necessarily exculpate Bartlett, but would only have given the jury other circumstances to consider. . . .
>
> In particular, as to whether the palm print was intermingled with blood, Bartlett demonstrates no nexus between that fact and his innocence beyond it tending to establish whether King could not accurately recall that fact. See Petition at p. 92. Even if, as Bartlett argues, Petition at p. 92, 173, and 182, a good palm print that could be compared to his had been lifted, the lack of a match between the lifted print and Bartlett, does not necessarily constitute exculpatory evidence, and would hardly introduce a reasonable probability, considering all the evidence at trial, that the jury would conclude Bartlett did not commit or participate in the murders.

*Record Proper* at 1806-07. The trial judge similarly rejected related claims as "rational trial tactic" and for lack of prejudice because Detective King's testimony about Webb was stricken on counsel's objection and "no evidence introduced at

---

*Record Proper* at 1714-15. He dismissed the prosecutorial misconduct claims as procedurally defaulted. *See id.* at 1716 (Grounds 38-45).

80

trial established a nexus between the print and Bartlett." *Id.* at 1766; *see also id.* at 1767. And, as he did in rejecting all of Bartlett's claims that counsel was ineffective for failing to call an expert, the trial court held that Bartlett "speculates that such expert testimony would have produced a reasonable probability the jury would have acquitted him" and, even if produced, such expert testimony "would not necessarily exculpate Bartlett given all of the evidence the State marshaled at trial . . . and it would thus not produce a reasonable probability that Bartlett would have been acquitted." *Id.* at 1783.

While the record does not reflect a conversation demonstrating why counsel chose to leave King's testimony unaddressed, counsel likely did so because the testimony did not hurt, and actually helped, the defense. It underscored another of the defense themes – that the police did not conduct a rigorous investigation because they "understandabl[y] . . . took a look at the physical evidence, basically, quit making any serious attempt to search for another killer. They simply decided they had their man. All we got to do is take the pictures, document this, and go on to the next case." *Transcript Vol.* XV at 102. At the very least, this presents a situation where a strong presumption should apply that counsel did so for tactical reasons. *E.g., Massaro,* 538 U.S. at 505. Thus, although the trial court did not discuss whether counsel's conduct was deficient in this regard, I independently find

81

that it was not.

Furthermore, I cannot find the basis for the trial judge's result unreasonable. Like with the fingerprints, gunshot residue and gun registration sections, Bartlett's print did not have to be on the truck for him to have been involved, and the presence of someone else's did not necessarily exculpate him.  *See supra* notes 60, 63 and accompanying text.  If for no other reason then, because of the utter lack of prejudice, all of Bartlett's claims in this regard fail.

Accordingly, I recommend that the "bloody palm print" aspects of Claims 1, 3 and 5 be dismissed.  *See Doc. 1* at 6, 9, 9A1, 9A.16(1), 10B4, 10B9.

## 4.  Footprints By The Bodies

Bartlett contends that, contrary to what one officer said, the investigators did not have a clear path to the bodies and trampled the scene where the bodies were found, thus either destroying or leaving their own boot prints.  Like the fingerprints argument, he contends that the police did not make castings of any footprint, particularly a lone cowboy boot print next to the bodies.  He also faults counsel for not calling an expert to compare the prints that were photographed and for not impeaching witnesses on these points.[66]  He concludes that had the scene

---

[66]  *See State Petition* at 63 (Ground 5 – counsel failed to call expert to testify that boot print did not match Bartlett's motorcycle boots); *id.* at 91 (Ground 9 – asserting officers trampled

been preserved in pristine condition and every footprint casted and compared to his

own motorcycle boots, and had his attorney called a expert, he would have been

entirely "eliminated" as a suspect because he has a "massive shoe size . . . 13EEE."

*State Petition* at 186.

Bartlett's arguments rest on some misrepresentations not discussed by the

trial judge.  For example, at one point in the State Petition, Bartlett cites Detective

King's trial testimony for the proposition that the officers "destroyed a second set"

of **footprints,** *see State Petition* at 185, when in fact the testimony indicated that

emergency personnel went into the scene and imposed their own tracks over a

portion of a **tire track.**  *See Transcript Vol. XII* at 89-91; *see also State Petition* at 91

(asserting officers trampled the scene because there were multiple footprints on top

of the tire tracks); *Petitioner Supplement,* Photographs (3 photos showing footprint

on top of or near by a tire track).

---

the scene because there were multiple footprints on top of the tire tracks, a second set of
footprints next to the bodies was destroyed, and Senior Medical Investigator Wayne Granger said
there were distinctive footprints northeast of victim A that were not properly identified); *id.* at
173 (Ground 38 – alleging prosecutor engaged in misconduct in using "false" evidence at trial
when officer testified a footprint was destroyed by the emergency response team getting to the
bodies, but another said they had a clear path to the bodies); *id.* at 185-86 (Ground 40 – re:
prosecutorial misconduct in that there was conflicting testimony about a clear path and failure to
properly identify and cast prints; most comprehensive discussion of claim).

The trial judge dismissed prosecutorial misconduct claims as procedurally defaulted.  *See
Record Proper* at 1716.

Bartlett also submits that we can conclude Detective King gave "false" testimony when he said the officers "had to go in [the crime scene] some way," *Transcript Vol. XII* at 90, because Sergeant Nacsi said he and Senior Medical Investigator Wayne Granger reported they had a "clear path" to the bodies and Sergeant Frazee had previously ordered everyone out of the inner crime scene, *see State Petition* at 185.  This misconstrues the evidence.  In proper context, Detective King's testimony plainly refers to the initial responders who approached the bodies to ascertain whether the victims were alive.  Finding the victims dead, the officers roped off a large area to keep the media and bystanders out of the scene, eliminated the foot and tire prints made by the initial responders, and proceeded to systematically process the scene.  Granger and Sergeant Nacsi were not permitted to get closer to the bodies until after the processing was completed.  Their "clear path" was the one left after all of the processing took place.[67]  This was the evidence heard by the jury and none of the materials Petitioner submitted provide

---

[67]   *See, e.g., Transcript Vol. X* at 65-67 (Deputy Fred Dixon was first officer on the scene, at distance of ten feet it was apparent the victims were dead, he did not get closer so as not to contaminate the scene, and he along with the second officer on the scene cordoned off the area with crime scene tape); *id.* at 71-72 (Sergeant David Frazee, third officer on the scene, did not go near the bodies); *id.* at 92-93 (Sergeant Roger Witt stayed with his detectives outside the scene waiting for "criminalistics people" to finish processing the scene).  Sergeant Witt is often referred to as "detective," but for the sake of consistency, I refer to him by the title he held during the investigation and at the time he testified.

Case 1:06-cv-00564-JCH-KBM   Document 26   Filed 03/04/08   Page 85 of 201
to the contrary.[68]

Bartlett also points to Granger's pretrial interview with the defense investigator for the proposition that "'distinctive footprints [near one of the victims were] not properly identified.'"  *State Petition* at 91, 186 (citing *Petitioner Supplement*, Granger Interview 8/29/96 at 9-10).  This takes the statement out of context. Granger's actual testimony was that he was looking for evidence as he approached the bodies, observed multiple sets of footprints near the victims that had not yet been marked and identified, pointed those out to the officers, and the officers then did in fact mark and photograph the prints he pointed out.  *See Petitioner Supplement*, Granger Interview 8/29/96 at 10.

As with the other expert claims, the trial judge found Bartlett simply speculated whether expert testimony would have made a difference and that even if introduced, would not have resulted in acquittal.  *See Record Proper* at 1783.  For similar reasons he rejected the claim that counsel was ineffective:

_____

[68]   *See, e.g., Petitioner Supplement,* Nasci Interview 1/8/97 at 4 ("once we got all of the things measured and photographed and that sort of thing and made sure that we had a clear path in and out [Granger] checked the bodies and . . . then we conducted a review of the scene to make sure that we didn't miss anything and then we started collecting up the evidence that was there."); *id.,* Detective Flores Supplement 11/19/95 at 1 (if paginated; "I videotaped the scene from the outter (sic) perimeter until Detective . . . King arrived [then] I videotaped that inner scene.  King and I photographed and processed the scene"); *id.,* Sergeant Frazee 11/19/95 Supplement at 1 (if paginated: "I was shown from a distance where the two bodies were located . . . we determined an area to be roped off to preserve the crime scene").

> Bartlett also apparently argues Witt and King
> falsely testified that footprints were not destroyed at the
> scene where the bodies . . . were found by officers
> trampling the prints.  Petition at p. 91.  Bartlett, however,
> fails to demonstrate how this testimony even if
> demonstrated as false, which counsel, Bartlett argues, <u>id.</u>,
> could have done based on pre-trial statements of
> Sergeant Nasci and Wayne Granger, would have created
> a reasonable probability the jury would have entertained
> reasonable doubt as to Bartlett's guilt. . . . These
> arguments thus fail for lack of prejudice.

*Id.* at 1803.

Like with the fingerprints, gunshot residue, gun registration, and palm print sections, the lack of a boot print matching Bartlett's at the scene where the bodies were dumped does not conclusively exonerate him.  See discussion *supra*, at page 80; *see also supra* notes 60, 63 and accompanying text; *see also supra* text at page 80. Therefore, I do not find the trial judge's result "contrary" or "unreasonable," and I recommend that the "uncasted footprint" aspects of Claims 3 and 5 be dismissed. *See Doc. 1* at 9A, 9A1, 10B3, 10B4, 10B5.

## 5.  Videotape of Police Interview of Bartlett

When the police took Bartlett into custody, they interviewed him for more than four hours.  The interview was videotaped and audiotaped, and he submitted the videotapes of the interview, which the Court has reviewed in full carefully, and

more than once.[69]  The trial judge reviewed them in their entirety too.  *See Transcript Vol. VIII* at 83, 88-89.

The videotapes are time-stamped and have two gaps.  Approximately 25 minutes are missing between the end of the first tape and the beginning of the second, and 23 minutes are missing between the end of the second tape and the beginning of the third.  All of the audiotapes went missing before defense counsel had the opportunity to review them.  The officer who was questioned about the gaps and the missing audiotapes attributed the problems to inadvertent mistakes. *See id.* at 62-64, 77-79, 82-85.

Bartlett asserts that counsel should have should have moved to suppress the videotapes on the ground of "inadvertent" destruction.  *See State Petition* at 118-20; *see also Doc. 1* at 9A5.  The trial judge summarily dismissed the claim for lack of prejudice.  *See Record Proper* at 1715.  I agree, but for an additional reason.

The premise for this claim has no basis in fact because counsel ***did*** move to suppress the videotape.  Not only did counsel argue that the videotape should be suppressed because Bartlett "was not in any condition to knowingly, intelligently

---

[69] Petitioner submitted four videotape cassettes, one of which overlaps another.  *See Petitioner Supplement,* Videotapes Labeled "5:02-6:09," "624 to 828," "6:24-7:57," and "8:15-9:27".  Defense counsel had three of the cassettes – 5:07 p.m. to 6:09 p.m., 6:24 p.m. to 8:28 p.m., and 8:51 to 9:27 p.m.  *See Transcript Vol. VIII* at 77-78.  These are the three tapes I discuss above.

waive his Fifth or Sixth amendment rights," *Transcript Vol. VIII* at 84, but also

because of the gaps and missing audiotapes:

> The main problem . . . is the lost tape. . . . not only are we
> missing the videotape recorded portions of it, but the
> entire audio recorded version . . . is missing as well . . .
> given these problems, this substantially impairs his rights
> of confrontation and his due process rights, and I request
> that the entire statement be suppressed because of the
> missing portions.

*Id.* at 84-85.  Because counsel did precisely what Bartlett claims he did not, this

aspect of Claim 3 should be dismissed.

A related claim is that counsel should have "consult[ed] a handwriting

expert [who] could have shown that Petitioner was 'under the influence' and sleep

deprived to the point that he was incoherent and not able to knowingly and

voluntarily sign away his constitutional right to an attorney."  *State Petition* at 63

(citing "Exhibit Hab. E," which is the written advice and waiver of rights).  In

rejecting the pretrial motion to suppress, the trial judge found as a matter of fact

that:

> The court viewed the entire video, and it appeared that
> the Defendant appeared on the tape, the Defendant was
> alert when dialoging with the police officer.  The court
> noted that he rested his head or eyes when not engaged
> in dialogue.
>
> The Defendant's testimony or the Defendant's

> version was pretty consistent throughout the four and-a-half hours that's on the video, and Defendant appeared interested in dialoging with the police officer.
>
> The Defendant had a right – had the right to stop the interview at any time he chose, but it appeared that the Defendant was interested in what information the State had at the time of the interview, and the tape is replete with repetition of the same stuff over and over again. So the motion will be denied.

*Transcript Vol. VIII* at 88-89. Bartlett does not allege, much less show by clear and convincing evidence under § 2254(d)(2) that the trial judge's factual findings are erroneous and, as such, they are presumed correct. As he did in rejecting all of Bartlett's claims that counsel was ineffective for failing to call an expert, the trial court held that Bartlett's claim was speculative and would not necessarily exculpate him anyway and, therefore, no reasonable probability he would have been acquitted. *See Record Proper* at 1782-83.

Moreover, having reviewed the videotape myself, and as explained in more detail below, I also find that Petitioner did ***not*** exhibit incoherence to the point where he could be considered to be acting without knowledge or unintelligently. Therefore, this aspect of Claim 3 should also be denied. *See Doc. 1* at 9A.

Even though defense counsel was not successful in suppressing the videotape, neither the prosecutor nor defense counsel used it during trial. Instead,

officers who were present during the interview testified to some of the things Bartlett said during the interview. *See, e.g., Transcript Vol. XIII* at 189-210. Bartlett makes some confusing arguments. He asserts that the trial judge should not have let a "partial" statement – a statement with "missing" parts – be "introduced" into evidence and asserts this demonstrates the court's bias toward the prosecution. *See State Petition* at 231. Yet, he does not indicate what significance the missing portions would have had at trial. Nor is there any indication that the trial court would have prohibited the jury from seeing the entire tape.

Bartlett also argues that counsel should have shown the videotapes (or a transcription of them) to the jury to impeach the officer's credibility generally, their descriptions of his demeanor and clothing during the interview, or their recollections about what he said.[70] He maintains that had the jury seen the tape,

---

[70]   Again Bartlett misquotes or misrepresents portions of the record. For instance, he asserted in the State Petition that "[p]rior to trial defense counsel informed the Court that he 'was not going to show to the ***jury*** Petitioner's video. [He is] going to argue what appears on the fact of the tape' [TT 8: 60]," *State Petition* at 88 (emphasis added), when what counsel actually was referring to was the motion hearing and not the trial, and said he was not going to present any witness testimony to the judge for consideration: "I'm not planning on submitting any evidence on that. Primarily, the tape that [the court has] reviewed, I would simply ask that . . . the tape . . . be admitted into evidence, and I'm going to argue simply on the basis of what appears on the face of that tape," *Transcript Vol. VIII* at 59-60. Bartlett also asserted that Detective Marquez testified that "'Petitioner did not give Debbie's last name.' [TT 13: 196]," *State Petition* at 87, when in fact the testimony was: "Q: Did he say if he had anybody with him . . . . A: He told me that he took Debbie. Q: Did you ever get a last name? A. I don't believe so,"

they would have concluded he was truly innocent – sleepy, dazed, confused,

muddled as to what was going on and, did not, as some of the officers suggested, *sua*

*sponte* introduce subjects into the conversation that the officers viewed as guilty

knowledge because only the murderer could have known them.[71]

---

*Transcript Vol. XIII* at 196.  Bartlett also asserted that Detective Marquez testified that when the officers said they were going to call Debbie to verify his alibi, Bartlett exclaimed "Oh shit, oh shit," but that neither this "statement or anything remotely close to it" exists on the videotape. *State Petition* at 87.  It is true that this Court did not hear Bartlett specifically say "Oh, shit" in this portion of the videotape.  Rather, after the officer said he was going to call the number he thought was Debbie's and left the room, Bartlett said "man."  For the next ten minutes he was fidgety then feigned sleep – he put his head on his hand facing away from the camera, murmured, uttered an occasional laugh, scratched his head, ate popcorn, fiddled with his fingers, murmured, laughed, and put his head in his hand, facing away from the camera, appears to be falling asleep but is breathing fairly rapidly.  *See Petitioner Supplement* (approximately 9:11 through 9:21).  He thus exhibited the very behavior the statement would have conveyed to the jury.

[71]  *See State Petition* at 84 (Ground 9 – defense counsel failed to show the jury the videotape of Bartlett's interview re:  condition of his jeans); *id.* at 85 (Ground 9 – defense counsel did not show jury portion of videotape where he was sleeping with head down when officers left interview room); *id.* (Ground 9 – defense counsel did not show jury portion of videotape where officer was asserting Bartlett made "mistake number 1" by *sua sponte* bringing up the subject of chairs missing from the trailer); *id.* at 86 (Ground 9 – defense counsel did not show jury portion of video showing that "[e]very time the detectives left the interview room [Bartlett] passed back out immediately"); *id.* at 87 (Ground 9 – defense counsel did not impeach officers on who was responsible for the gaps in the tapes); *id.* (defense counsel did not  show jury portion of the videotape where he gave Debbie's last name to officers); *id.* at 87 (Ground 9 – defense counsel did not show the jurors the portion of the videotape that showed he did not say "Oh, shit" when officer when to call Debbie); *id.* at 88 (Ground 9 – defense counsel did not show portion of tape showing that he was muddled and sleeping); *id.* at 88-89 (Ground 9 – defense counsel failed to show jury the videotapes or have them transcribed for impeachment purposes to dispute officers' testimony regarding his demeanor); *id.* at 90-91 (Ground 9 – defense counsel did not effectively impeach Sergeant Witt re: when the deer was slaughtered); *id.* at 107-09 (Ground 14 – defense counsel failed to "confront" the evidence about Bartlett's jeans by failing to show jury the videotape of Bartlett's interview that would have demonstrated no yellow stains at time of arrest); *id.* at 120 (Ground 17 – defense counsel ineffective for not showing jury video to demonstrate the officers gave "false testimonies . . . as described in Ground 9, 38, 14, 36 of the petition"); *id.* at 131 (Ground 21 – during a pretrial hearing defense counsel misstated the

The trial judge addressed the videotape claim and found that counsel was neither ineffective nor did Bartlett suffer any prejudice.  He concluded there was no prejudice because that the videotape was "inculpatory" rather than "exculpatory" as it showed Bartlett denying "involvement in the murders without explanation of the circumstantial evidence that indicated he was involved." *Record Proper* at 1798.[72]  The trial judge also concluded that counsel understandably avoided "focusing the jury's attention upon [videotape because of] its inculpatory nature . . . and its apparent lack of exculpatory facts demonstrated within it."  *Id.* at

---

interview was only 1 to 2 hours, when it was in fact much longer, thereby introducing "highly prejudicial" evidence to the trial court); *id.* at 172 (Ground 38 – prosecutorial misconduct in allowing Detective Marquez to "falsely" testify at trial that "[t]here was nobody assigned to" the task of monitoring the videotape, *Transcript Vol. XIII* at 191, when at the pretrial hearing he testified that "there's usually one or two people to keep an eye on the machine . . .  Myself – I mean, I'm partly responsible.  I'm supposed to keep an eye on that and through the conversation and talking, I didn't get a chance to check on it all the time.  Detective Ortiz was busy working on warrants and stuff and it just didn't get done," *Transcript Vol. VIII* at 78-79)); *id.* (Ground 38 prosecutorial misconduct in allowing Detective Marquez to "falsely" testify at trial Bartlett said "Oh shit, Oh shit," when officers announced they were going to call Debbie); *id.* (Ground 38 – prosecutorial misconduct in allowing Detective Marquez to "falsely" testify at trial that Bartlett brought up subject of missing chairs and hearing gunshot *sua sponte*); *id.* (prosecutorial misconduct in allowing Marquez to testify that he could not tell if Bartlett was sleeping during interview because hat blocked his face when at least twice he fell asleep with his head tilted backward); *id.* at 187-88 (Ground 40 – prosecutorial misconduct in destroying or losing audiotapes of interview); *id.* at 241 (Ground 47 – trial court erred in denying motion to suppress videotaped statement because of gaps).

[72]  *See also Record Proper* at 1796 ("Bartlett denied he committed the murders and provided no explanation for the inculpatory circumstantial evidence found outside and inside his home").

1800.[73]

Again, Bartlett has not made the requisite showing that the trial judge's factual findings are incorrect. Having reviewed the tapes myself, it is readily apparent why defense counsel wanted to keep them from the jury. The jurors could have easily drawn these impressions had they seen the videotapes: Bartlett feigned sleepiness, forcing yawns and pretending to fall asleep in order to keep his face from being seen on the videotape while the officers were out of the interview room. He was not drunk or genuinely sleepy when he is speaking to the officers. His rough voice sounds like someone who is a long-time smoker, not someone who was roused out of a deep drunken sleep and feeling the effects hours afterwards. His usual one-word or short responses to the officers questions are incongruent – insolent and evasive, rather than concerned or outraged. When confronted with physical evidence at the scenes, his attempts to appear confused are forced and his long silences indicate feeling trapped or thinking through a story. Throughout the interview, there were points where Bartlett's explanations changed slightly but, as

---

[73] *See also id.* at 1798 ("counsel could reasonably choose not to use Bartlett's statement as impeachment evidence in order to avoid unduly drawing the jury's attention to it."); *id.* at 1797 ("The use of Bartlett's videotaped statement would have drawn the jury's attention back to it, and it provided substantial inculpatory evidence, that is, Bartlett's denial of committing the murders without explanation for the inculpatory circumstantial evidence found at this home").

the trial judge noted, his recitation of where he was and what he did the night before were generally consistent.  Portions where the officers mischaracterize what Bartlett previously said are not the "falsehoods" as Bartlett wanted his attorney to portray to the jury, but obvious and intentional attempts to goad Bartlett into reacting and saying something incriminatory.  The officers did not deprive him of food and drink and were accommodating in that regard.

I find the trial judge's conclusions on both *Strickland* prongs are neither "contrary to" nor "unreasonable."  As such, I recommend that videotape aspects of Claims 3, 5, and 7 be dismissed.  *See Doc. 1* at 9A1, 9A5, 9A6, 10B3, 10B5, 10D1. Nonetheless, I will also separately address the videotape claims in connection with the condition of the pants claims below.

## 6.  Pool Of Blood Outside Trailer Explains Blood On Bartlett's Pants

Bartlett raises many claims in connection with the blood found outside his trailer and with the small amount of blood found on the jeans and boots he was wearing when he was taken into custody.[74]  The assertions associated with this

---

[74] *See State Petition* at 63 (Ground 5 – defense counsel failed to present expert testimony "to prove that whoever killed the two men at close or point blank range would certainly exhibit blood splattering on his clothing in an amount much more extensive than that found on" Bartlett's jeans and boot); *id.* at 84 (Ground 9 – defense counsel failed to show the jury the videotape of Bartlett's interview showing the condition of his jeans); *id.* at 88 (Ground 9 – defense counsel did not effectively impeach Sergeant Nasci on his testimony that the pool of blood was undisturbed because photos showed it was stepped in); *id.* at 90 (Ground 9 – defense

group of claims are misrepresentations of the record, immaterial or at least

inconsequential, and ultimately without merit.

The record reflects copious amounts of blood were located in the back of

Bartlett's trailer on the far side opposite the front door.  Some drops of blood led

from that area to the carpet by the inside of the front door.  There was also one

---

counsel did not effectively impeach Sergeant Witt on whether there was blood on the deck of the trailer); *id.* at 90-91 (Ground 9 – defense counsel did not effectively impeach Sergeant Witt re: when the deer was slaughtered); id. at 92 (Ground – defense counsel failed to explain Bartlett's blood on bed sheet was dry and Benjamin's was wet); *id.* at 107-09 (Ground 14 – defense counsel failed to "confront" the evidence about Bartlett's jeans by failing to show jury the videotape of Bartlett's interview that would have demonstrated no yellow stains at time of arrest); *id.* at 107-08 (Ground 14 – defense counsel failed to "confront" the evidence about his jeans in closing argument); *id.* at 108 (Ground 14 – same claim about Sergeant Nasci's testimony as in Ground 9); *id.* at 123-24 (Ground 19 – defense counsel told jurors in opening that jeans had two drops of blood but evidence was altered pants were stained all over); *id.* at 141 (Ground 27 – ineffective assistance of appellate counsel for failing to raise issue of altered jeans);  *id.* at 158-159 (Ground 36 – prosecutor used altered evidence at trial re: yellow stains); *id.* at 171 (Ground 38 – prosecutorial misconduct for use of "false" testimony re: Sergeant Witt's testimony that blood was on the deck); *id.* at 172 (Ground 38 – prosecutorial misconduct for use of "false" testimony re: Sergeant Nasci saying jeans were in roughly the same condition); *id.* at 173 (Ground 38 – prosecutorial misconduct for use of "false" testimony re: same claim about Sergeant Nasci's testimony); *id.* (Ground 38 – prosecutorial misconduct for use of "false" testimony re: Detective King's testimony that "'all the steps were very bloody.'"); *id.* at 188 (Ground 40 – prosecutorial misconduct re: officers failing to properly preserve the jeans); *id.* at 205 (prosecutorial misconduct for allowing Sergeant Witt to testify there was blood on the porch); *id.* at 217 (Ground 44 – prosecutorial misconduct in closing argument re: whether tire tracks were flush with deck); *id.* at 225-26 (Ground 46 – prosecutorial misconduct for misrepresenting condition of jeans on appeal); *id.* at 230-31 (Ground 47 – trial court error for allowing prosecutor to introduce altered jeans into evidence).

The trial judge summarily dismissed Ground 19 as duplicative of Grounds 4-6, 9, and 14. *See id.* at 1715.  He summarily dismissed the appellate counsel claim under Ernesto for no showing of prejudice.  *See id.* at 1716.  He summarily dismissed prosecutorial misconduct and trial court error claims as procedurally defaulted.  *See id.* at 1716 (Grounds 35 through 45); *id.* at 1717 (Ground 47).

blood smear and some blood drops on one of the two steps outside the front door.

There was a sock on the deck, and two more areas of blood in the dirt driveway

leading to a set of dually tire tracks.[75]  The closest area of blood to the tire marks

contained a much larger amount of blood.  One officer described it as a

"considerable" amount.[76]  Sergeant Nasci described it as a "pool" in his report.[77]

When the officers found Bartlett in his bedroom and took him from the

trailer, they noticed spots of blood on the boots and jeans he was wearing.  *See, e.g.,*

*Transcript Vol.* X at 82, 103-06; *Petitioner Supplement,* Ortiz Interview at 28-29.  His

boots, shirt and pants were taken for DNA analysis and compared to the DNA

samples taken from Bartlett and the victims.  *See, e.g., Transcript Vol.* XI at 93;

*Transcript Vol.* XII at 25; *Petitioner Supplement,* Tape of Sergeant Witt Interview

1/8/97.  At trial, the DNA analyst testified that blood stains from the sides of

Bartlett's left and right boots "matched the DNA types" of Unser.  *Transcript Vol.*

---

[75]  *See, e.g., Transcript Vol.* XI at 13-14; *Transcript* XII at 100-02; *State Petition* (attached Exhibit "Hab.A, which is Detective Flores' map of driveway, steps, patio, entryway, and master bedroom, showing blood drops and a sock); *Petitioner Supplement,* Detective Flores Map (layout of entire trailer, showing where victims were slain); *id.,* Photo Showing Areas F, G, I, K, J, L; *Transcript Vol.* XII at 100-02 (Detective King testimony identifying areas marked on maps and picture).

[76]  *Transcript Vol.* XII at 101.

[77]  *See Petitioner Supplement,* Nasci Supplement at 2.

XI at 94; *see also id.* at 100.  The blood stains on his jeans either contained Bartlett's DNA, or a mixture of DNA from him and Unser.  *See id.* at 96-97.  None of the blood on Bartlett's clothing matched Benjamin's DNA, *see id.* at 103-04, but one of the blood stains from his bed sheet and the DNA from the sock did match Benjamin's, *see id.* at 106, 108.

   ***Amount of Blood.***  Bartlett maintains that whoever killed the victims at such close range would have much blood on them and faults defense counsel for not presenting expert testimony "to prove that whoever killed the two men at close or point blank range would certainly exhibit blood splattering on his clothing in an amount much more extensive than that found on" Bartlett's jeans and boots.  *State Petition* at 63.  As with the other expert claims, the trial judge found Bartlett simply speculated whether expert testimony on this point would have made a difference and that even if introduced, would not have resulted in acquittal.  *See Record Proper* at 1782-83.  I agree.  I also independently find that counsel was not ineffective.

   Expert testimony is admissible when it will assist the trier of fact in making a decision.  Conversely, it is not admissible where, as here, the issue is a matter of

common sense.[78]  Moreover, counsel **did** raise the issue as early as opening

argument, and asked the jurors to use their common sense in evaluating this

evidence:

> There was also some blood on Mr. Bartlett's jeans, and on
> his – drops of blood on the front of his jeans and the
> drops of blood on his boot.  It's not the kind of blood, the
> amount of blood you would expect to see from somebody
> who's shot two people several times at close range, let
> alone someone who carried two bodies that were bleeding
> like these were, from his house out to a truck or moving
> haul.  There was no blood on his shirt at all, just these
> two drops or on the jeans and on the toe of the boot,
> basically.

*Transcript Vol.* X at 27.

---

[78]  *See, e.g., Francis v. Southern Pac. Co.,* 162 F.2d 813, 817 (10th Cir. 1947) ("The opinion of a witness qualifying as an expert is not admissible in evidence where the question for determination by the jury depends entirely on common knowledge and common understanding, and no special training or experience is required for its correct decision.  In a case of that kind the jury is equally competent with the expert to weigh and appraise the evidence and to draw conclusions from it, and therefore expert testimony should be excluded."), *aff'd,* 333 U.S. 445 (1948); *Sherrors v. Scribne,* 2007 WL 3276171 at *42  (S.D. Cal. 2007) ("The jury was capable of using its common sense in determining the effect alcohol and marijuana may have had on Walker.  Even if expert testimony were deemed admissible, Sherrors has not shown that there was a likelihood that the outcome would have been different with the testimony.  Counsel introduced evidence of Walker's possible intoxication as well as impeached her credibility in general.  There is no reasonable likelihood that the addition of an expert to testify on a topic that jurors were capable of evaluating as lay people, would have changed the outcome of the proceedings.  *See Strickland,* 466 U.S. 694."); *Massaro v. United States,* 2004 WL 2251679 at *4 (S.D.N.Y. 2004) (after remand in *Massaro,* 538 U.S. at 509, held "[w]here an expert would only marginally assist the jury in its role as fact finder, an attorney's decision not to call an expert is more likely to fall within the bounds of reasonable performance and less likely to prejudice the defendant. . . .  The lack of spatter, the deformity of the bullet, and the quality of the forensic investigation are matters which require only visual inspection or common sense to sort out.") (internal quotations and citations omitted), *aff'd,* 152 Fed.Appx. 20 (2nd Cir. 2005).

**Bed sheet.**  Bartlett asserts that had defense counsel established Benjamin's blood on the bed sheet was wet but that Bartlett's  blood on the same bed sheet was dry, "[t]his information would have clearly eliminated from the jury's minds that Petitioner and Lee struggled and both bled." *State Petition* at 92.  The trial judge rejected this argument as "speculation" saying "Bartlett apparently argues that explaining the difference would have introduced a reasonable probability the jury would have acquitted him. . . .  Bartlett's speculation, however renders his argument inapposite." *Record Proper* at 1804-05.  Again, I agree that speculation is generally insufficient to establish prejudice under *Strickland.*  See, for example, discussion *supra,* at page 68 & n.63 and page 45 & n.47.  Moreover, Bartlett's argument again misrepresents the record.

There was evidence at trial about abrasions and bruises on the victims other than the wounds associated with the gunshots.  For Benjamin or "John Doe A," these "relatively minor" injuries appeared "a little bit on the head and face, some over the . . . right lower back then around the elbow areas bilaterally." *Transcript Vol. XI* at 34 (testimony of Assistant Chief Medical Investigator McFeeley).[79]  It

---

[79]  The medical examiner's testimony switched back and forth between Unser and Benjamin, but it is clear which victim she was referring to upon a careful reading of the transcript.  *Compare Transcript Vol. XI* at 33 (Benjamin had three gunshot wounds in his head); *with id.* at 38-39 (McFeeley's overview of Unser's eight gunshot wounds and minor injuries).

was the medical examiner's opinion that Benjamin's minor injuries occurred "right at or right after death" because blood "dries . . . different than if you were alive and . . . it leaves a little different color. *Id.* at 54-55.[80] The sole time that the medical examiner mentioned the word "fight" was in connection with Unser's abrasions, not Benjamin. *Id.* at 71.

The odd thing about Benjamin's body was that he had a triangular piece of metal in his mouth, *see id.* at 60-61, but the State told the jurors that it was "**not** going to be able to explain that to you," and asked them "does it really matter with all this overwhelming evidence that you see here?," *Transcript Vol. XV* at 67 (emphasis added). The State never suggested that the blood on the bed sheet was due to a fight between Petitioner and Benjamin.

***Pool of Blood In Driveway.*** At trial, defense counsel asked Sergeant Nasci about his use of the word "pool" and this exchange took place:

> Q.    . . . was there pooling of blood somewhere . . . ?
> A.    There was pooling kind of in a drive area right
>        outside the front doors and the steps.
> Q.    And this pooling continued up into the steps and
>        up all the way to the front?
> A.    There was a blood trail that led up to the steps up

---

[80] *Compare id.* at 44-55, 60-61 (McFeeley's detailed discussion of Benjamin's three gunshot wounds and other injuries); *with id.* at 61-74 (McFeeley's detailed discussion of Unser's eight gunshot wound and other injuries).

to the front door.

Q.   Okay.  And pooling, how would you describe or define the word "pooling"?  This is more than drops; is that correct?

A.   More than just a couple of drops, a splotch, something more than two, three, four drops.

Q.   All right.  **And this pooling, could you tell whether or not it appeared that it would be tracked through?**

A.   What do you mean by "tracked through", sir?

Q.   Were any of those stains that you observed transfer stains from one pooling spot and did you see any transfer stains going up into that door?

A.   **From the pooling, no.  The pooling appeared to be undisturbed.**

*Transcript Vol. XII* at 36-37 (emphasis added).  In response to the prosecutor's questions on redirect, Sergeant Nasci explained that the pool was "dry" when he observed it because the "dirt had absorbed it," and that it was possible to get into the house without stepping in the pool because it "was off, basically, if you're facing that doorway, it was off to the left of the door."  *Id.* at 41-42.

The trial court rejected Bartlett's argument that

> his trial counsel erred in not confronting Nasci's testimony that a blood puddle outside Bartlett's home was undisturbed because photograph evidence of the puddle indicated it had been stepped in or disturbed . . . . Bartlett's apparent argument that the photograph evidence supports his innocence because it constitutes a possible explanation of how blood got onto his boots and clothes does not merit habeas relief.

101

*Record Proper* at 1799.

This conclusion is reasonable because Bartlett's attorney did in fact "confront" Sergeant Nasci on this issue and also encouraged the jurors to look at the photographs.  On recross-examination, for example, Sergeant Nasci admitted to defense counsel that in addition to the "pool," there was a "trial of blood leading from the pooling to the front door," and thus agreed with the implicit suggestion by defense counsel's question – that there were other sources of blood for Bartlett to have stepped in besides the "pool" in the driveway.  *Transcript Vol. XII* at 42-43.  In closing, counsel argued that even if the jurors believed that "DNA tests were somehow infallible . . . the amount of blood . . . on the boots and down one of the legs of the pants, it's just frankly not consistent with the state's theory . . . and with the scene, then you go through these photographs, take a look at it.  There's blood everywhere."  *Transcript Vol. XV* at 75.  Furthermore, as discussed in more detail in the next section, the blood on the step was smeared, which common sense suggests someone stepped in it.

**Tire Marks & Blood On Deck/Steps/Driveway.**  As for Bartlett's arguments about the amount of blood on the deck and steps, and the placement of the tire marks, he asserts that the prosecutor engaged in misconduct in closing argument when he said "'you saw how big Petitioner is.  He backed he truck up to the deck

102

and loaded them that way.' [TT 15: 129]." *State Petition* at 217.[81]  Bartlett asserts

this comment was "contrary to" the testimony of Detective King where he

estimated that the tracks were "approximately ten feet away" from the "front

porch." *Transcript Vol. XII* at 143.

The clearly established Supreme Court precedent on prosecutorial

misconduct of this sort in closing argument is whether the comment was so

egregious and infected the trial in a way that amounts to a denial of due process.

*E.g., Romero v. Franklin*, 244 Fed. Appx. 224, 226 (10th Cir. 2007) (citing *Donnelly

v. DeChristoforo*, 416 U.S. 637 (1974)).  There was nothing improper or unfair

about the prosecutor's remark.  The prosecutor did not make any comment about

the exact distance.  Moreover, the point was that whoever moved the bodies from

the trailer pulled Benjamin's truck up near the deck to do so.  The tire tracks near

the deck and the officers' testimony supported that construction of the evidence.

---

[81]   What the prosecutor actually said was:

> can this man do this by himself?  You've seen how big he is.  Do
> you think he can carry or drag a couple of people out especially
> when he backed that truck up to the deck?  Open the back, just
> drag them in and dump them, throw all the rest of the bloody trash
> in there with it.  That's what he's thinking, get rid of it, get it out
> of my house.

*Transcript Vol. XV* at 129.

The exact distance from the deck was of no consequence.

Bartlett also contends that Sergeant Witt "perjured" himself by agreeing with the statements that there was "some blood on the deck," *Transcript Vol. X* at 100, and that he noticed "blood in the deck of the house," *id.* at 117, and then purportedly contradicted himself by saying there was no blood on the deck, *see State Petition* at 90, 171.  The trial court accepted Bartlett's characterization of Witt's testimony as contradictory.[82]  I disagree.

To reach that conclusion, the trial judge and Bartlett had to take a portion of Sergeant Witt's testimony – "[t]hey weren't actually on the deck" –  out of context.  *Transcript Vol. X* at 101.   Initially, Sergeant Witt had testified about the "blood on the doorstep of the house leading into the door."  *Id.* at 99.  The remark at issue was made after questions that attempted to have Sergeant Witt estimate the distance the blood drops covered between the edge of the deck and the tire

---

[82]   The trial court reasoned:

> [Bartlett asserts that] Sergeant Witt should have been impeached as to his testimony there was blood on the deck of Bartlett's home. Petition at p. 90.  Witt's testimony, however, contradicted itself. Compare Vol. 10 TP at pp. 100, 117 (blood on deck at Bartlett's home) with Vol 10 TP at p. 101 (Blood not on deck but on dirt along side it).  Counsel could reasonably choose not to impeach Witt about this testimony given Witt's contradictory testimony was already before the jury.

*Record Proper* at 1802.

marks. *See id.* at 100-01. He never answered the question. Instead, he stated:

> The droplets ended up at the front of the – where the
> deck was. **They weren't actually on the deck,** they were
> in the dirt by it. From the **front of the deck to the door
> stop, was the trail,** and that was about 10 to 15 feet.

*Id.* at 101 (emphasis added). Plainly, the trail he was talking about started with the

blood on the doorstep, which itself was located on the deck, and continued just off

of the deck in the driveway, just as Detective Flores' diagram showed and

Detective King testified. See discussion *supra,* at page 94. Thus, Bartlett's

argument rests on an inconsistency from the transcripts where none exists.

At most, the testimony Bartlett points to was Sergeant Witt's clarification of

exactly where the blood was located and the later testimony of Detective King

would have cleared up any question the jurors could have possibly had from

Sergeant Witt's testimony. This brings me to Bartlett's next argument, which

inexplicably finds fault with testimony that in fact supports his position.

The diagrams Bartlett submitted to the state court and this Court show two

steps on the deck to the threshold of the door to his trailer, and one of the steps is

where item "E" was marked and photographed by the officers. *See State Petition*

(attachment Exhibit "Hab. A," showing areas marked "A" through "E"); *Petitioner*

*Supplement* (diagram of the trailer). The State either introduced this exact diagram

or one like it as State's Exhibit 71, and Detective King testified about the

individual items as well as the diagram as a whole.  *See Transcript Vol. XII* at 100-

01.

> That, basically, is with all of them identified, A through
> E, and it is giving you an overall view of how they were all
> related.  Like the diagram shows, you get blood ["pool"],
> blood, sock, and then the ***blood smear*** going up.

*Id.* at 101-02 (emphasis added).

Bartlett contends that Detective King's testimony that "all the steps were

very bloody" is "false . . . contrary to the facts of this case."  *State Petition* at 173

(the statement appears at page 127 of *Transcript Vol. XII* and not at page 90 as

Bartlett cites).  However, Detective King's specific testimony about the photograph

of item "E" was:  "That's right here on this step.  There's a blood smear ***right there***

***and right there,*** okay, ***and a little bit right here,*** too."  *Id.* at 100 (emphasis added).

Again Bartlett takes a snippet of testimony out of context.  What he said was:  ***"as***

***I said,*** this whole area , as indicated, were all – the blood spots and ***all the steps***

***were very bloody***."  *Id.* at 127 (emphasis added).  If it were not plain from exactly

what he said, I think it is clear from his testimony as a whole that when Detective

King later testified the steps were "very" bloody, what he was referring to were the

multiple areas he pointed out on the step in his prior testimony.  Thus, although I

disagree with the trial judge that "very bloody" comment was unclear, I agree that the import of the testimony was for the jurors to decide.[83]

I further find that counsel was not ineffective and no prejudice resulted because Bartlett's quibble with the phrase Detective King uttered is incomprehensible. More than the puddle in the driveway, which was to the side and could be circumvented, the step to his front door is one area where Bartlett would have had to step to enter the home. Detective King's testimony that the step was smeared directly supports the notion that Bartlett "easily could have

-----

[83]    The trial judge reasoned:

> The amount of blood found on the steps of Bartlett's home that Bartlett apparently argues constituted a subject on which counsel should have impeached King does not constitute ground that merits habeas relief because differences in testimony as provided by witnesses other than King compared to King's testimony (that all steps were very bloody, but King's testimony was not clear as to whether King was referring to steps at Bartlett's home, Vol. 12 TP at p. 127) were before the jury for it to decide what the evidence established about the amount of blood on the steps, and what weight to assign to each portion of the testimony. Compare Vol. 10, PT at pp. 99-1-1- (Witt testifying trial to blood drops leading to Bartlett's door from driveway are (onto deck steps and on the deck up to door step) with Vol. 1 TP at pp. 36-37 (Nasci testifying blood trail up stairs to Bartlett's front door from "drive are" and blood appeared in "splotches" of approximately two, three, or four drops in size) and Vol. 12 TP at pp. 40-43 (Nasci on redirect testifying to "pooling" of blood apparently at Bartlett's front step onto his deck).

*Record Proper* at 1808.

stepped in the pool of blood on the ground outside his home when he staggered into his home in the 3:00 a.m. darkness." *State Petition* at 107. In fact, the phrase Bartlett objects to appears during the testimony where Detective King was asked if it had been possible to move around the scenes without stepping in the blood and he responded: "the blood spots and all the steps were very bloody but, no, *if you didn't be careful and notice where you were stepping, you probably would end up stepping into it."* *Id.* at 127-28 (emphasis added).

*Drag Marks.* Also in connection with the blood on the deck and driveway, Bartlett takes issue with whether there were in fact "drag marks" in the driveway. During a suppression hearing, Detective Ortiz testified that there were what appeared to be drag marks in the vicinity of the blood from the front door to the driveway. *Compare Transcript Vol. VII* at 36 ("dried" marks, meaning blood), *with id.* at 58-59 (testimony about "drag" marks next to blood). Bartlett faults counsel for failing to "impeach" on the drag mark issue during trial, contending that there were no such drag marks as illustrated both by the diagram discussed above and by Sergeant Witt's testimony that he "'did not notice any drag marks.' [TT 10: 117]." *State Petition* at 90.

The trial judge rejected the claim on the prejudice prong because at trial there was "no testimony as to whether . . . there were drag marks [and because]

Ortiz' testimony . . . was not before the jury." *Record Proper* at 1802.

This finding is reasonable, as Bartlett again misrepresents the record. The testimony he attributes to Sergeant Witt does not say "drag marks." Sergeant Witt's actual testimony was that he did not notice "track marks," but did notice the "tire marks" noted as item "A" on the diagram. *See Transcript Vol. X* at 117; *State Petition,* Hab.Exh. A.

*Use of Videotape For Impeachment For Deer Blood & Yellow Stains On Jeans.* Bartlett claimed that his attorney was ineffective for failing to use the videotape of his interview with the officers to "impeach" them on issues pertaining to deer blood and yellow stains on his jeans. The trial court rejected them, among other things, because it found the videotape was inculpatory. I again agree and cannot find this conclusion unreasonable for the same reasons set forth in the previous section.[84]

---

[84] The trial court held:

> Bartlett's argument that counsel erred in not confronting Witt's testimony using the [videotaped] statement, Petition at pp. 88-89, fails concerning Witt's testimony that they found Bartlett sitting near blood on the floor in his home, that Bartlett told the officers he butchered a deer approximately a week before they found him, and that Bartlett wore the pants in which he did the butchering for a week. Counsel could reasonably choose not to use the statement in order to avoid focusing the jury's attention upon it given its inculpatory nature as discussed above, and its apparent lack of exculpatory facts demonstrated within it.

To that I add these reasons for rejecting the various claims in this regard. The videotape of Bartlett's interview with the police reveals that at several points Bartlett suggested deer blood could be the source of the blood on his jeans and boots. Around 5:25 p.m., just minutes into the interview, when first asked how he

---

*Record Proper* at 1800.

> Detective Marquez' testimony at trial that Bartlett indicated in his videotaped statement that he was at the butchering of a deer six weeks before November. 18. Petition at p. 90. Bartlett argues his videotape statement consistently indicated the butchering occurred two to three weeks before November 18. Id. at p. 91. If counsel used Bartlett's statement to impeach Marquez' testimony, Bartlett argues that his version of events would then have appeared to be consistent and credible before the jury. As discussed above concerning counsel's choice not the use the videotaped statement to impeach state witnesses, counsel could reasonably choose not to use it here. Moreover, contrary to Bartlett's apparent argument, only one version of Marquez' testimony was before the jury, that Bartlett was at the butchering six weeks before November 18, not testimony that Bartlett apparently had claimed three different time periods (three weeks, six days, and six weeks).

*Id.* at 1802-03.

> Detective Nasci testified on direct examination [sic] that he could not recall if yellow stains were on the jeans when they were taken from Bartlett. Vol. 13 [sic] TP pp. 32-34 [sic]. Moreover, he also testified on direct that he did not know what caused the stains. Id. Rather than use Bartlett's videotaped statement to emphasize there were no such stains in the jeans, and thus focus the jury's attention upon [areas of the videotape] in which Bartlett denied he committed the murders and provide no explanation for the inculpatory circumstantial evidence found outside and inside his home . . . counsel reasonably could choose to avoid doing so given Nasci's equivocal testimony about the stains.

RP at 1795-96.

could explain the blood spots on his pants and boots, Bartlett replied: "I don't know what to tell you," "I don't know." When asked a second time again he said: "Maybe in a fight?" Then when an officer asked whether it could be animal blood, Bartlett replied that he was present when a deer was butchered a month earlier. *See Petitioner Supplement,* Bartlett Interview Videotape at 5:31 p.m.. Later in the interview he gave a slightly different time frame – saying that the butchering took place "three weeks ago or so." *Id.* at 7:56 p.m.; *see also e.g., id.* at 8:07 p.m. (more discussion about the deer as possible source of blood).

Bartlett faults counsel for failing to impeach the officers' pretrial and trial testimony about when exactly the butchering took place, but Bartlett himself cannot remember correctly either. He asserts that he "stated consistently that the deer was slaughtered two to three weeks prior," *State Petition* at 91, but the tape showed he thought it was three weeks or more. Even if Bartlett had accurately described the testimony, the differences in time frame are immaterial in my view.[85] Either claim fails for lack of prejudice.

Bartlett also makes much of the condition of his jeans when they were

---

[85]   *See State Petition* at 90 (Sergeant Witt gave the time frame of one week; pretrial Officer Marquez gave time frame of six weeks to grand jury and at suppression hearing stated Bartlett first asserted six weeks and then changed his statement to six days).

admitted into evidence at trial, calling them the State's "key" piece of evidence. *See State Petition* at 107, 159.  He contends that contrary to the "few spots of blood" on his left leg and no yellow stains on his jeans when he was arrested, at trial the jurors "gasped in horror at the sight" of the pants full of yellow stains.  *Id.* at 108. He asserts that these yellow stains demonstrate that his jeans were altered by the State between the time they were taken from him and trial, and submitted a picture of the pants taken at the crime scene laboratory to illustrate the stains.  *See Petitioner Supplement* (photograph with notation "1 of 11").

The premise for this argument has no basis in fact.  Although either the time-stamp, an officer's leg, or Bartlett's crossing of his right leg over his left knee kept the thigh of his left leg and entire right leg often out of view, there are brief moments on the videotape where the relatively few white spots in those areas appear to be forming.  *See Petitioner Supplement,* Bartlett Interview Videotape at 5:11, 7:17 - 7:19, 7:42, 8:23.  Moreover, at different points on the videotape there are clearly-visible white spots on the lower part of the left leg of his jeans, that correspond precisely to the six areas of spots shown on the photograph he submitted from the crime lab.  *See, e.g., id.* at 5:31, 6:48 - 6:49, 6:56, 7:10, 7:24, 8:07 - 8:09, 8:13.

Defense counsel was not successful in suppressing the videotape of the

112

officers' interview with Bartlett.  Nonetheless, the videotape was not used at trial

nor did any of the officers testify or otherwise mention the white spots.[86]  And, the

State did not have any photographs of the condition of Bartlett's pants when he

was seized.  The only thing it had to introduce were the jeans themselves.[87]  Thus,

it turned out that the jurors did not know that the spots were present at the time of

Bartlett's arrest, and the defense used that to its advantage as events unfolded

during trial.

The DNA analyst testified that there were areas of the jeans that tested

positive for human blood but did not yield any ascertainable DNA.  He surmised

this was so either because the sample was too small or that it had been "broken

down" by sunlight or chemicals.  *Transcript Vol. XI* at 98-101.  That provoked a

juror question – "What is the yellow stains on pants?" – which the prosecution said

it would clarify after the recess.  *Id.* at 102.  After the recess, when the prosecutor

---

[86]  *See, e.g., Record Proper* at 73; *State Petition* at 84; *Transcript Vol. VII* at 85, 88-89, 91-92 (motion to suppress); *Transcript Vol. X* at 82 (Officer Frazee testimony); *id.* at 106 (Sergeant Witt testimony); *Transcript Vol. XI* at 20 (Detective King testimony); *Transcript Vol. XII* at 139-40 (Detective King testimony); *Petitioner Supplement* (portions of written reports, transcribed interviews, and taped interviews for officers Flores, Frazee, King, Marquez, Ortiz, Stebelton, and Witt).

[87]  Evidently, the picture of the white-spotted jeans at the State crime lab that Bartlett submitted for the record was not introduced at trial.  *See Record Proper* at 186-187; *Transcript Vol. XI* at 20, 96.  Even if it was, it was a picture of the jeans from the crime lab and not from the night of Bartlett's arrest.

asked whether bleach was a chemical that could break down the DNA, the analyst

answered: "Yes. *We use bleach in the laboratory* to decontaminate or clean the

surfaces so that could – and does break down DNA." *Id.* (emphasis added).  He

thought the yellow areas were caused by "some type of chemical," but when he

tested the area could not identify what made the discoloration.  *Id.* at 103.

      The defense capitalized on this line of questioning.  Earlier, Detective King

had testified that the officers recovered "a rag that appeared to be a bloody rag and

a bloody sponge . . . that smelled of Clorox, gave the impression that someone may

have been using the Clorox to try and to clean up the place." *Id.* at 16.  Defense

counsel not only had the analyst's testimony that the laboratory itself uses Clorox,

but also established that the analyst had no idea how the samples from the crime

scenes were maintained before they were sent to him and that he was never given

the sponge to analyze.  *Id.* at 115-16.

      Deputy Nasci testified after the analyst and stated on direct examination

that the only thing different about the jeans from the time Bartlett was arrested was

that portions had been cut out for testing – he mentioned nothing about the stains.

*Transcript Vol. XII* at 23.  When defense counsel asked him about the stains on

cross-examination, Nasci testified that he did not know what caused them.  And,

as discussed above, Sergeant Nasci did not think the acid he used to conduct the

114

primer residue test could have caused them.  *See id.* at 33-34.  Detective King, who had started his testimony the previous day but was bumped until after the analyst to accommodate other witnesses, was not asked about the yellow stains.

The cumulative effect of this testimony was to leave the jurors with the impression that there was Clorox both in other pieces of evidence and at the lab that could have accounted for the staining.  Counsel emphasized this in closing, as discussed in more detail below.

Therefore, I recommend that the blood and jeans aspects of Claims 3, 4, 5, 6, and 7 be denied.  *See Doc. 1* at 9A-9A6, 10A1, 10B1, 10B5, 10B10, 10C-10C1, 10D-10D1.

## 7.  Final Thoughts On Physical Evidence

The defense introduced its closing argument by emphasizing the lack of physical evidence tying Bartlett to the murders:

> The only things that could conceivably relate to Mr. Bartlett in terms of tying him directly to this are the claims that there were blood, a few drops of blood on his pants and on his shoe, some of which matched Jeff Unser and a couple of drops on this sheet that matched Lee Benjamin.
>
> The District Attorney said when she spoke to you a minute ago, that it's not possible, not possible that these items could have been contaminated.  I ask you to think about the totality of the investigation that the sheriff's

115

office conducted in this case and ask yourself is it really impossible that these were, these items got contaminated[?]

For instance, there was a lot of talk and questions about how these drops of blood get on him, and then – and yet, for all the officers that asked him about that, no one apparently asked him where did the white spots come from[?] When did those white spots on his pants get there? This evidence was apparently stored together at one time, albeit in separate paper bags. Is it inconceivable? Is it inconceivable that the sponge, the wet sponge that was never sent off to Santa Fe for analysis or one of the wet rags that was placed on there leaked onto some of this other evidence?

If you recall the testimony of Mark Salvo, he indicated that the amount of contamination that's necessary to foul up these tests up is, indeed, very, very slight. Someone sneezing could. Furthermore, he also told you that what his DNA testing shows is that a very small portion of the DNA strand, just a mirco, microscopic particle of a very, very long strand was consistent with that particle of strands of DNA from the various people that testified about it. What he didn't tell you, what there's no evidence about is how many other hundreds, thousands, millions of people there might be whose DNA matches that.

You have no statistical information about that whatsoever, and he told you but this is not and exclusive match, this isn't like fingerprints, it's nothing of the sort. For all we know, there may be people who dealt with this on the sheriffs officers whose DNA would have matched this just as well, which there may have been people in the lab who handled the stuff whose DNA would have matched that.

116

But be that as it may, even if you assume, even if you assume that these DNA tests were somehow infallible and accurate to a degree that's – you've not been presented with here in terms of evidence, the fact of the matter is the amount of blood and the way this blood was one on the boots and down one of the legs of the pants, it's just frankly not consistent with the state's theory of what's here, and with the scene, the scene, then you go through these photographs, take a look at it.  There's blood everywhere.

Could someone who shot these people in close range, several times not have had more blood than that blow back on their pants, much less, could someone have picked these people up by the head as it was demonstrated that they believe these people were carried, dragged this way?  Look at these hats.  You'll have them in the jury room.  See how much blood is in them, without getting blood in (sic) them.  There's a couple of drops, which was very difficult to even see at the time, when we (sic) were asking Mr. Bartlett about it, not consistent with somebody who committed these kind of brutal, bloody murders, much less even assisted in disposing of the bodies.

*Transcript Vol. XV* at 73-76.

Bartlett tries to convey the impression with the claims discussed in Section VII that defense counsel did nothing to impress upon the jurors the lack of physical evidence against him.  He attempts to bolster his claims by lumping almost all the physical evidence under the heading "exculpatory" or "exonerating," even where that is a complete mischaracterization.  And, for all of reasons discussed in the last

117

sixty pages covering Sections VII.B.1 though 6, the record bears no resemblance to
his impression that counsel did nothing.  In fact it provides the exact contrary
impression – a cornerstone to the defense was the lack of physical evidence.  All of
Bartlett's related claims in this regard should be dismissed, at the very least, for lack
of prejudice, as the trial judge held in his summary and merits decisions.

### C. *Failure To Present Defense Of Alibi And That Others Had Motive To Commit And/Or Committed, The Murders* & *Related Claims*

Bartlett's "main grievance is that all of the known evidence and
circumstances did not come to light" during the trial.  *State Petition* at 131.  He
contends that the officers and prosecutors "did not want to pursue this case with
any type of meaningful investigation [and] that in January, 1996 this ordeal was
over.  They had stopped looking for any other suspects. . . . they were not looking
for justice, rather just a conviction of an individual who has had a previous run
with these detectives."  *State Petition* at 189.  He believes that the jury would have
acquitted him if defense counsel had only:  "proven the alibi defense with the facts
shown at the time of trial," *id.* at 64; shown "that others had admitted to this crime
or had a motive," *id.* at 67; and shown "that the State's chief witness, Roberts, was
in fact implicated in this crime," *id.*

Bartlett asserts that these aims were not accomplished because counsel failed to investigate witnesses who "could corroborate Petitioner's alibi" or witnesses who "could have implicated others," *id.* at 72, and failed to effectively impeach "witnesses with all the facts which were available at the time of trial," *id.* at 95.  He expected counsel to raise every conceivable impeachment issue and in his State Petition cited numerous examples, but he "refrain[ed] from citing" them all because the "document would be far to extensive [if he did] so."  *Id.* at 84; *see also e.g., id.* at 72-98.  He maintains that by not doing so, counsel "authoriz[ed] the State to fabricate and/or elicit unreliable testimony," *id.* at 75, and the testimony was "not factual [and therefore] inadmissible," *id.* at 131.

Before I delve into the specifics of the many claims in this section, I will address Bartlett's related jury instruction claims.  He recognizes that an alibi instruction "is not necessary because it is not a legal defense and merely a comment on the evidence,"[88] but maintains that in a "murder trial it is reversible error for failing to tender instructions on motive when the evidence, like in this case is

---

[88]  *State Petition* at 72 (citing *State v. McGuire,* 110 N.M. 304, 795 P.2d 996 (N.M. 1990), *United States v. Hicks,* 748 F.2d 854 (4th Cir. 1984), and *United States v. Burse,* 531 F.2d 1151 (2nd Cir. 1976)).

circumstantial."[89]  He thus faults defense counsel for failing to tender, and the trial

court for failing to give, instructions to the jury on both "alibi" and "motive."[90]

New Mexico's Uniform Jury Instructions include instructions on motive and

alibi, but the "Use Notes" to both provide that "[n]o instruction on this subject

shall be given."[91]  Indeed, the trial judge dismissed the claims based on the use note

directive.  *See Record Proper* at 1714, 1786-87.  He did not mention a federal aspect

of the claim, so I will address it independently.

Historically, the federal circuits have been split on the issue of whether and

alibi instructions should be given at all and under what circumstances.  The Fourth

---

[89] *Id.* (citing *State v. Vigil*, 87 N.M. 345, 533 P.2d 578 (N.M. 1975), and *State v. Tally*, 103 NM 33, 36-37, 702 P.2d 353 (Ct. App. 1985)).

[90] *See id.* at 68 (Ground 6 – counsel failed to tender alibi instruction); id. at 71-72 (Ground 7 – counsel failed to tender UJI instruction 14-5150 on alibi or instruction on motive); id. at 241-42 (Ground 47 – trial court failed to instruct the jury on motive).

[91] The alibi instruction provides that if the jurors "have reasonable doubt that the defendant was present at the time the crime was committed, you must find him not guilty."  The commentary provides that, "[a]nalytically, an alibi is not a technical or 'legal' defense but it is used to cast doubt on the proof of elements of the crime. . . .  Consequently, the committee believed that no instruction on alibi should be given since it merely comments on the evidence." N.M. R. CRIM. P., Uniform Jury Instruction 14-5150 & Committee Commentary (LexisNexis 2004 & Supp. 2007).  The motive instruction provides that the State "does not have to prove a motive. However, motive or lack of motive may be considered by you as a fact or circumstance in this case. You may give the presence or lack of motive such weight as you find it to be entitled." The commentary provides that "[m]otive is not an element of the crime nor its absence a defense. . . .  The committee believed that an instruction on motive amounted to a comment on the circumstantial evidence. . . .  The adoption of this instruction consequently supersedes the holding in *State v. Vigil*."   N.M. R. CRIM. P., Uniform Jury Instruction 14-5029 & Committee Commentary (LexisNexis 2004 & Supp. 2007).

and Second Circuit decisions Bartlett cited in support represent only one end of the spectrum.  *See e.g., supra* note 88; 2A Charles A. Wright, et al., FEDERAL PRACTICE & PROCEDURE § 491, n.2.

There is no Supreme Court precedent, much less clearly established precedent, that constitutionally requires an instruction on alibi or motive be given in homicide trials.  The clearly established Supreme Court precedent on jury instructions holds that habeas relief will only issue for instructions that "so infected the entire trial that the resulting conviction violates due process."  It is not available if the state court gave an instruction that is wrong, or undesireable, or "universally condemned."  *Estelle v. McGuire,* 502 U.S. 62, 72 (1991) (internal quotations and citations omitted); *see also, e.g., Middleton v. McNeil,* 541 U.S. 433, 437 (2004) (reiterating same standard).  The clearly established Supreme Court precedent on counsel's failure to ask for a particular instruction implicates the *Strickland* test.  And, "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  *Henderson v. Kibbe,* 431 U.S. 145, 155 (1977).  Indeed, the Supreme Court has stated that

> "[we] presum[e] that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *Francis v. Franklin,* 471 U.S. 307, 324, n. 9

121

> (1985). *See also Strickland* . . . 466 U.S. [at] 694 (in
> assessing prejudice for purposes of ineffective-assistance
> claim, "a court should presume . . . that the judge or jury
> acted according to law").

*United States v. Olano,* 507 U.S. 725, 740-41 (1993).

Federal decisions hold that if the state court properly instructs the jury on all

the elements of the crime and the burden of proof, as was done here,[92] relief is not

available for the lack of an alibi instruction.[93]   I find these decisions persuasive and

---

[92]  *See Record Proper* at 190-214 (trial court's instructions to jury).

[93]  For a federal habeas decision that collects cases in this area, see, for example, *Parreno
v. Annetts,* 2006 WL 689511 at **13-14 (S.D.N.Y 2006) ("It is simpler to dispose of Parreno's
claim based on the second prong of the [*Strickland*] inquiry: that is, whether Parreno suffered
actual prejudice due to the lack of an alibi instruction. . . . *United States v. McCall,* 85 F.3d 1193
(6th Cir. 1996) . . . held that omission of an alibi instruction is not plain error 'as long as the jury
is otherwise correctly instructed concerning the government's burden of proving every element of
the crimes charged, and the defendant is given a full opportunity to present his alibi defense in
closing argument.' *Id.* at 1196; *see also Ducket v. Godinez,* 67 F.3d 734, 744 (9th Cir.1995), *cert.
denied,* 517 U.S. 1158 (1996) (commenting that this court has "never held . . . that failure to
give a specific alibi instruction is necessarily a constitutional violation.  Nor has any other
circuit.") (emphasis omitted).  New York State law itself recognizes this principle. . . .  Consistent
with these principles, federal habeas cases have recognized the lack of prejudice in circumstances
similar to those present here.  In *Cruz v. Greiner,* 1999 WL 1043961, at *17 (S.D.N.Y. 1999), the
court held that there was no prejudice under *Strickland* resulting from a court's failure to give an
alibi instruction where the jury was otherwise charged on burden of proof.  Similarly, in
*Wyniemko v. Smith,* 2000 WL 760704, at *8 (E.D. Mich. May 10, 2000), the court held that there
was no prejudice where alibi evidence was presented at trial and where counsel discussed the
alibi in closing arguments.  *Cf. Jones v. Kemp,* 794 F.2d 1536, 1540-41 (1986) (11th Cir. 1986) (no
error in failing to instruct on alibi in absence of request for instruction, noting that '[t]he court
gave proper instructions on the elements of the crime and burden of proof, and [the petitioner]
has demonstrated no prejudice from the absence of a specific alibi instruction'").

For a decision that holds the same in the federal post-conviction posture, see, for
example, *McGonagle v. United States,* 2002 WL 31409820 at *7  (D.N.H. 2002) ("None of the
petitioners (acting through counsel) requested the court to provide an "alibi" instruction to the

further find the same reasoning applies to motive, which is not an element of the crimes or a defense to them.[94]  Moreover, "[i]t cannot be ineffective assistance of counsel to fail to request a [jury instruction] that was not available [under state law]."  *Bilderback v. Abbott*, 107 Fed. Appx. 852, 855 (10th Cir. 2004); *see also Florez v. Williams*, 41 Fed. Appx. 293, 295 (10th Cir.) ("Because . . . the New Mexico courts ruled that Florez was not entitled under New Mexico law to a voluntary intoxication instruction, it follows that counsel was not ineffective for failing to request one."), *cert. denied*,  537 U.S. 1054 (2002).

---

jury, nor did any of the petitioners object to the absence of such an instruction. . . .  Even if the court were to assume that both trial and appellate counsel were constitutionally deficient in the way they handled the alibi instruction issue, petitioners still cannot carry their burden with regard to the second element of the *Strickland* test. . . .  The primary purpose of an 'alibi' instruction is to 'remind the jury as to the government's burden of demonstrating all elements of the crime beyond a reasonable doubt, including defendant's presence at the crime scene.' [*McCall*, 85 F.3d at 1196].  Notwithstanding the absence of a specific alibi instruction, the instructions given to the jury made abundantly clear the extent of the government's substantial burden of proof with regard to every essential element of each crime charged. . . .  Jury members were well aware that, to the extent their verdict as to any petitioner on any specific count required a finding that he was physically present in a particular location at a particular time, they were required to unanimously agree that the government had proved that fact beyond a reasonable doubt."), *certificate of appealability denied*, 137 Fed. Appx. 373 (1st Cir.), *cert. denied*, 546 U.S. 971 (2005).

[94]   As the proposed jury instruction provides, in New Mexico motive is not an element of homicide.  *See supra* note 91.  For a decision denying habeas relief for lack of a jury instruction on motive, see, for example, *Harrison v. Dahm*, 880 F.2d 999, 1002 (8th Cir. 1989) ("nothing short of a complete miscarriage of justice justifies federal habeas relief based on erroneous instructions. . . . the [state] court's refusal to instruct the jury concerning lack of motive does not appear erroneous.  Perhaps more importantly, as Harrison's proposed instruction states . . . motive is not an essential element of first degree murder.  Therefore, we do not believe that the trial court's refusal to give the proposed motive instruction created a fundamental defect causing a complete miscarriage of justice.").

Therefore, I recommend that the jury instruction aspects of Claims 3 and 7 be dismissed as without merit.  *See Doc. 1* at 9A, 10D5.

## 1.  Time of Death & Alibi Witnesses

The testimony about time of death was provided by Senior Medical Investigator Wayne Granger and Assistant Chief Medical Investigator Dr. Patricia McFeeley[95] of the New Mexico Office of the Medical Examiner.  The State called McFeeley to testify, and the defense called Granger to testify.

Almost every claim in this next category rests on the premise that the murders and dumping of the bodies occurred between midnight and 3:00 a.m. on Sunday while, as the defense witnesses testified, Bartlett was drinking in Albuquerque.  Bartlett generally emphasizes midnight rather than 3:00 a.m., based on a statement Granger made during an interview with defense counsel.[96]  Bartlett contends that his attorneys failed to properly develop the critical facts for this alibi, either by not calling a defense expert to pinpoint the time of death, not handling

---

[95]  She is married to Chief United States Bankruptcy Judge Mark McFeeley.

[96]  Bartlett asserts that:  "Granger estimated . . . the time of death some time around midnight," *State Petition* at 5; according to Granger, "the dumping of the bodies in the East mountain area between 1:00 and 3:00 a.m., when Petitioner was some 30 miles away in downtown Albuquerque, NM, at the Wine Cellar Bar from approximately 9:30 p.m. to 2:10 a.m.," *id.* at 65; and "2:00 a.m. is 2:00 a.m., not bar time. . . . Petitioner was so drunk it took him ten minutes to find the right key to get into his truck . . .  It is a solid half-hour 'plus' drive up the mountain to Petitioner's house," *id.* at 65-66.

Granger's testimony at trial for the defense properly, or not calling enough

witnesses to testify that he was in Albuquerque at the time of death.[97]

Bartlett makes much of the fact that McFeeley gave a range of time of death

from eight to twenty-four hours prior to 3:30 p.m. Sunday afternoon, the time

when Investigator Granger was able to view the bodies at close range.   According

to Dr. McFeeley's testimony then, the victims could have been shot as early as 3:30

---

[97] *See State Petition* at 44 (Ground 1 – defense counsel could have "confronted" Detective Ortiz when he testified for the State by having him contradict the twenty-four-hour estimate of time of death with his twelve-hour estimate for the grand jurors, or contradicting Robert's testimony that he saw the victims dead between 8:30 and 9:00 p.m. with the fact that Ruthanne Jojola told officers she saw victims alive after 10:00 p.m., or contradicting Hooven's testimony that she saw Bartlett in the bar a second time at 8:00 p.m. and not 9:00 to 9:30 p.m.); *id.* at 61-62 (Ground 5 – defense counsel ineffective in not calling expert to more accurately pinpoint time of death and by not qualifying defense witness Granger as an expert to testify that time of death was around midnight because he said in an interview with defense that if more than that the blood would have a different pattern); *id.* at 65 (Ground 6 – defense counsel failed to properly present the alibi defense by misleading jurors in opening statement by saying "They don't know when the bodies were dumped" when Granger's interview provided they were dumped between 1:00 a.m. and 3:00 a.m.); *id.* at 66-67 (Ground 6 – defense counsel failed to properly present the alibi defense because failed to put the 24-hour estimate to adversarial testing by, among other things, Granger's interview and Unser's fiancé left a U.S. West Phone Message for Unser at 7:00 p.m. that was picked up at 1:00 a.m.); *id.* at 93-94 (Ground 9 – defense counsel failed to effectively impeach Granger by bolstering his credibility with his credentials, refresh his memory that he was kept from approaching the bodies right away because officers were dispatched to another crime scene, dispute his agreement with the 24-hour estimate, and point out his "exit interview" with Detective Ortiz was only a "very brief conversation"); *id.* at 124 (Ground 19 – defense counsel said in opening statement that Granger would testify the victims were "certainly killed sometime after midnight," but what Granger said in his interview was "around" midnight); *id.* at 126 (Ground 19 – same claim re: opening statement and when bodies dumped as Ground 6); *id.* at 126 (Ground 19 – defense counsel said in opening statement that Granger's case experience ranged in the hundreds when the number was 5,000 over 23 years); *id.* at 201 (Ground 41 – prosecutorial misconduct by delay of trial when time of death was "no longer an issue" based on Ruth Jojola's testimony that she saw the victims alive at 10:15 p.m. Saturday).

p.m. Saturday afternoon and as late as 7:30 a.m. Sunday morning. *See Transcript Vol. XI* at 38. Bartlett considers this testimony "false" when compared with Granger's estimate, and what Detective Ortiz told the grand jurors,[98] and wanted his attorneys to "impeach" her on her estimate and pinpoint the time of death exclusively at the midnight to 3:00 a.m. time frame.

As with many of his other claims, here too Bartlett has an expansive view of the evidence that is reason to reject the claims. For example, he assumes that the time of death could have been made with precision. But both McFeeley and Granger indicated that generally it is not possible to estimate precisely when a victim died, and it was not possible to do so with these victims. McFeeley explained that medical examiners "can only make an estimate under the best of circumstances," *Transcript Vol. XI* at 35, and time of death is "not an exact science

---

[98] Detective Ortiz testified before the grand jury as follows:

| | |
|---|---|
| [Prosecutor]: | Was the Office of the Medical Investigator able to give you any insight into the possible time frame, the death of these individuals? |
| [Det. Ortiz]: | It appeared to be an over-night type within 12 hour period, 12 hour range. |
| [Prosecutor]: | Consistent with some time over night between the 18th [Saturday] and 19th [Sunday] of November, 1995? |
| [Det. Ortiz]: | Correct. |

*Petitioner Supplement,* Grand Jury Transcript 11/27/95 at 9.

. . . the farther you are away from the time of death, the less exact it is," *id.* at 36.

Granger likewise indicated at trial that estimating time of death was not an "exact

science," *Transcript Vol. XV* at 26, his estimate to the officers was simply a "general

estimation," *id.,* and not a "definite" statement of when the victims died, *id.* at 27.

When interviewed by the defense Granger indicated there is "[a]lways that

possibility" that a different time of death is equally accurate.  *Petitioner Supplement,*

Granger Interview 8/29/96 at 8.

Bartlett does not identify what a defense expert on time of death would have

testified, which alone is grounds to deny the claim and one of the reasons the trial

judge seemed to cite in denying the claim.[99]  Nor is there any indication that the

---

[99]  *See, e.g., Record Proper* at 1783 ("Bartlett does not allege facts in his Petition which demonstrate such expert testimony could have been produced."); *Cummings v. Sirmons,* 506 F.3d 1211, 1233 (10th Cir. 2007) ("We conclude that Cummings has failed to establish the first *Strickland* prong with respect to this claim.  To begin with, Cummings never identified precisely what these purported experts would have testified to"); *Cowans v. Bagley,* 2002 WL 31370475 at * 9 (S.D. Ohio 2002) ("Petitioner asserts that time of death 'was obviously a significant issue' in his case, in light of his alibi defense, and that counsel had a duty to fully investigate and prepare to challenge the State's initial determination as to time of death and the State's modification as to time of death.  Petitioner has not offered an affidavit from a pathologist to demonstrate that a time of death might be determined from the autopsy records sought that would buttress his alibi defense any more than the circumstantial evidence relied on by the prosecution to establish time of death.  Petitioner has not shown good cause for his discovery requests pertaining to the autopsy records because he has not alleged what any of the autopsy records might reveal about the probable time of death"); *Sappenfield v. State of Washington,* 1997 WL 409570 at * 2 (9th Cir. 1997 ("Finally, Sappenfield has not shown his counsel's failure to obtain an independent expert opinion as to the time of the victim's death was ineffective or prejudicial. . . .  The State's expert witness admitted that, given the unknown environmental conditions in the victim's apartment, he could not pinpoint the time of death, other than to state that it could have occurred anywhere from a few hours to a week before the discovery of the victim's body.  Sappenfield has

expert would have been able to pinpoint time of death more accurately after the fact than Granger and McFeeley had been able to contemporaneous with the murders. Even using Bartlett's own theory about the time of death, the victims had lain dead for hours before being discovered and therefore pinpointing time of death would have been more difficult.[100]

Bartlett's arguments also characterize Granger's and McFeeley's estimates as inconsistent. The trial judge held they were not because both testified at trial that the range could have been from eight to twenty-four hours before 3:00 p.m. on Sunday, or from 3:30 p.m. Saturday afternoon to late as 7:30 a.m. Sunday morning. *See Record Proper* at 1784. As such, he rejected the various time of death claims for lack of prejudice because Bartlett did not have an alibi for every hour of the twenty–four hour period. *See, e.g., id.* at 1782 ("the jury could have rationally inferred from the evidence that Bartlett murdered the victims or participated in the murders before 7:00 p.m., a time period that no witness in Bartlett's defense accounted for his whereabouts."). I do not agree with the suggestion that

---

not presented any evidence to the contrary.")

[100] He contends that the victims had been dead for at least six to nine hours before they were first discovered and eight to eleven hours before anyone from the medical examiner's office first got a glimpse of the bodies. *E.g., State Petition* at 5 (victims murdered "some time around midnight," discovered by a citizen "at 9:00 a.m.," and "Granger arrived on the scene at approximately 11:00 a.m.").

128

testimony left the jurors with the impression that death likely occurred toward the 24-hour end of the range.

Granger's "first impression," as he told defense counsel in his interview at page 6, was that the bodies had been lying for "6 to 8 hours" when they were discovered at 9:00 a.m. *Petitioner Supplement*, Granger Interview 8/29/96 at 6. Petitioner did not supply the entire interview, in particular page 7, where it appears there was other discussion about time of death estimate. On page 8, Granger agreed with the defense statement that he "would put time of death 6 to 8 hours prior to the bodies being there sometime around midnight." Conversely, he did not believe death occurred "some 14 hours prior" at 7:00 p.m. on Saturday because he did not find blood separation consistent with having been dead that long. *Id.* at 8. What he told the officers at the scene, and what the jurors heard at trial, was that Granger believed the victims were murdered in "an area of 12 hours" prior to when the bodies were first discovered at 9:00 a.m., in other words, "the wee hours of the morning." *Transcript Vol. XV* at 26.

Although Granger testified that he would not necessarily disagree with McFeeley's estimate, this did not widen the likely time frame in my view. *See Transcript Vol. XV* at 30. McFeeley's actual direct testimony was that the **more likely** time frame was narrower than twenty-four hours and in fact in the range

129

consistent with Granger's estimate:

> Q.  . . . based upon the information that you have, are you able to come up with any sort of estimate as to the time of death, in terms of days, weeks?
>
> A.  Well, I think it was not, certainly it was not weeks, and it probably wasn't in days.  There was no evidence of any decomposition that would suggest it was days or weeks, certainly.  And our investigation, when we did the autopsies, that was also true.  [Granger] did say that when he, when they removed the bodies from the scene, there was generally rigor mortis or the bodies were stiff . . .
>
> * * * * *
>
> A.  . . . suggesting that it was beginning to go away. Those are fairly general observations*, so I think it's fair to say that it was certainly several hours, could have been eight or ten or 12 hours.*  I can't say it wasn't 24 hours since, and I'm talking now from that 3:30 in the afternoon, not in the morning when they were found, and so, you know, *it could be 24 hours, it could be eight or ten hours.*

*Transcript Vol. XI* at 37-38 (emphasis added).  Furthermore, she admitted on cross-examination that by the time of autopsy she as "not able . . . to determine much of anything about the time of death," that the person who examined the bodies prior to her autopsy would be "more likely . . . to be able to make a determination as to when the [victims] died," *id.* at 80, and that person may have been able to "narrow" the time frame somewhat, *id.* at 84.  As I read this testimony, McFeeley

130

indicated that she was giving some deference to Granger's estimate.

The trial judge also held that it was reasonable for defense counsel to choose between "undermining the credibility of Roberts" and trying to establish a narrow time frame for time of death to coincide with Bartlett's alibi. *Record Proper* at 1785. I do not read the record as demonstrating counsel made a choice of one strategy over the other as the trial judge suggests. The fact that time of death was not exactly certain, and could have occurred in a wider time frame than Granger estimated, may have helped the defense. *See, e.g., Transcript Vol. XIII* at 117. There was no reason to over emphasize a very narrow time frame as Bartlett wanted defense counsel to do.

Defense witnesses placed Bartlett in downtown Albuquerque from 7:00 p.m. Saturday to 2:00 a.m. Sunday. Cassandra Coleman saw him at Valencia Lounge at around 7:00 p.m. *Transcript Vol. XIV* at 119. She left there at 8:30 p.m. to go to the Wine Cellar where a band was setting up. *Id.* at 123-24. Both she and one of the band players saw Bartlett at the Wine Cellar beginning at 9:30 p.m., and he stayed until closing at 2:00 a.m. *See id.* at 124, 126; *Transcript Vol. XV* at 31-34.

There was no suggestion by the prosecution that Bartlett could make a round-trip drive from Albuquerque to Pete's and commit a murder in an hour. Nor did the prosecution attack the credibility of these witnesses. Its focus was

131

elsewhere – the physical evidence and its witnesses.  *See Transcript Vol. XV* at 116, 118-19.

In direct contrast to the defense witnesses, most of the State witnesses placed Bartlett at Pete's or his trailer from 4:00 p.m. to 10:00 p.m., and pointed to the murders having occurred late Saturday afternoon or early Saturday evening, times when Roberts and Clabaugh were at work.  Hooven, the bartender at Pete's all day and all night on that Saturday, testified that she saw the victims in the bar sometime between 2:00 p.m. and 4:00 p.m.  *See Transcript Vol. XIII* at 160-62, 166, 172-73.  She testified that while they were there, Bartlett came in with someone named "TJ" or "RJ," whom she had never seen before.  Bartlett had a short conversation with Benjamin that she could not overhear, but observed Benjamin then become quiet and his face very tight.  Unser appeared the same.  This was not the normal friendly talk Bartlett and the victims usually had.  After this occurred, the victims, Bartlett, and Bartlett's friend left the bar followed shortly thereafter by Bartlett and his friend.  *See id.* at 164-66, 176.

Clabaugh testified that "between 5:30 and 6:30 [p.m.], somewhere around there" on Saturday afternoon, Bartlett came into the bar dressed in white painter's clothes, *id.* at 7, and Clabaugh overheard him asking someone at the bar for a shovel, but could not see the person to whom Bartlett was speaking, *see id.* at 7-8,

34.  Clabaugh testified that Bartlett had two other people with him at the time – a short male with blond hair and a handle bar mustache, and a woman with whiter or silver hair and a gray sweatshirt.  *Id.* at 8, 30.

Both Clabaugh and Roberts testified that Bartlett was in the bar later that evening wearing biker garb.  Clabaugh believed it was around 7:00 p.m., *see id.* at 9, 19, and at that time Bartlett asked him for two body bags.

> So . . . I asked him, I said, "Well, what happened?"
> And he told me he had two, two-hour old bodies in his
> living room.  And when I asked him what happened – he
> was pretty drunk at the time – he stated that he asked
> one of the guys about a Harley Davidison.
>
> And the way he said it was, "I asked him about the
> Harley Davidison, Ba-Zabba-Zabba-Za.  He lied to me."
> And then he hit me in the forehead with his trigger
> finger.  . . . .and he said, "Pow."

*Id.* at 12-13; *see also id.* at 24, 40-41.  Bartlett also allegedly said:  "'This is between me, you, and this fencepost or your life,'" which Clabaugh understood to mean "keep quiet or you're dead."  *Id.* at 13; *see also id.* at 31.

Roberts estimated that it was sometime between 7:30 and 8:30 p.m. when Bartlett came into the bar and asked Roberts for a shovel.  *Id.* at 57-58, 116.  Even though the fact the he had a falling out with Bartlett weeks earlier, Roberts testified that when he left his shift at 8:30 p.m., he decided to go to Bartlett's trailer to

133

either reimburse him $20 he had borrowed or to fetch a jewelry-making machine he had lent Bartlett.  It was at that time when he saw the victims' bodies and recognized Benjamin.  Roberts happened to have his gun with him, saying that it was not unusual for him to carry it in the first instance and that he had intended to take the receipts for the head waitress later that night to Ruthanne Jojola anyway.  *Id.* at 60-61, 98-100.

The latest report of Bartlett being at Pete's came from Hooven.  She testified that she was Bartlett come back into the bar and ordered food "around 9:00, between 9:00 and 9:30."  *Id.* at 166.  He left "probably quarter of 10:00."  *Id.* at 168.

Ruthanne Jojola testified for the defense and directly contradicted Roberts' testimony.  She testified that there was no reason for Roberts to bring her the money from the restaurant since she could never remember him having done so before.  *Transcript Vol. XIV* at 101.  She also testified that she knew the victims, she had been back and forth to the bar several times on Saturday, and remembered seeing them at 10:00 p.m. on Saturday night in the bar.  She spoke to Benjamin then and he did not seem "upset, scared, or anything of that sort" and "he seemed very happy."  *Id.* at 100; *see also id.* at 94-95, 97, 99-100.  Her testimony on direct was delivered with certainty and details.

Initially on cross-examination she was equally certain that she had seen the

134

victims at 10:00 p.m., *see id.* at 110, but then stated that she was "not really sure," *id.* at 111.  The prosecutor also asked if she remembered giving a statement to the police that was recorded and transcribed, and she replied "yes."  *Id.*  On redirect examination, defense counsel elicited that her memory was better when she spoke with the police and that she told them she saw the victims at 10:00 p.m. that night. *Id.* at 113-14.  On re-cross-examination, she again maintained what she told the police was correct, and then again abruptly admitted uncertainty which virtually stopped the questioning.  *See id.* at 115-17.[101]

During closing argument counsel recounted the reasons why the jurors should not believe the testimony of Roberts, Clabaugh or Hooven and why the late afternoon and early evening times they mentioned conveniently provided Roberts with an alibi.  Among other things counsel then made these points:

> Now, let's talk a little bit about the time of death here.  You heard from Wayne Granger and he said that he might very well have been able to tell more about this if he had been permitted to get into the scene [earlier]. He's not the one that makes the decision.  He does what [the officers] tell him to do . . . .

---

[101]   *See also Petitioner Supplement,* Ruthanne Jojola Statement 11/21/94 at 2-3 ("I've know [Benjamin] probably for about eight years [and Unser] just a few months [and last saw Benjamin "Saturday, November 19, approximately 10 o'clock PM, him and [Unser] both. . . at the Bar, Pete's bar . . . They were sitting in the corner booth having a drink. . . . I spoke to them, Hi how are you, I didn't really stop and talk to them . . . They both had on black hats, that's what I remember").

Mr. Granger did finally see . . . the bodies.  The police were interested in how long they had been dead he figured 12, 15 hours, something like that.  But he told you that's certainly just an estimate at that point and there's no way to be sure of it, and it's certainly conceivable they could have been as much as 24 hours earlier . . . .

. . . *that's not the primary piece of evidence upon which you're going to be able to determine whether these people were alive or dead at 5:30 in the afternoon.*

You can use your common sense in this, too.  You'll recall that . . . sometime after 1:00 in the afternoon [on Sunday] . . . there was still blood dripping off the tailgate, still dripping literally onto the ground from the truck.

So I would submit that's an unlikely occurrence if these people had, in fact, been killed nearly 20 hours, some 20 hours before that.  But aside from Wayne Granger, you heard from Ruthanne Jojola [who] saw [the victims] alive and apparently well and happy after 10:00 that night.  She remembered very clearly going over to the bar at – after 10:00.  When she saw the news came on, she figured it was time to go over there and that's what she did.  It would have been after 10.  She remembers going to the bar and they were sitting at the corner booth, immediately to the left of the entrance as she walked in the bar.  She even told you how they were sitting.  [Unser] was on the inside, [Benjamin] was on the outside with his foot standing there.

She had kind of a nice relationship with [Benjamin], said hi to him, exchanged some pleasantries.  She also told you that he didn't seem to be particularly upset, scared, worried or any other odd state of mind at that point to her knowledge.

136

Now, [the prosecutor] tried very hard to get her to say that, well, it could have been another time.  She led her into trying to say that as much as she could, but she stuck with it.  She stuck with it.  She said it could have been.  That's the way I remembered it, and more important, that's the way she remembered it on the 21st of November, two days after this happened.  The 21st of November 1995.  That's what she told the police that day.

Aside from the testimony of Ruthanne Jojola, you also heard from Christine Fisher [Unser's fiancé who] has no reason be to [Bartlett's] best friend.  She didn't even know him before this.  Frankly, hadn't even heard his name before this.  She testified that, as you will recall, that she was going to a party [Saturday] night. . . . [and she] left a message on . . . her answering [service] sometime after 6:30 p.m. [which had been retrieved] when she came back.  [Unser] had retrieved that message somewhere – at some point, after 6:30 or 7:00.  We don't know exactly when he retrieved it.  We don't know from what location he retrieved it.  It might be that we could have known that information if the police, if the sheriff's office had checked with U.S. West messaging service because they have got computers and they can find out all sorts of information.  They might very well have been able to tell from what location that message was retrieved.

We know it wasn't retrieved from Steven Bartlett's house, because as you heard, they don't have a telephone there.

*Transcript Vol. XV* at 86-90.

The point of this argument was that, even though the estimates made it

possible for the murders to have occurred *after* Bartlett returned from the bars

Albuquerque, the uncertainty about the time of death also allowed for the

possibility that the victims were murdered just after last being seen at 10:00 p.m., a

time when more than one person without apparent motive to lie saw Bartlett

dancing in Albuquerque.

Reading the trial judge's entire decision as a whole, it is plain that he was of

the opinion that the wider time frame supported the defense theory and did not

prejudice Bartlett. *See, e.g., Record Proper* at 1789-90, 1799, 1808, 1809-11. For

the reasons above, I find the trial judge's decision on the ultimate issue of prejudice

is reasonable.

Therefore, I recommend that the "time of death" aspects of Claims 1, 3, 5,

and 7 be dismissed. *See Doc. 1* at 6, 9A, 9A1, 9A6, 10B7, 10D1.

## 2.  Failure To Investigate The U.S. West Message

In Ground 8 of the State Petition, Bartlett claims that defense counsel was

ineffective for failing to investigate when the U.S. West message from Unser's

fiancé was retrieved because his attorney's comment about the message in closing

argument was "desperate" and countered by the prosecutor in rebuttal argument.

*State Petition* at 73.[102]  The trial judge summarily dismissed Ground 8 as duplicating

Grounds 3-6.  *Record Proper* at 1714.  He did not address the issue of the message in

his decision on the merits.

I do not find counsel was ineffective in mentioning the message in closing

argument.

> The right to effective assistance extends to closing
> arguments.  *See Bell v. Cone,* 535 U.S. 685, 701-702
> (2002); *Herring v. New York,* 422 U.S. 853, 865 (1975).
> Nonetheless, counsel has wide latitude in deciding how
> best to represent a client, and deference to counsel's
> tactical decisions in his closing presentation is particularly
> important because of the broad range of legitimate
> defense strategy at that stage.  Closing arguments should
> "sharpen and clarify the issues for resolution by the trier
> of fact," *id.* at 862, but which issues to sharpen and how
> best to clarify them are questions with many reasonable
> answers.  Indeed, it might sometimes make sense to forgo
> closing argument altogether.  *See Bell, supra,* at 701-702.
> Judicial review of a defense attorney's summation is
> therefore highly deferential – and doubly deferential
> when it is conducted through the lens of federal habeas.

*Yarborough,* 540 U.S. at 5-6.

Moreover, it is sheer speculation that investigating this avenue would have

disclosed evidence favorable to Bartlett.  The lack of the telephone records fit the

---

[102]  The prosecutor said: "I guess the cops could have checked it out, could have found out, subpoena (sic) phone records.  The defense could have subpoenaed phone records.  We don't know now."  *Transcript Vol. XV* at 116.

defense theory that the police work was shoddy and also provided an objective basis

for the jury to credit Ruthanne Jojola's testimony.  At the very least then, the claim

fails for lack of prejudice, and I recommend that the "message" aspects of Claim 3

be dismissed.  *See Doc. 1* at 9A, 9A1.

### 3.  Failure To Call Other Witnesses To Testify Bartlett Was In Albuquerque

Two people testified for the defense about seeing Bartlett at the bars in

Albuquerque and another who the defense intended to call did not appear as

expected.  In Grounds 1, 3, and 47(D) of the State Petition, Bartlett criticized

counsel for failing to call other witnesses to testify about seeing at him and faulted

the court for not ordering a warrant or a continuance to secure the third defense

witness.  *See State Petition* at 31-32, 57-58, 232-33.  The trial judge summarily

dismissed Ground 1 as duplicative, Ground 47 as procedurally defaulted, and also

dismissed the substance of the claim on the merits.  *See Record Proper* at 1714,

1717, 1761-62.  He found counsel was not ineffective and Bartlett suffered no

prejudice because the witnesses "would have provided cumulative testimony" for

the two witnesses who did testify, and "cumulative testimony does not raise a

reasonable probability the result of Bartlett's trial would have been different."  *Id.* at

1761.

In particular, the physical evidence and expert

> testimony introduced at trial did not establish an exact
> time of death for Benjamin and Unser . . . and therefore
> the testimony . . . as to Bartlett being at the Wine Cellar
> does not necessarily exculpate him.  Counsel's alleged
> failure to call witnesses who would provide cumulative
> testimony in order to bolster that credibility [of other
> defense witnesses] does not constitute ineffective
> assistance. . . .   Neither does Bartlett's argument about
> [an] unidentified [witness] demonstrate the . . .
> testimony would not be cumulative.

*Id.* at 1762.

The trial judge's conclusion that counsel need not present cumulative testimony and that Bartlett was not prejudiced are neither "contrary" nor "unreasonable."  Foremost, no Supreme Court decision supports the view that Bartlett asks the Court to adopt, which alone is dispositive of the issue.

In addition, other decisions either flatly hold that an attorney's failure to provide cumulative witness testimony is not ineffective or, even if it is, is not prejudicial in light of the evidence at trial.  This is so even in capital cases,[103] which

---

[103]  *See, e.g., Snow v. Sirmons,* 474 F.3d 693, 729 (10th Cir. 2007) (complete failure to call witnesses to support defendant's innocence was ineffective but defendant not prejudiced; also noting that "[g]enerally, counsel's failure to call witnesses whose testimony would be corroborative or cumulative of evidence already presented at trial is not deemed constitutionally deficient."); *Coleman v. Brown,* 802 F.2d 1227, 1233-34 (10th Cir. 1986) (complete failure to investigate alibi in capital case was ineffective but defendant not prejudiced), cert. denied, 482 U.S. 909 (1987); *Johnson v. Champion,* 1993 WL 425407 at * 3 (10th Cir. 1993) ("Even if this testimony would have established an alibi, we conclude [counsel's] failure to call [the] witness did not constitute ineffective assistance of counsel [because the] same testimony was presented at trial by [another witness].  Counsel is not ineffective for failing to present cumulative evidence.").

Bartlett's case was not.[104]

The trial judge did not directly comment on Bartlett's assertions that his attorney failed to investigate.  I independently find that, contrary to Bartlett's characterization, defense counsel did undertake a "thorough investigation" of the case generally and the alibi defense in particular.  Not only do the transcripts and documents of the pretrial proceedings establish that fact, all of the materials Bartlett submitted in his supplemental materials only bolster the conclusion.  *See Transcript Vols. 1-7; Record Proper* at 23-163; *Petitioner Supplement* (videotapes and/or interviews by defense and videotapes and/or interviews by officers available to the defense); *Strickland,* 466 U.S. at 490 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").

Furthermore, I have also reviewed the videotape of the police interview with one of the witnesses Bartlett wanted counsel to call and testify when he was at the

---

[104]   Bartlett's case was not a "capital murder case" as he contends, because the State never filed a notice of its intent to pursue the death penalty. *See, e.g., State Petition* at 57 ("it is inexcusable for defense counsel to not subpoena and investigate witnesses in a capital murder case that would have given an alibi of the defendant or would have implicated someone else in the commission of the crime."); *State v. Smallwood,* 141 N.M. 178, 182-83,152 P.3d 821, 825-26 (N.M. 2007) (under New Mexico Rule 5-704(A), the State is required to file a notice of intent to seek the death penalty within ninety days of arraignment or show good cause for not have filing it earlier).

Wine Cellar.  This witness admitted she had substance abuse problem and its effect

on her was notable.  She would not have made a good witness due to the way she

delivered a rambling, inconsistent, and sometimes incoherent and incredible

statement while fidgeting, twitching her fingers, laughing, rummaging through her

purse, and offering assistance in helping the police to find out information.  *See*

*Petitioner Supplement,* R.J. Stawarz Interview 5/20/86 9:14 - 10:34.  Another of the

witnesses Bartlett wanted his attorney to call was plainly hostile at the time of

trial.[105]  There is no indication in the record what characteristics of the potential

witnesses may have harmed the defense and informed counsel's decision not to call

them.[106]

Therefore, I recommend that the "additional alibi witnesses" aspects of

Claims 1, 3, and 7 be dismissed.  *See Doc. 1* at 6, 9, 9A, 10D1, 10D5.

---

[105]   *See Transcript Vol. XV* at 37-38, 40 (defense counsel contacted their last witness
Juana Lewis who said her attorney advised her she need not testify and would not despite being
properly served; defense counsel request for break to talk to her further as she was "around" was
granted, subsequently defense rested without further discussion of this witness).

[106]   *See Jackson v. Shanks,* 143 F.3d 1313, 1320 (10th Cir.) ("Generally, the decision
whether to call a witness rests within the sound discretion of trial counsel. . . .  Here, counsel
offered other witnesses who testified that [defendant] was intoxicated the night of the robbery
and that [these others] assisted him into [a] house roughly three hours before the robbery
occurred.  Given that [a potential witness] admittedly suffered from mental disabilities . . .
counsel could have reasonably determined that harmful testimony elicited during . . .
cross-examination would far outweigh the benefit of testimony elicited during direct
examination.  Thus, trial counsel's judgment was reasonable, and cannot support an ineffective
assistance claim."), *cert. denied,* 525 U.S. 950 (1998).

**4.  Failure To Secure Disclosure Of Identity Of Confidential Informant**

There was confusion in a police report, pretrial testimony, and a prosecutor's proffer, about what a confidential witness or witnesses said to whom and when.  A number of Bartlett's claims are based on this confusion.

Detective Ortiz completed a supplemental report on July 26, 1996, and it contains two entries about information he received from New Mexico State Police Agents Michael Davies and Michael Fenner.  *See Transcript Vol. VII* at 21-22 ("This report, it was completed in July . . . of 96."); *Petitioner Supplement,* Ortiz Supplemental Report at 32, 44 (the two entries dated 7/26/96).  In some parts of the record, "Fenner" is spelled "Finner," but I have adopted the spelling Bartlett and Detective Ortiz use.  There is no question both "Finner" and "Fenner" are the same person.

Six weeks after Detective Ortiz wrote his supplemental report, defense counsel filed a motion to disclose the name and address of the person who talked to Agent Davies.  *See Record Proper* at 83-84.  The trial judge held a hearing on September 19, 1996, where both Agent Davies and Detective Ortiz testified.  *See Transcript Vol. VII.*

According to Detective Ortiz's report, Agent Davies spoke with a "confidential informant" who identified Dallas Labrum, Roberts, and Pete Jojola as

144

involved with the crime, but did not mention Bartlett.  The person had overheard

Dallas Labrum, Roberts, and Pete Jojola asking about needing a shovel to bury

bodies around 7:00 to 7:30 p.m. on the Saturday in question.[107]  Also according to

Detective Ortiz's report, the later written report he received from Fenner said that

a "concerned citizen" implicated Bartlett by his nickname and that Bartlett bragged

about killing Unser and Benjamin.  This "citizen" thought seven others were

involved with the crimes, but only knew about four of them.[108]  Thus, the Ortiz

---

[107]  The entry provides that on November 29, 1995, Agent Davies said he

> had a confidential informant who overheard "Dallas [Labrum], HB
> [Roberts], and Pete [Jojola]" talking about needing a shovel to
> bury bodies.  The conversation which was overheard took place on
> Saturday, November 18, 1995 between 7:00 and 7:30 p.m.  The
> informant believed that the killings had taken place over a
> chemical called p2p and stolen motorcycles.  The confidential
> informant also stated that "HB [Roberts] seemed to be very
> disturbed, nervous about the situation" and that we may want to
> talk to him once again.  Agent Davies stated that he would
> complete an intelligence report which would be forwarded to me,
> but the CI wished to remain anonymous.

*Petitioner Supplement,* Ortiz Supplemental Report at 32.  The entry does not note when Agent
Davies talked to the "informant" and Agent Davies never followed up with written report.

[108]  In the December 20, 1995 entry in that same report, *id.* at 43, Detective Ortiz notes
that he

> received an intelligence report from State Police which was
> completed by Agent M. Fenner.  In his report he stated that on
> November 28, 1995, that he met with a concerned citizen who
> wished to remain anonymous.  This concerned citizen told Agent
> Fenner that Shadow [Bartlett's nickname] had bragged about
> killing two men, Jeff and Lee.  According to this person, there may
> have been up to seven people present at the time of the shooting.

145

report has the Davies "informant" implicating only other people, while the Fenner "citizen" implicated Bartlett by name.  But when Agent Davies testified at the pretrial motion hearing, he reported the opposite.

Agent Davies testified that in late November he "received a call from a *concerned citizen* who wished to remain anonymous."  *Transcript Vol. VII* at 8 (emphasis added).  The person told him that

> a person by the name of Shadow, and the only other name given was Steve, was involved with this homicide and it occurred . . . at seven o'clock at night, before the victims were located at Pete Jojola's house, which was next to a bar.
>
> The citizen . . . listed to me four other people.  The citizen said there was seven people in the house . . . but only game me names [of] four . . .
>
> \* \* \* \* \*
>
> . . . Pete Jojola. . . . Roberts was another name and then the person by the name of Dallas.  The information the citizen told me about that was Dallas supposedly helped to dispose of the victim's bodies.
>
> The only other information that the citizen advised

_____

However the person knew of four.  Review THE REPORT BY AGENT FENNER FOR FURTHER INFORMATION.

*Id.* at 44.  The Fenner report is not part of the State court record and was not submitted by Bartlett in his supplemental materials.  The tape of defense counsel's interview with Agent Fenner indicates that counsel was given a copy of the report and read it, but the substance of it was not mentioned on the tape.

> me, it was having to do with stolen motorcycle and car
> parts and a Harley Davidson and, I think, listed a person
> by the name of Jerry . . .

*Id.* at 8-9.  Agent Davies said he called Detective Ortiz and relayed this

information, while it was fresh in his mind. *Id.* at 13.  He did not recall any mention

of drugs as a motive for the murders or who actually killed the victims.  *Id.* at 9.

Nor did he recall any conversation about shovels needed to bury bodies.  *Id.* at 12,

14.

Detective Ortiz was not able to clarify the discrepancy between his report

entries and Agent Davies' testimony during the pretrial hearing.  He testified that

Agent Davies told him about the shovel conversation, the mention of Bartlett by

name, and that the caller believed the motive for the murders was drugs and a

stolen motorcycle.  *Id.* at 16-19.  He did not know whether Agent Fenner had an

additional conversation with Agent Davies' caller, and he did not have a copy of

Agent Fenner's report or his field notes with him at the time.  *See id.* at 18-19, 22-

24.

Agent Davies' testimony began to suggest a reason for the discrepancies but

did not completely resolve it.  He explained that when he took the call, the caller

specifically wanted to speak to New Mexico State Police Agent Michael "Finner,"

*id.* at 8 – "really wanted to talk to Agent Finner and I don't know why," *id.* at 10.

Because "the citizen was wanting to talk to Agent Finner about this," Agent Davies "in turn, had contacted Agent Finner," *id.* at 8, and passed along the information to him, *id.* at 10.  Agent Davies thought Agent Fenner wrote the information they discussed about the Davies/citizen conversation in a report and forwarded it to Detective Ortiz.  *See id.* at 10.  On cross-examination, however, he testified that Agent Fenner's report was about a Fenner/citizen conversation – Agent Fenner had a conversation "with his concerned citizen," who Agent Davies assumed "was the same person" he had spoken with.  *Id.* at 12.

At the end of the hearing then the attorneys agreed that an interview with Agent Fenner was necessary before submitting the motion to disclose for ruling by the trial court.  *See id.* at 24-25.  In the subsequent interview defense counsel had with Agent Fenner in January 9, 1997 confirmed that Agent Fenner talked with an informant after Agent Davies had and wrote up the information to forward to Detective Ortiz.  Agent Fenner and Agent Davies also had talked to each other about the information they received.  Agent Fenner also thought that they both talked to the same person, who wanted to remain anonymous and was not willing to talk to the police who were investigating the murders.  At the time of the interview with counsel, Agent Fenner had not heard from the informant in over a year and did not know whether the person was still in the area.  *See Petitioner*

148

*Supplement,* Tape "B," side A.

Bartlett maintains that by securing the identity of the Davies confidential informant he would have been "exculpated" because the caller implicated Roberts, Dallas Labrum and Pete Jojola in the crimes.[109] The trial court wrote extensively on this issue, which I will not repeat here.   Even though the trial court did not have the benefit of the Agent Fenner tape that clarifies the Agent Davies pretrial testimony, I cannot conclude the result reached was "contrary" or "unreasonable."

---

[109]  *See State Petition* at 58-59 (Ground 4 – defense counsel failed to secure the identity of the informant and this was prejudicial because it implicated others); *id.* at 92 (Ground 9 – defense counsel failed to impeach New Mexico State Police officer "Mike Davies about his knowledge of the C.I.," incorporating Grounds 4, 38.); *id.* at 98-99 (Ground 10 – defense counsel failed to "acquire all the facts prior to [the] motion to disclose confidential informant" who would have "implicated [Pete] Jojola, Dalla [Labrum], and . . . Roberts," incorporating Grounds 4, 38, 15, 37; specifically, before the motion to disclose hearing, counsel should have interviewed Officers Davies, Witt, Stebelton, and Nasci); *id.* at 116 (Ground 16 – counsel failed to file a motion to dismiss the indictment on ground of "exculpatory information" and "[n]umerous confidential informants had come forward in the weeks following the murders to implicate people other than Petitioner"); *id.* at 174-76 (Ground 38 – prosecutorial misconduct by use of false testimony at trial that because "Davies testified that he received information on November 29, 1995 that involved names like Dallas, HB and Pete," then said it was Fenner who actually received the call; the prosecutor "obscured [the motion to disclose hearing] by encumbering it with the facts from at least two different confidential informants . . . to intentionally muddle the disclosure of this confidential informant" . . . Ortiz' Field Notes [say he was] Contacted by S.P. M. Davies; advised that . . . confidential informant . . . that 'she' over heard [the conversation about the shovel outside Pete's and the prosecutor] continued to cloud this hearing, misleading the Court by eliciting . . . unreliable testimony from Ortiz . . . Freder (sic) should be Frenner . . . Now the [prosecutor] had confused this motion to disclose this C.I. with three different confidential informants"); *id.* at 188-89 (Ground 40 – prosecutorial misconduct for failing to have officers follow up on the confidential informant who implicated Roberts, Dallas Labrum, Pete Jojola, LBJ, or Antony Newman); *id.* at 207 (Ground 43 – prosecutorial misconduct in by saying the Fenner/Davies confidential informant was "more of a tipster" rather than an informant they sat down and talked with); *id.* at 236-37 (Ground 47 – trial court erred in not ordering disclosure of identity of confidential informant).

149

First, the trial court found there was nothing, save for Bartlett's assertions, that Agent Fenner actually met the caller in person and, as such, counsel was not ineffective "in not investigating about the caller beyond moving for disclosure of the caller's identity." *Record Proper* at 1778. This Court does not interpret Agent Fenner's use of the word "sat" during his interview with counsel to necessarily mean he personally met with the informant.

Second, even if Agent Fenner had met the informant, nothing on the tape establishes that he knew the informant's identity. At the hearing, counsel silently read the report that Agent Fenner submitted to Detective Ortiz and made a copy. The questioning did not mention what the contents contained except to say that Agent Fenner's caller was anonymous. More significantly, there was no indication during the interview that the written report differed from what Ortiz reported, including Bartlett's involvement in the murders.

Third, Bartlett argues that there were multiple "confidential" callers but the the trial judge reached the conclusion that there was only one caller based on the motions hearing testimony. *See Record Proper* at 1778-81. The tape further verifies that neither Agent Fenner nor Agent Davies believed there was more than one caller. Bartlett has not shown by clear and convincing evidence that the trial judge's factual finding is incorrect, and it is therefore presumed so.

150

Fourth, there is no rule of constitutional dimension clearly identified by the Supreme Court that requires disclosure of the identity of confidential informants simply because a defendant requests it.  The leading Supreme Court case on whether the identity of a confidential informant must be revealed is *Roviaro v. United States*, 353 U.S. 53 (1957).  *Rovario* construed the scope of prosecutorial privilege – federal evidentiary law and the courts' authority  – and was not decided on constitutional grounds.  The Supreme Court has suggested, but not expressly decided, the contours of a constitutional rule concerning when or under what circumstances a confidential informant's identity must be revealed.[110]

Finally, even if the *Roviaro* standard is a constitutional one, it does not

---

[110]  *See, e.g., Banks v. Dretke*, 540 U.S. 668, 697 (2004) ("The issue of evidentiary law on *Roviaro* was . . . ); *United States v. Valenzuela-Bernal*, 458 U.S. 858, 870 (1982) ("While *Roviaro* was not decided on the basis of constitutional claims, its subsequent affirmation in *McCray v. Illinois* . . ., where both due process and confrontation claims were considered by the Court, suggests that *Roviaro* would not have been decided differently if those claims had actually been called to the Court's attention."); *McCray v. Illiniois*, 386 U.S. 300, 309-13(1967) ("This Court . . . has the ultimate task of defining the scope to be accorded to the various common law evidentiary privileges in the trial of federal criminal cases. . . .  This is a task which is quite different, of course, from the responsibility of constitutional adjudication.  In the exercise of this supervisory jurisdiction the Court had occasion . . . in *Roviaro* . . . to give thorough consideration to one aspect of the informer's privilege . . .   What *Roviaro* thus makes clear is that this Court was unwilling to impose any absolute rule requiring disclosure of an informer's identity even in formulating evidentiary rules for federal criminal trials. . . .  we are now asked to hold that the Constitution somehow compels Illinois to abolish the informer's privilege from its law of evidence, and to require disclosure of the informer's identity in every such preliminary hearing where it appears that the officers made the arrest or search in reliance upon facts supplied by an informer they had reason to trust.  The argument is based upon the Due Process Clause of the Fourteenth Amendment, and upon the Sixth Amendment right of confrontation . . .   We find no support for the petitioner's position in either of those constitutional provisions.").

provide a defendant an absolute right to the identity of an informant.    The New

Mexico statutory privilege and caselaw construing it is the same.

> Rule 11-510 provides a method for balancing the state's
> interest in protecting the free flow of information against
> a defendant's right to prepare his defense.  *State v. Perez,*
> 102 N.M. 663, 699 P.2d 136 (Ct. App. 1985); *State v.*
> *Beck,* 97 N.M. 312, 639 P.2d 599 (Ct. App. 1982).
> Regardless of the circumstances, however, there is no
> absolute right to disclosure of the identity of the
> confidential informant.  *See McCray v. Illinois,* 386 U.S.
> 300 (1967); *see also State v. Perez; see generally* 1 W.
> LaFave, Search and Seizure § 3.3(g) (1987).

*State v. Campos,* 113 N.M. 421, 424, 827 P.2d 136, 139 (N.M. App. 1991), *r'vd*

*other grounds,* 117 N.M. 155, 870 P.2d 117 (N.M. 1994).

Even if Bartlett's counsel had pursued the identity of the informant after

interviewing Fenner, the defense would not have been entitled to the name

because the informant was not involved with the murders and implicated Bartlett

as bragging about committing them.[111]  The defense had little to gain by identifying

---

[111]    *See, e.g., Bernard v. Ray,* 246 Fed. Appx. 553, 555 (10th Cir. 2007) ("'[d]isclosure of an informant is not required where the information sought from him or her would be merely cumulative, or where the informant is not a participant in or a witness to the crime charged.' *United States v. Moralez,* 908 F.2d 565, 567 (10th Cir. 1990)."); *United States v. Wilson,* 1996 WL 494414 at **4-5 (10th Cir. 1996) ("'A defendant may obtain the identity and whereabouts of an informer if his testimony might be relevant to the defendant's case and justice would be best served by disclosure." *United States v. Reardon,* 787 F.2d 512, 517 (10th Cir. 1986).  Disclosure is not required if the informant did not participate in the illegal activity or when information sought is cumulative.  *Id.*  An informant's testimony must be shown to be valuable to a defendant; mere speculation is not enough.  *United States v. Mendoza-Salgado,* 964 F.2d 993, 1001 (10th Cir. 1992).  In . . . *Moralez* . . . this court noted: '[C]ases involving confidential informants

this informant – the State had much more to gain by using this informant as a witness if it could have.  Counsel's inaction was an obvious trial tactic and was not prejudicial.  As the trial judge held, since the caller also named Bartlett as having participated in the crimes, "cast[ing] suspicion upon Labrum, Jojola, and Roberts . . . does not exculpate Bartlett."  *Record Proper* at 1781.  At the very least then, the claims fail for this reasonable conclusion of lack of prejudice.

Therefore, I recommend that the Davies/Fenner "confidential informant" aspects of Claims 2, 3, 5, and 7 be dismissed.  *See Doc. 1* at 7, 9A, 9A1, 9A4, 10B3, 10B9, 10D1.

## 5.  Failure To Establish That Others Were Implicated In The Crimes

Many of claims relate to Bartlett's assertion that others were implicated in the crimes and had motive to commit them.  Specifically, he asserts that:  Pete Jojola and Roberts wanted to "frame" him so that they could gain possession of his

---

fall into several broad categories.  At one extreme are the cases where the informant is a mere tipster, and disclosure is not required.  At the other extreme are cases such as *Roviaro* itself where the informant has played a crucial role in the alleged criminal transaction, and disclosure and production of the informant are required to ensure a fair trial.  In addition, there are cases where there is a slight possibility a defendant might benefit from disclosure, but the government has demonstrated a compelling need to protect its informant."); *State v. Rojo*, 126 N.M. 438, 448-49, 971 P.2d 829, 839-40 (N.M. 1998) ("According to the testimony of Gonzales and Fay, the information from the CI tended to implicate both Ibarra and Defendant in the victim's murder. Thus, it was not 'directly exculpatory evidence' as alleged by Defendant in his motion.  Further, the statements that the CI attributed to Defendant or his brother were conveyed through several layers of hearsay, there was no testimony that the CI was an active participant or eyewitness to the killing or the events surrounding it") (and cases cited therein).

153

belongings and the trailer; Roberts and Clabaugh had motive to commit the

murders because of their interest in the stolen motorcycle; the unknown "LBJ" and

Dallas Labrum both confessed to committing the murders; and Anthony Newman

and Chuck Woods moved the bodies.  He faults the police and defense counsel for

not investigating those other potential suspects.[112]

_____

[112]  *See State Petition* at 32-33, 35-36 (Ground 1 – defense counsel  failed to "confront"
accusers with testimony that Pete Jojola did not have an alibi and had a financial motive to frame
Bartlett for the murders);  *id.* at 34 (Ground 1 – defense counsel  failed to "confront" accusers
with testimony from Peter Newman, the prosecutor's hairdresser, that his brother Anthony
Newman moved the bodies); *id.* at 34-35 (Ground 1 – defense counsel  failed to "confront"
accusers with testimony from William Doke that would implicate Dallas Labrum – his statement
to police was that "'Jeff Unser was sick of Dallas stealing all of his things.  Jeff was real upset.'");
*id.* at 35 (Ground 1 – defense counsel  failed to "confront" accusers with testimony from Eddie
Picken, the Jojola's babysitter, that a "guy came over [to the Jojola's home] in a truck, drove
around the loop . . . where Tony Newman lived, and didn't say anything, and had two bodies in
the back of the truck. Mr. Jojola started swearing at him, telling him to get out of there . . . 'get
the hell out of there, [I don't] want nothing to do with anything' . . . acting frantic and mumbling
something about killing someone."); *id.* at 36-37 (Ground 1 – defense counsel  failed to
"confront" accusers with testimony from James Thomas, who's grandmother is a neighbor of
Bartlett's, to show that after Bartlett was jailed, Pete Jojola and Roberts loaded Bartlett's
belongings into an orange truck); *id.* at 36-38 (Ground 1 – defense counsel  failed to "confront"
accusers with from James Thomas, and Chris Stephens that the day after Bartlett was arrested,
Pete Jojola and Roberts removed Bartlett's belongings from the trailer, kept some and gave some
away); *id.* at 37 (Ground 1 – defense counsel failed to "confront" accusers with testimony from
James Thomas that Jojola's motorcycle was stolen and he and Roberts "were trying to get it back"
and that "'Mr. Jojola threatened to kill me if I ever showed up on his property again, or he would
pay somebody to shoot me or beat the living-crap out of me until I'm dead. . . . Jojola also
wanted to sic Labrum on another person who he thought stole his motorcycle."); *id.* at 38-39
(Ground 1 – defense counsel failed to "confront" accusers with testimony from Sherry Hall and
her friend Debbie about the stolen motorcycle and the fact that it was stolen upset Bartlett, who
"returned the stolen Triumph motorcycle to Jerry Nelson (aka 'TJ')"); *id.* at 39-40 (Ground 1 –
defense counsel  failed to "confront" accusers with testimony that the statements of Dallas
Labrum and his girlfriend regarding their Socorro alibi were contradictory, and that Labrum
asserted LBJ confessed to participating in the murders – "'It's a Mexican thing'" – and that "'Pete
Jojola wanted to "'sic Labrum on two guys that he thought stole his Harley-Davidson'"); *id.* at 50,

In other overlapping allegations, he faults counsel for not exposing every

possible ground for impeaching the State witnesses, particularly Roberts' and

Clabaugh's renditions of what they witnessed,[113] descriptions of Bartlett's

––––––––––––––––––

Hab.Exh.O (Ground 2 – newly discovered evidence; inmate Darren Paully would have testified that Pete Jojola was suspected by police and Jojola told Paully that "life was good . . . he loved it when a plan came together . . . he had killed three birds with one stone. Getting Jeff and Lee in Shadow's house before he had them wacked (sic). He was getting over because the house that Shadow had rented was in a mess before he moved in and he had fixed it up real nice. It was so messy that he had actually thought about bulldozing it. And now it had been fixed up and he got it back. [The victims] deserved it because of the Harley that had stolen from him last year."); *id.* at 50-51 (Ground 2 – newly discovered evidence; inmate Chad Kurston would have testified that his uncle, Dallas Labrum, admitted that he and others carried out the murders as payback for stealing Labrum's motorcycle; defense counsel failed to preserve Kurston's testimony knowing he would move to East Coast upon release); *id.* at 51, Hab.Exh.P (Ground 2 – newly discovered evidence; inmate Steve Gordon, husband of Bobbie Jo Schultz, would testify that Pete Jojola gave his wife a half ounce of methamphetamine for doing Jojola "a favor" by speaking with the sheriff's department and Jojola said "we all know Shadow did it. This is just a little insurance to make the cops['] job easier;" Gordon refused to speak with defense counsel because "he wanted to question him in front of the whole pod" and Grodeon "felt as though my life was put in jeopardy"); *id.* at 67 (Ground 6 – defense counsel failed to properly present the alibi defense by "neglect[ing] to show that others had admitted to this crime or had a motive . . . and that the State's chief witness, Roberts, was in fact implicated in this crime . . . None of this testimony was presented at trial by defense counsel"); *id.* at 72 (Ground 8 – defense counsel failed to investigate that Detective Ortiz was "'getting information that [Chuck Woods] was responsible for dumping the bodies.'"); *id.* at 73 (Ground 8 – defense counsel failed to investigate whether the human hair found on the sock matched any of the State witnesses who "were suspects."); *id.* at 73-74 (Ground 8 – defense counsel failed to investigate evidence that others moved the bodies or confessed to the crimes, incorporating numerous other claims).

[113]   *See, e.g., id.* at 76 (Ground 9 – defense counsel failed to impeach Roberts and Clabaugh by showing they did not implicate Bartlett until after the confidential informant implicated Roberts and Jojola); *id.* (defense counsel failed to impeach Roberts by showing when he called the police to report the truck but did "share any of the significant information which he allegedly knew about the murders when he telephoned," yet pointed out the purple sock was found in Petitioner's driveway when the officers arrived); *id.* (Ground 9 – defense counsel failed to impeach Roberts by showing he told the officers that he saw an orange seat cushion in back of truck without touching anything, but Officer Frazee later said he could not see the seat cushion without moving the tarp); *id.* at 77 (Ground 9– defense counsel failed to effectively impeach

clothing,[114] and when Bartlett was seen.[115]  His specific examples in the previous

_____

Roberts when he said he did not know Detective Ortiz wanted to talk to him a second time, yet Detective Ortiz's Supplementary report said he left a message with Hooven to have Roberts call again, and Roberts told counsel that he called to set up the second appointment); *id.* at 77 (Ground 9 – defense counsel failed to show that Roberts spoke with Detective Ortiz for hours but only 40 minutes are taped, therefore Roberts' second statement is "altered"); *id.* at 77-78 (Ground 9 – defense counsel failed to impeach Roberts by showing his statement to police said Bartlett asked for shovel at 6:00 p.m. but he testified it was 7:30 to 8:00 p.m.); *id.* at 78-79 (Ground 9 – defense counsel failed to impeach Roberts with his first statement that he saw Bartlett in painter clothing on Friday night, as opposed to his testimony that it was Saturday night); *id.* at 80 (Ground 9 – defense counsel failed to show Clabaugh contradicted himself by testifying that his name came up in the investigation through Roberts, then said he had no idea how his name came up); *id.* (Ground 9 - defense counsel failed to show that Clabaugh contradicted Roberts' testimony and his prior statement to the police by saying he and Roberts did not discuss the murders on the evening Roberts); *id.* at 81 (Ground 9 – counsel failed to show that Clabaugh told an officer he thought the truck belong to Lee but testified in court that when the police arrived on the scene he did not know who the truck belonged to); *id.* (counsel failed to show that Clabaugh too said he saw an orange seat cushion in the bed of the truck and did not touch it, contrary to what Sergeant Frazee testified:  "How could Clabaugh and Roberts . . . know of the 'orange in color' seat cushion, which was underneath a blue (non-transparent) tarp, unless they put it there themselves?  Clearly, this must prove that Petitioner was in fact set-up/framed for these murders by these individuals."); *id.* at 81-82 (Ground 9 – defense counsel failed to show that  State wanted to prove that Lee and Bartlett had a heated exchange on Saturday afternoon through Hooven's testimony yet Clabaugh retracted his "mad dogging" statement to the police, and Roberts said in an interview that Hooven is "'overly excitable, makes things up, blows things out of proportion.'"); *id.* at 82 (Ground 9 – defense counsel failed to show that Roberts testified that he did not see Clabaugh the next morning but Clabaugh testified that he talked to Roberts after he saw the truck and they discussed who was going to call the police); *id.* (Ground 9 – counsel failed to show  Clabaugh's interview with counsel that he owned a Glock 9mm and was "Pete's right-hand-man" or that in Roberts' second statement he told Detective Ortiz that "Pete's been good to me.  I am loyal to him.");  *id.* at 83 (Ground 9 – defense counsel failed to impeach Roberts' statement that he saw a man and woman in the trailer with the bodies but told Hooven that he saw two females).

    [114]  *See, e.g., id.* at 79-80  (Ground 9 – defense counsel failed to impeach Hooven by showing her statement to police was that Bartlett was wearing dark or black jeans on Saturday, but then testified that he was wearing washed out/faded jeans); *id.* at 80 (Ground 9 – defense counsel failed to elicit from Roberts' first statement that Bartlett was wearing the same clothes on Saturday as when he was arrested – that is, "'black biker garb'").

three footnotes are illustrations only, because Bartlett said his State Petition would have been "far too extensive" had he discussed them all.  He therefore also cited to lines in the transcripts where he asserted that Roberts', Clabaugh's, or Hooven's testimony was "different [than] their prior statements" and where "counsel had every opportunity to impeach" them but did not.  *State Petition* at 84, 178-79.  As a result of these failings, and other things, Bartlett faults the prosecutor for presenting what he calls "false," "inconsistent," or "perjured" testimony that tended to inculpate him.[116]

---

[115] *See, e.g., id.* at 77-78 (Ground 9 – defense counsel failed to effectively impeach Roberts by showing he testified Bartlett asked to borrow a shovel between 7:30 and 8:00 p.m. but in a second statement to police said the request was made at 6:00 p.m.); *id.* at 82-83 (Ground 9 – defense counsel failed to impeach Hooven on her testimony that Bartlett returned to Pete's at 9:00 to 9:30 p.m., by showing her statement said it was "late . . . 8:00 p.m. or so" and stayed for "about an hour" and "left here about 9:30 p.m."); *id.* at 83 (Ground 9 - defense counsel failed to show that Ruthanne Jojola stated in interviews that she "'didn't want Petitioner anywhere around her. {She} didn't want to have nothing to do with him,'" and "Petitioner buried guns in his backyard," and thus "despised" Bartlett, yet was the one who was "unequivocal" that she saw the victims after 10:00 p.m. even though others told her they were killed at 7:00 p.m., and thus contradicted Roberts' testimony that he saw the bodies between 8:30 and 9:00 p.m.).

[116] *See, e.g., id.* at 159-60 (Ground 36 – prosecutorial misconduct by altering tag on Bartlett's t-shirt to show it was size "large," so that it would match the size large plaid overshirt/coat-like jacket found next to bodies; according to Bartlett has "not been able to wear a size 'large' shirt since approximately the age of 11."); *id.* at 160 (Ground 36 – prosecutorial misconduct by eliciting testimony from Hooven that she has seen Bartlett in a "flannel long-sleeved shirt," when her prior statement was that Bartlett wears black biker clothing); *id.* (Ground 36 – prosecutorial misconduct by an incomprehensible assertion about coveralls); *id.* at 176-77 (Ground 38 – prosecutorial misconduct by "20 inconsistent testimonies given and no less than three counts of perjury given by Roberts, such as, there is questionable testimony concerning whether or not Petitioner was seen at Pete's bar, in painter's clothes, on Saturday;" also including:  Roberts' inconsistent testimony that he shared a key to the trailer with Scott,

The trial judge summarily dismissed the prosecutorial misconduct claims as procedurally defaulted, the "newly-discovered" evidence claims as not cognizable, and the confrontation claims as duplicative.  Nonetheless, much of the trial court's 74-page opinion dealt with the substance of the bulk of the claims set forth in footnotes 112 through 116 above.  *See Record Proper* at 1714, 1716-17, 1762-1765,

---

then that he had his own key, compared with an interview where he said that Bartlett left the door open for him; Roberts inconsistent testimony that he kept a gun at waitress station, then behind the bar, compared with an interview where said he only takes gun to work when he tends bar and on the night of the murders he was waiting tables and not bartending; and Roberts stating in an interview that he saw Bobbie Joe Shultz in the trailer with the bodies, but testified that he could not be 100% positive and that she was not in the area at the time); *id.* at 177 (Ground 38 – prosecutorial misconduct by Bobbie  Joe Shultz stating in one interview that she was the bodies and spent the night with Petitioner then said she saw the bodies and Pete Jojola is like a brother to her and she is loyal to him); *id.* at 178 (Ground 38 – prosecutorial misconduct by "10 inconsistent testimonies given by Tim Clagaugh and at least one occasion of perjured testimony given by Clabaugh," including:  Clabaugh testified that he found out about the murders on Sunday, but in interview said Roberts told him the night of the murders; Clabaugh testified that the didn't know who the truck belonged to, even though he told Sergeant Frazee that it belonged to Lee; Clabaugh testified that he talked to Roberts before the police arrived, but in his first statement said Roberts told him after the police arrived; Clabaugh's first statement said Lee and Bartlett were giving each other mad-dog looks then recanted; and Clabaugh testified that his name came to attention of officers through Roberts, then said he had no idea how it came up"); *id.* at 179 (Ground 38 – prosecutorial misconduct by "coaching" Hooven's to say Bartlett returned to the bar a second time at 9:00 p.m. or 9:30 p.m. when her original estimate was 8:00, 8:30 or 9:00 and that Bartlett's pants were stone washed/faded, when she originally told officers they were black); *id.* at 204 (Ground 42 – prosecutorial misconduct by pursuing questions with Roberts about when he saw Bartlett in painters' clothing that was "maliciously corrupt, vindictive . . to falsely misled (sic) the jury" to believe Roberts corroborated Hooven's testimony); *id.* at 205 (Ground 42 - prosecutorial misconduct by eliciting response from Hooven that Bartlett had a plaid shirt like the one found by the victims when her prior statement was that "all" he wore was other sorts of clothing); *id.* at 208 (Ground 43 – prosecutorial misconduct by "coaching" Hooven; same claim as at 179); *id.* at 208-09 (Ground 43 - prosecutorial misconduct re:  when Roberts saw Bartlett in painter clothing); *id.* at 209 (Ground 43 – prosecutorial misconduct by misquoting prior question by defense counsel – "how the defendant said he killed these people"); *id.* at 211 (Ground 43 – prosecutorial misconduct by Roberts questioning re:  whether he saw Bobbie Joe Schultz).

1784-86, 1787-95.  I will not repeat all of the trial court's discussion here, but incorporate it by reference.  I do not find any of those results "contrary" or "unreasonable."

First, as for the testimony Bartlett wanted his counsel to present, the trial court held:

> Even assuming the facts to which Jojola, Newman, Doke, Picken, Thomas, Stephens, Hall (and "Debbie"), and Labrum would allegedly testify were true, although those facts case suspicion upon Jojola, Roberts, and Labrum, along with Anthony Newman and L.B.J. they do not necessarily exculpate Bartlett.  That is, those facts do not explain the uncontradicted circumstantial evidence at trial that Bartlett was found at his home where Unser and Benamin were murdered [citing factual background section of opinion].
>
> Moreover, Detective Marquez testified at trial that in Bartlett's videotaped . . . statement, Bartlett essentially offered no explanations as to the blood found on his clothes, at his home on the floor, on a rag, on a bed sheet, and he simply denied without explanation that he had committed or participated in the murders.  Vol.  13 TP at pp.  204-206.
>
> Thus, the facts to which the witnesses noted above, who Bartlett asserts counsel should have subpoenaed, would have testified do not necessarily preclude Bartlett's participation in the murders, and counsel's lack of calling those witnesses therefore does not constitute ineffective assistance.

*Id.* at 1765.  The trial judge later reasoned that:

159

> To the extent Bartlett argues that his counsel erred simply in not introducing evidence of the culpability of Roberts and others as to the murders, Petition at pp. 67-69, none of that evidence Bartlett argues about necessarily exculpates him such that his trial without that evidence was unfair, and his argument thus fails.

*Id.* at 1786.

I agree that the fact others may have been involved does not conclusively exculpate Bartlett given that the murders occurred in his home and he was found there unresponsive to the police without explanation.  Furthermore, Bartlett's arguments appear to be based on the notion that it is unfair to have prosecuted him when there was information that others were involved.  Under clearly established Supreme Court precedent, however, there is no constitutional relief available for a "selective prosecution" claim unless the prosecution is based on factors neither asserted nor present here.

> In our system, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.  Within the limits set by the legislature's constitutionally valid definition of chargeable offenses, ***the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation so long as the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.***

160

*Bordenkircher v. Hayes,* 434 U.S. 357, 364 (1978) (internal quotations and citation omitted) (emphasis added).[117]

Second, when the trial judge rejected the merits of specific impeachment claims regarding Roberts, Hooven, and Clabaugh, his conclusions rested either on a finding that Bartlett's assertions were inaccurate, counsel's conduct was reasonable, and/or that Bartlett was not prejudiced. *See Record Proper* at 1787-95. In addition to finding those conclusions reasonable, I also note that this is not a case where counsel failed to cross-examine or challenge the credibility of the State's witnesses.[118] Instead, Bartlett simply asserts in hindsight that counsel should have included every conceivable "contradiction" from a prior statement for these witnesses during cross-examination. He contends this extensive impeachment

---

[117] *See also, e.g., United States v. Armstrong,* 517 U.S. 456, 465 (1996) ("In order to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present 'clear evidence to the contrary.'"); *Wayte v. United States,* 470 U.S. 598, 608 (1985) ("It is appropriate to judge selective prosecution claims according to ordinary equal protection standards. . . . Under our prior cases, these standards require petitioner to show both that the passive enforcement system had a discriminatory effect and that it was motivated by a discriminatory purpose."); *Jennings v. City of Stillwater,* 383 F.3d 1199, 1214-15 (10th Cir. 2004) (discussion of same in § 1983 case).

[118] *Compare Moore v. Marr,* 254 F.3d 1235, 1241 (10th Cir.) (stabbing case where defendant claimed self-defense, counsel did not question victim about his use of alcohol and drugs on day in question; court stated "[a]lthough counsel's failure to impeach a key prosecution witness is potentially the kind of representation that falls 'outside the wide range of professionally competent assistance,'" but declined to address ineffectiveness prong and decided case solely on prejudice prong), *cert. denied,* 534 U.S. 1068 (2001).

"would not have been boring to the jury panel since they already had an adamant desire to hear their testimonies again [TT 15:38] in that their testimonies did not jibe with their pre-trial statements, or the facts of the case." *State Petition* at 84.

Cross-examination and impeachment are matters of trial tactics that are not subject to second-guessing after the fact under *Strickland*. Moreover, the fact that before closing arguments two jurors wanted to hear from Roberts and Clabaugh again – one juror because "their testimony does not coincide with" their earlier interviews, statements, or even their courtroom testimony[119] – illustrates counsel's effectiveness in handling impeachment of State witnesses and presenting the defense strategy, as well as the lack of prejudice.[120]

---

[119]   The first question was "'I'm curious as to the testimony of [Roberts and Clabaugh]. Can we bring them back? We need to hear their stories again? I would again like to hear from Cassie.'" *Transcript Vol. XV* at 38. The other question was "'I would like the prosecution to bring back [Roberts and Clabaugh] to testify again. Reason being is that their testimony does not coincide with their first testimony or their second or even now in the courtroom. It doesn't coincide with the detective's testimony either, when they interviewed them.'" *Id.* Without objection, the court answered the juror questions by advising them that: "You are to rely on your memories as to the testimony of the witnesses." *Id.* at 40. Immediately thereafter, closing argument began.

[120]   *See, e.g., Boyd v. Ward*, 179 F.3d 904, 915 (10th Cir. 1999) ("those accused of crimes, even capital crimes, are entitled only to a reasonable and adequate defense, not the defense which, in hindsight, they believe would have been the best. Many of Mr. Boyd's claims of ineffectiveness involve challenges to trial strategy and tactics (how best to cross-examine and/or attempt to impeach witnesses, what evidence to introduce, what defense theory will be most plausible). Even assuming that Mr. Boyd established deficient performance, we conclude he has shown no prejudice under *Strickland* -no reasonable probability that, had counsel not committed the errors he now claims were committed, the outcome of the case would have been different."), *cert. denied*, 528 U.S. 1167 (2000); *Jalowiec v. Bradshaw*, 2008 WL 312655 at * 86 (N.D.Ohio

162

Third, Bartlett's characterization of counsel's actions are simply not borne out by the record.  He asserts that defense counsel failed to properly present the alibi defense by "neglect[ing] to show that others had admitted to this crime or had a motive . . . and that the State's chief witness, Roberts, was in fact implicated in this crime . . .  ***None*** of this testimony was presented at trial by defense counsel."  *State Petition* at 67 (emphasis added).  Elsewhere he asserts that "clearly . . . the testimonies of Clabaugh, Roberts and Hooven, are wholly without credibility and not worthy of consideration by a finder of fact" and that when "trial counsel ineffectively failed to apply ***any*** adversarial testing to the State's case in chief" the

---

2008) ("Usually, cross-examination techniques, like other matters of trial strategy, are within the professional discretion of counsel.  *Dunham v. Travis,* 313 F.3d 724, 732 (2nd Cir. 2002); *Davie v. Mitchell,* 291 F. Supp. 2d 573, 604 (N.D.Ohio 2003).  As long as trial counsel conducts a thorough and meaningful cross-examination of a witness, counsel's failure to employ a trial strategy should not be subjected to the second-guessing prohibited by *Strickland.  Strickland,* 466 U.S. at 689.  Even if cross-examination might have been more effective, it does not constitute an unreasonable performance for purposes of an ineffective assistance of counsel claim.  *Dell v. Straub,* 194 F. Supp. 2d 629, 651 (E.D.Mich. 2002) (citing *Cardwell v. Netherland,* 971 F. Supp. 997, 1019 (E.D.Va. 1997)).  Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available.  *Johnson v. Hofbauer,* 159 F. Supp. 2d 582, 607 (E.D.Mich. 2001).  Even so, the Court must also assess if this strategy itself was constitutionally deficient.  *Washington v. Hofbauer,* 228 F.3d 689, 702 (6th Cir.2000).  Defense counsel's performance did not constitute ineffective assistance of counsel where the record shows that defense counsel carefully cross-examined the prosecution witnesses and, in his closing argument, emphasized the inconsistencies and weaknesses in the testimony of the various witnesses.  As a general rule, [d]ecisions about 'whether to engage in cross-examination, and if so to what extent and in what manner, are ... strategic in nature' and generally will not support an ineffective assistance claim.  *Davie,* 291 F. Supp. 2d at 604 (quoting *Dunham,* 313 F.3d at 732).  *See Mooney v. Trombley,* 2007 WL 496470 * 14 (E.D.Mich. Feb.12, 2007).") (internal quotations omitted).

163

trial was "infected with unfairness, allowing the jurors "draw inference for testimony that was nothing less than false, inconsistent or perjured." *Id.* at 179 (emphasis added).

Contrary to what Bartlett asserts, a key component to the defense was that Roberts' and Clabaugh's reports were incredible and that they were the ones who had the opportunity and motive to murder the victims. This was presented to the jurors throughout the trial from opening to closing and what counsel said in opening and closing illustrates that Bartlett's counsel did precisely what Bartlett maintains was not done.[121] The closing argument, in pertinent part, bears repeating in full:

---

[121] In the beginning of opening statement counsel told the jurors that the evidence would point "toward different people that might be involved" and some "of the evidence is going to point to Steven Bartlett, but it's going to point to him in a very unusual, very calculated way." *Transcript Vol.* X at 12. Counsel then introduced to the jurors to the fact that it was Roberts who called the police to alert them about the bloody truck in Pete's parking lot was Roberts, but he did so anonymously. Ten days later, Roberts told a different story to the police and by then had brought Clabaugh into the picture, who corroborated Roberts' new rendition. They told an incredible story. *See id.* at 24, 28-33. Once Detective Ortiz had Roberts' and Clabaugh's renditions there "was virtually no effort to locate this other mystery man. . . . And that's pretty much were the investigation stands today. The problem is that Roberts, the Roberts/Clabaugh story is a lie. Not only is it ridiculously improbable in some respects, not only are there numerous contractions and changes in the story," *id.* at 33-34, "sometime after Mr. Bartlett was arrested . . . his truck, which was parked outside of his house up there, was fire bombed, perhaps a warning of some sort, we don't know, *id.* at 37. Counsel concluded that the "evidence had several possibilities as people who might have been involved in these homicides" and that "certainly when all the evidence is in, you're not going to be able to declare with real assurance, let alone beyond a reasonable doubt, that you know who killed these two young men or why they were killed." *Id.* at 37-37.

The prosecutors promised you initially a trail of blood. A trail of blood that led right to Mr. Bartlett's house and they gave you that. They gave you that and then they gave you a certifiable liar, and [his] good friend, to come in here and try to tie Steven Bartlett to this flood of evidence.

[Discussion of only a few drops of blood on Bartlett, contamination and reliability of DNA results, and improbability of a few drops of blood given amount of blood found at the scenes].

As I say, what we've got here is this trail of blood. And if you are to believe that Mr. Bartlett is the one that did this, if you believe Steven Bartlett is the one that killed these people, you're going to have to believe that based upon the testimony of H.B. Roberts and his friend, Timothy Clabaugh. I would submit to you that's not in the cards.

Now, aside from the fact that Clabaugh acknowledged or Roberts acknowledged that he had lied to the police initially, not only is the story utterly ridiculous and inconsistent from one version to the next, it's at odds with known facts, other facts represented in this courtroom. You would have to believe that Mr. Roberts was telling the truth and virtually everyone else who testified aside from the officers who were testifying about the collecting of the evidence and so forth, most of the rest of the fact witnesses are somehow lying.

What was his reason for not telling the truth initially? Well, he was afraid. He was afraid for his friends, the friends that he had told the story to that night [after coming] back from seeing these two people lying in the livingroom of Mr. Bartlett, these friends from whom you never heard on the witness stand here at this

165

trial.

Now, he just said – he just had a recent argument with Mr. Bartlett.  He said he hadn't seen him for several days, hadn't been to his house for several days because of this falling out that he had over some woman or something.  Yet this evening he fixes to go to Mr. Bartlett's house to, depending upon which statement you listen to, and first it's to pick up a grinder or polisher that he borrowed from him, and the second statement was to return $20 that he owed Mr. Bartlett[,] and when he spoke to you in court, it was to do both of those things.

Now, this is what he was going over there to do, after, he says, he had spoken with Tim Clabaugh who had left work earlier than he had when he was finished bussing, and he would inform him that Steven Bartlett was over at the restaurant looking for body bags.  Body bags, body bags.  What a bizarre request.  This sort of coincided, Mr. Roberts says, with what he heard . . . now that he thought about it.  He was in the restaurant and he had heard Steven come in and ask for a shovel.  Never mind Jan Hooven doesn't remember Shadow talking to [Roberts] or Tim Clabaugh, never mind, despite now he says some reason to think this is true, he's got two bodies over there.  He picks this time to strap on his gun and go over to Mr. Bartlett's house to repay him $20 and get his grinder back now.

Now, we'll talk about the gun a little bit.  Why did he carry the gun with him?  Well, he had sort of an explanation for that too.  He said, "I was working that night, and I handled money out and carried it to Ruthanne Jojola's house, and since I'm supposed to be taking care of the money, I have to take my gun to work with me."  In fact, he said he was going to be taking the money over there that night.  Well, you heard from

166

Ruthanne.  That's just not true.  She doesn't recall his ever doing that.  Jan Hooven told you that sometimes the bartender will take the cash over there if the safe is too full, but Mr. Roberts wasn't working as a bartender that night.  He was working as a waiter.

The fact is he didn't have any gun on his hip because he was going to be taking the proceeds of the day's work from the restaurant over there.  But why did he bring up the gun?  Why did he bring up having a gun on his hip at all?  Why did he mention this to the authorities?  I can suggest a very good reason.  Mr. Roberts, and this is when [he] finally went and told the amended version of the truth . . . about 11 days after this actually occurred, I will simply suggest it's because there are a lot of rumors floating around.  There's all sorts of stories as Detective Ortiz told you about who was involved in this, who might have seen what, and Mr. Clabaugh (sic) might very well have known that he was the subject of rumors about having been out with a gun that night, and he's looking for an explanation – to any sort of preempted explanation to explain this.

Now, you also recall when he talks about this, having seen Mr. Bartlett in the bar, despite what Ms. Hooven said, he saw him in black clothes, he didn't see him in painter's clothes.  That was Tim Clabaugh who saw him in painter's clothes.  Tim Clabaugh was the only person who claimed to see him in painter's clothes which Roberts does not say that.  Roberts saw him in dark jeans, Jan Hooven said dark jeans, hat, vest, the same outfit she recalls he ever wore. Then there's a story he tells about his ankle.  He twisted his ankle.  He said he twisted his ankle that night about 8:30 when he was leaving the restaurant presumably on his way home, strapped his gun on and repaid the $20 and collect[ed] his grinder from Steven Bartlett.

167

What did he say, what happened?  Well, he twisted it on the toe (sic) [Jojola child's toy] and he told Ruthanne Jojola about it when he saw her the next morning.  In fact, their (sic) [her] son, either Ricky or David, one of the two, had witnessed this as he twisted his ankle.  You will recall when Ruth Jojola testified here she had been over there three times that day . . . .  She wasn't over there at 8:30 in the evening.  She was home with her children all the rest of the day . . . .  And furthermore, she said she didn't take her children over there with her when she went.  None of the Jojola kids saw this.  But why was he – why did he bring this up, in the first interview, excuse me, the second interview, when he decided to ["]tell the truth about this["] as he put it?

Again, I think it's the same reason he's hobbling around with a twisted ankle, there's a lot of stories around, somebody knew what went on.  Somebody up there and probably several somebodys knew actually what happened and somebody was talking about Mr. Roberts' twisted ankle and that he twisted it being involved in the killing of Jeff Unser and Lee Benjamin.

So this was their – the bridge between their trail of blood . . . The key stone cops couldn't fail to make the connection from one place to the other.  And just in case, the key stone cops did show up and were not able to make the connection, by God, there was [Roberts] standing there ready to point Sergeant Witt to Shadow's house.

He says he went home that night after seeing this, this horrid scene and these two dead people on the floor of Mr. Bartlett's house.  He had some various explanations – explanations about what happened while

168

he was there.  He either pulled his gun when Mr. Bartlett was grabbing him from behind[,] or he didn't pull his gun[,] and that changed.  There are various other details that changed, and I'm not going to sit here and try to recount every one of them.

Your memories are better than mine.  You've got 12 heads.  But he said he went home ashen as, of course, anybody would after this and spilled it all out to his roommates and Timothy Clabaugh at that time, telling them exactly what he had seen, at which point he got drunk as could be, passed out and didn't hear this truck coming roaring up in the middle of the night.

Well, where are these people that he told this to?  Did you hear from any of them?  Tim Clabaugh says that he didn't even learn about this until the next day.  Now, Clabaugh's his friend, Clabaugh's here to help him, plainly that's what's going on here.  There's some other details, however, that Clabaugh can't help him much with.  There's some other – the prosecutors characterize these changes in story, these inconsistent details with the different stories and the details that are – that don't match the fact as minor, trivial why he is lying about Bobbi Jo Schultz.  He didn't say in his interview at the District Attorney's Office that it could have been Bobbi Jo Schultz.  It might have been Bobbie Jo Schultz.

Now, you heard [the other defense attorney, John Borgren] ask David Roberts if you were asked this question and you gave this answer, and "There is no doubt in you mind that the women you saw there, woman you saw there was the woman you saw that night."  David Roberts['] answer, "I swear my soul and my life on it."

Does that sound like an equivocal answer?  Does that sound like somebody who's saying, ["well, it could

have been her.["] No, the first time he started waffling about that, not just waffling, he just flat recanted it, here in front of you. Prior to that, of course, he said that he didn't get a good look at the person, he didn't really know who it was. Well, you heard Janice Hooven say that he knew very well who Bobbi Jo Schultz was. He was the one who introduced her to Bobbi Joe Schultz. Bobbi Jo Schultz used to work at that restaurant. He knew her very well.

Why is he lying about this? The prosecutors are relying upon Mr. Roberts, . . . and his buddy[,] to supply a reason for Steven Bartlett to have slaughtered these people in the livingroom of his own house, to spray it full of bullets, cover his walls and his floor with blood. What's the reason? He broke the code. They broke the code, something about a motorcycle, stolen motorcycle, "I had to do it". Which motorcycle? Which motorcycle are they talking about? Stolen from whom? When? What information did you get about this stolen motorcycle? What evidence did they present to you about it? Who owned this motorcycle and might really have wanted to kill Jeff Unser and Lee Benjamin?

Theresa Byroad told you that he [referring to Bartlett] came over the day before and was not particularly upset about it and, well, he might not have been upset about it because he had traded this motorcycle for a gram of some kind of coke, not very much, not very much of an outlay of funds for something like this. He and Natalie had every reason to believe it was stolen to begin with, and he was not particularly shocked to find out he was going to lose it. But Tim Clabaugh comes along on December 14th, they finally produce him at that point to back up his buddy, David Roberts. What's he say? Well, he's got Shadow coming into a bar in white painter's outfit unlike, as I say, anyone

170

else you heard here testify about seeing him that day.  He says he came into the bar with two people, a man and a woman.

Again, Jan Hooven saw him come in for a short time with another man.  She never saw him with another woman.  He comes in, what's he ask for?  He doesn't ask or something [– "]I got to get rid of the bodies["] or something of that nature.  He comes in and asks specifically for body bags and then talks about some Harley Davidson[?]  Well, the only motorcycle that we heard about being ever in Shadow's possession during the this was a, some sort of Triumph that David Roberts was very interested in buying, a Triumph, not a Harley Davidson.  There has been no evidence of any stolen Harley Davidson.  We're left with pure speculation as to where this might have come from.

But the real reason for Clabaugh's testimony, for his statement, is to push the time of the death of these people back.  He says he spoke to Shadow, I think, between 6:30, 7:30, something like that.  And not only does Steven Bartlett tell him, "I need two body bags", he tells him, I have two, two-hour old bodies in my livingroom".  Isn't that convenient?  He doesn't say I have a couple of bodies I need to get rid of, I need some body bags, he makes it clear to him that the bodies are exactly two hours old, about pushing the time of death back to 4:30 to 5:30.

Now, who does that help?  Well, I can suggest one person it might help.  It might help David Roberts, and the reason it might help David Roberts is because he's got a good alibi for that period of time because he's out of (sic) [at] work.

The details of Clabaugh's and Roberts' stories don't

match well in some respects, in some very important respects. We never said they're good liars, just liars. And is there anyone of you who sat there and listened to Mr. Roberts and didn't think that he was lying? One of the instructions you got will tell you that when you're judging the credibility of witnesses, you should judge his or her manner while testifying. You watched him terribly, think back about [Roberts] sitting there on the stand kind of leaning back a little, his eyes squinted a little bit and his pupils dialated (sic) like saucers. They were enormous.

Now, he said he hadn't been using any drugs or drinking anything, but that doesn't mean you have to believe it just because he said it. I would suggest that plainly he was under the influence of something, and I would not pretend to tell you what it was.

So, Clabaugh's main purpose in this whole thing, as far as it appears is to, as I say, get the time of deaths pushed back to a point around between 4:30 and 5:30, the time when Mr. Roberts was at work.

[Extensive discussion about time of death and all the evidence that pointed to the victims not having been killed at 5:30 in the afternoon].

. . . aside from the latent ridiculousness you heard from the story from H.B. Roberts and his friend, it's pretty clear that these people were alive well after Shadow was supposed to have come dressed in white painter's clothes to the middle of a busy restaurant where he was not seen by Jan Hooven and told — not seen by Jan Hooven and talking to Tim Clabaugh and telling Clabaugh he needed two body bags for his two-hour old bodies that were sitting in his house at that point.

So, if they were killed late in the evening, probably

172

they were killed when Shadow wasn't even there.
[Extensive discussion about alibi, gun, and forensics].

There were potential witnesses that were just looked into in some half-hearted way. One of the ones I asked Detective Ortiz about was a brother of a hairdresser of one of the District Attorney's who claimed to have personal knowledge of what occurred that night. Detective Ortiz made several attempts to contact this person. Apparently, they never returned the phone calls and so it was just dropped.

But I guess the biggest thing, what did you hear about steps that the police took to locate these two mystery people, these two people who were seen by [Roberts] stepping over the bodies in Mr. Bartlett's house. What did you hear about the investigation that was done, the attempt to locate those two?

If the District Attorney's Office, the police believed that [Roberts] was telling the truth that day in the District Attorney's Office when he points, when he says ["]I swear on my life that that's the woman that was in that house when those people were killed, I saw them in there,["] why didn't they arrest her? Where is she? Who else could have done this? Who else could have done this if it's not Mr. Bartlett? And who knows who could have done it.

Roberts admits he had a key to this place and used to go over there all the time. His roommate, Scott Baird, had a key and he certainly was able to get in and out of the house. [Roberts] said there were keys to that house floating everywhere. Why was [Roberts] lying about Bobbi Jo Schultz? Why was he lying about being with Chuck Woods the date after this happened? Chuck Woods was running around telling everybody that this

173

was Lee Benjamin who was killed.  You heard testimony
of Jan Kabella, again, not something (sic) who had any
acts (sic) to grind in this, nobody was out to help Ms.
Kabella.  She told about seeing . . . Roberts that night,
the night of the 19th.  She was sitting with and which he
specifically denied when he talked to him on cross-
examination . . .   He said, remember he said ["]it didn't
happen.["]  Why?  Why is he trying to distance himself or
take Mr. Woods out of the picture?  Who knows who did
it.  Who knows who did it.  The fact is it could have been
anybody.  It could very well be somebody's name you
haven't even heard today.

*Transcript Vol. XV* at 73-105.

This closing argument, and the transcript of the testimony upon which it is

based, flatly contradict many of subjects Bartlett claims his counsel failed to use for

"impeachment."  Furthermore, the closing argument illustrates the danger the

defense would have faced if it pursued the route Bartlett now advocates.  As it

stood, without the other suspects being made part of the proceedings, the defense

had a strong basis to argue reasonable doubt:  there were no witnesses who could

point to Bartlett as having committed the crimes; Roberts and Clabaugh had no

independent corroboration for their dubious versions of the events; the police did

not investigate others despite leads;  and Bartlett had alibi witnesses.  If the defense

had sought to make other suspects part of the proceedings, the tactic could have

completely backfired, since all of them would have had every incentive to lay the

blame elsewhere and thereby strengthen the prosecution's case against Bartlett.

Accordingly, I recommend that the "impeachment/false testimony" aspects of Claims 1, 2, 3, and 5 be dismissed. *See Doc. 1* at 6, 7, 9, 9A, 9A1, 10B, 10B3, 10B7, 10B8.

## D.  Miscellaneous Claims

### 1.  Juror Issues

Bartlett contends the trial judge erred in instructing the jurors to rely on their memories. *See State Petition* at 240-41 (Ground 47(L)); *Doc. 1* at 10D5.  As mentioned earlier, this happened before closing arguments when jurors inquired about recalling Roberts and Clabaugh to the stand.  See *supra* note 119 and accompanying text.  It also happened during deliberations, when a juror asked: "Can we have Tim Clabaugh's testimony about what Shadow said him (sic) outside Pete's on the patio." *Transcript Vol. XVI* at 4-5.  On both occasions, counsel had no objection to the court's instruction.  *See id.* at 5; *see also Transcript Vol.* XV at 40.

In addition, on the first day of trial after the lunch recess, a juror evidently left the courthouse and did not come back.  She phoned the judge and told him she was ill with diarrhea and vomiting and wanted to be excused for the rest of the

afternoon.  Neither defense counsel nor the prosecutor wanted to postpone the trial for the afternoon.  *See Trial Transcript Vol. X* at 59-61.  The judge was inclined to dismiss the juror and seat one of the three alternates because there was no guarantee that the juror would be well the following day.  *Id.* at 60.  The prosecutor agreed.  *Id.* at 61.  The defense objected on the ground that a "temporary stomach upset" was not grounds to dismiss a juror – "if we get rid of a juror every time someone's sick for the afternoon, if it happens three times . . . we're going to be out of jurors."  *Id.* at 62.   The trial judge decided to excuse the juror and told counsel he would let her know, but he called the juror outside the presence of the attorneys.  He apologized, relayed the substance of their conversation to counsel and offered to call her again and put her on speaker phone.  Neither side objected to the call and the alternate was seated.  *Id.* at 62-63.  There is no indication that defendant was not present for any of these proceedings.  Bartlett claims the ex-parte telephone conversations were error.  *See State Petition* at 238; *Doc. 1* at 10D3.

The claims were dismissed as procedurally-defaulted, *see Record Proper* at 1717, but I need not engage in the difficult analysis because independently, I find them without merit, *e.g., Smith v. Mullin*, 379 F.3d 919, 927 (2004).

Both  a New Mexico rule[122] and federal decisions[123] address juror requests for transcripts of witness testimony during deliberations and the standard is the same. The decision whether to give the jurors the transcript is within the trial judge's discretion.  However, no federal or New Mexico authority authorizes a trial judge to recall a witness who has been excused for further testimony simply because a juror requests it.  Since there is no constitutional right to the additional testimony or transcript and habeas relief is generally not available for errors of state law, the "additional testimony" claims are unavailing, even if Bartlett had cast them as an

---

[122]   Regarding whether jurors will be provided additional resources while deliberating, the rule provides:

> After the jurors have retired to consider their verdict, if they desire additional instructions or to have any testimony read to them, they may in the discretion of the court be returned to the courtroom and the court may give them such additional instructions if authorized by UJI Criminal or may order such testimony read to them.   Such instruction shall be given and such testimony read only after notice to, and in the presence of, the attorneys and the defendants.

N.M. RULE § 5-610(A) (LexisNexis 2004 & Supp. 2007).

[123]   *E.g., United States v. Howard,* 80 F.3d 1194, 1202 (7th Cir. 1996) ("It is well settled that the decision whether to comply with the jury's request for the transcript of a witness' testimony is one "'purely within the trial court's discretion.'") (citations omitted); *Lamon v. City of Shawnee, Kan.,* 972 F.2d 1145, 1154 (10th Cir. 1992) ("Plaintiffs raise an evidentiary issue . . . the jury sent a note requesting the transcribed testimony of witnesses . . .  The court denied the request, directing the jury to rely on its best recollection of the testimony.  . . . the denial of the requested read-back was well within the trial judge's sound discretion."), *cert. denied,* 507 U.S. 972 (1993).

ineffectiveness claim.[124]

---

[124]   The Sixth Circuit has addressed a claim of this sort in the Sixth Amendment "jury" context:

> Bradley asserts that the trial court "denied petitioner's Sixth Amendment right to an informed jury when it effectively advised the jury [that] transcripts of Cootware's testimony would never be available."  As discussed immediately above, the trial court's statement to the jury regarding the transcripts may have violated Michigan state law.  Yet Bradley cannot demonstrate a federal constitutional right to have the jury provided with transcripts of witness testimony.  Those federal cases that discuss the issue of readbacks and transcript availability do so under the rubric of the court's supervisory authority over federal criminal trials, not on constitutional principles, and in any event do not establish a uniform rule. . . .  "[F]ederal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire,* 502 U.S. 62, 67 (1991) (citations omitted). Bradley's claim lacks merit.

*Bradley v. Birkett,* 192 Fed. Appx. 468, 477 (6th Cir. 2006) (certain citations omitted).

The Tenth Circuit has addressed a claim of this sort in the Sixth Amendment "counsel" context:

> Mr. Jackson further questions trial counsel's failure to object to the trial court's denial of the jury's request to review certain transcripts during its deliberations, arguing that without review of the transcripts the jury was left to speculate about the testimony of key witnesses.  How counsel's failure to object constitutes deficient performance or how it prejudiced Mr. Jackson is not apparent. . . .  Moreover, even had Mr. Jackson's counsel objected and raised this issue on appeal, it is unlikely the New Mexico Supreme Court would have disturbed the trial court's decision to keep such testimony from the jury.  *See, e.g.,* Rule 5-610(A) . . .  (allowing for reading of testimony upon jurors' request "in the discretion of the court"); *State v. Montoya,* 86 N.M. 316, 523 P.2d 814, 815 (App.1974) (holding court's decision to allow testimony read back lies in the discretion of the trial judge).  Thus, counsel's failure to object was neither deficient nor prejudicial.

*Jackson v. Shanks,* 143 F.3d 1313, 1320 (10th Cir.), *cert. denied,* 525 U.S. 950 (1998).

The New Mexico rule does provide that any communications by the judge
with a juror must be done in the presence of counsel.[125]  However, the general
standard for evaluating court instructions and state evidentiary rulings is an
exacting "due process" standard.[126]  I cannot conclude that even if the trial judge
erred in handling the juror issues raised by Bartlett, the errors were "so grossly
prejudicial that [they] fatally infected the trial and denied the fundamental fairness

---

[125]  The rule states:

> The defendant shall be present during all communications between
> the court and the jury unless the defendant has signed a written
> waiver of the right to be personally present.  All communications
> between the court and the jury must be in open court in the
> presence of the defendant and counsel for the parties unless the
> defendant waives on the record the right to be present or unless
> the communication involves only a ministerial matter.  Unless
> requested by counsel for the defendant, communications between
> the court and the jury on a ministerial matter may be made in
> writing after notice to all counsel without recalling the defendant.

N.M. RULE § 5-610(D) (LexisNexis 2004 & Supp. 2007).

[126]  *See, e.g., Estelle v. McGuire,* 502 U.S. 62, 72-73 (1991) ("The only question for us is
whether the ailing instruction by itself so infected the entire trial that the resulting conviction
violates due process. . . .  And we also bear in mind our previous admonition that we have
defined the category of infractions that violate fundamental fairness very narrowly.  . . . Beyond
the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited
operation.") (internal quotations and citations omitted); *Henderson v. Kibbe,* 431 U.S. 145, 154
(1977) ("The burden of demonstrating that an erroneous instruction was so prejudicial that it
will support a collateral attack on the constitutional validity of a state court's judgment is even
greater than the showing required to establish plain error on direct appeal.  The question in such
a collateral proceeding is whether the ailing instruction by itself so infected the entire trial that
the resulting conviction violates due process, not merely whether the instruction is undesirable,
erroneous, or even universally condemned.").

179

that is the essence of due process" such that federal habeas relief is warranted.  *Fox v. Ward,* 200 F.3d 1286, 1296 (10th Cir.), *cert. denied,* 531 U.S. 938 (2000). Therefore, I recommend that the "juror" issues in Claim 7 be dismissed.  *See Doc. 1* at 10D3, 10D5.

## 2.  Bartlett's Failure To Testify

In Ground 11 of the State Petition, Bartlett asserts that he was "clear in his desire to testify" and "at the close of the State's case . . . asked to confer with counsel to prepare his testimony to dispute the many misstated testimonies of State witnesses," nonetheless, "despite these repeated requests, counsel for Petitioner rested without calling Petitioner to testify on his own behalf."   He further asserts there is "no rational, tactical reason" not to have called him, because the defense itself disclosed Bartlett's felony conviction in opening statement and allowed the prosecution to "introduce numerous bad acts" during trial without objection.  He maintains that he was prejudiced because had he been permitted to testify, "the results of this case would have been different."  *State Petition* at 100.

After the last defense witness, the defense asked for a bench conference because a defense witness was not willing to testify.  The jurors were excused and while they were excused, counsel and the court discussed jury questions and the fact that the defense was going to rest its case.  *See Trial Transcript Vol. XV* at 37-

39.  The jurors were called back in, instructed on their questions, and the defense announced in open court that it rested its case.  The jurors were again dismissed and the court heard the defense motion for a directed verdict of acquittal, and discussed jury instructions, closing arguments and other ministerial matters.  *Id.* at 40-46.  There was no indication from defense counsel or Defendant throughout any of these proceedings that Bartlett wanted to testify.

The trial court held the testimony claim without merit because the "trial record provides no indication that Bartlett desired to testify in his defense."  *Record Proper* at 1811.  The court cited *United States v. Nohara,* 3 F.3d 1239, 1243-44 (9th Cir. 1993), for the proposition that "when a defendant is silent in the face of [an] attorney's decision not to call him as a witness, the defense waives the right to testify and there need not be a waive on the record, nor is there a duty on the trial court to advise of the right."  *Id.*

This holding is neither contrary nor unreasonable because there is no clearly established authority from the Supreme Court on the issue of whether waiver can be found based on a defendant's silence or whether a trial court is obliged to inquire.

> A criminal defendant's right to testify is "a fundamental constitutional right."  *Rock v. Arkansas,* 483 U.S. 44, 53 n. 10 (1987).  Whether silence alone should be presumed

to be a waiver is a more difficult question.  As we explained in *Underwood v. Clark,* 939 F.2d 473, 476 (7th Cir. 1991), some circuits require a defendant to protest a lawyer's refusal to allow her to testify during trial to preserve the right. . . .  Illinois follows that rule. . . .  At the other extreme, several state courts require judges to inquire of defendants directly whether they want to testify. . . .  The rule in this circuit "steer[s] a middle course," requiring a defendant who wishes to raise this claim to meet a heightened pleading standard before the court must hold an evidentiary hearing on the question of waiver. *Underwood,* 939 F.2d at 476.  In other words, a "barebones assertion by a defendant, albeit made under oath, is insufficient"; something more, such as an affidavit from the lawyer who allegedly forbade his client to testify, is required.  *Id.*  And although we do not require judges to question defendants regarding their desire to testify, we have suggested that prudent counsel may choose to put such waivers on the record outside the presence of the jury, as is standard practice in some courts.  *See Taylor v. United States,* 287 F.3d 658, 662 (7th Cir. 2002).

The variety in practice among the state courts and the various federal courts shows, unfortunately for Thompson, that there is no standard clearly established by the Supreme Court of the United States that is binding on all.

*Thompson v. Battaglia,* 458 F.3d 614, 619 (7th Cir. 2006), *cert. denied,* 127 S. Ct. 1302 (2007).  The Tenth Circuit is among those courts that agree with the position taken by the trial judge and holds that silence constitutes a waiver and the court has no duty to inquire:

A trial court has no duty to explain to the defendant . . .

182

that he has a right to testify or to verify that a defendant
who is not testifying has waived the right. . . .  To ensure
his constitutional rights, a defendant must alert the trial
court that he desires to testify or that there is a
disagreement with defense counsel regarding whether he
should take the stand. . . .  When a defendant does not
alert the trial court of a disagreement [with his counsel
regarding his right to testify], waiver of the right to testify
may be inferred from the defendant's conduct . . .

*United States v. Williams,* 139 Fed. Appx. 974, 976 (10th Cir. 2005) ((internal

quotations and citations omitted).[127] The Tenth Circuit has also held that a trial

---

[127]   *See also, e.g., United States v. Manjarrez,* 258 F.3d 618, 623 -624 (7th Cir. 2001) ("we
have repeatedly held that the Constitution does not require a trial court to question a defendant
*sua sponte* in order to ensure that his decision not to testify was undertaken knowingly and
intelligently unless there is some indication that the defendant has been prevented from
exercising that right. . . .  Indeed, we have discouraged [the practice] for fear that in so doing
judges will insert themselves into a sensitive aspect of trial strategy, thereby intruding
inappropriately on the attorney-client relationship."); *Frey v. Schuetzle,* 151 F.3d 893, 897 -899
(8th Cir. 1998) ("a knowing and voluntary waiver of the right may be found based on a
defendant's silence when his counsel rests without calling him to testify. . . .  the defendant must
act affirmatively rather than apparently acquiesc[ing] in his counsel's advice that he not testify,
and then later claim[ing] that his will to testify was overcome.") (internal quotations and
citations omitted); *Brown v. Artuz,* 124 F.3d 73, 78 (2nd Cir. 1997) ("the question arises as to who
should bear the responsibility for ensuring that the defendant is informed of the nature and
existence of this right and that any decision to waive this right by the defendant is knowingly and
intentionally made.  The caselaw has assigned this responsibility to either the trial judge or the
defense counsel, or left it with the defendant himself. . . .  We agree with those courts that place
no general obligation on the trial court to inform a defendant of the right to testify and ascertain
whether the defendant wishes to waive that right.") (citations omitted), *cert. denied,* 522 U.S.
1128 (1998); *McElvain v. Lewis,* 283 F. Supp. 2d 1104, 1117 (C.D. Cal. 2003) ("waiver of the
right to testify . . . need not be explicit [and] may be inferred from the defendant's conduct and is
presumed from the defendant's failure to testify or notify the court of his desire to do so. . . .
When a defendant remains silent in the face of his attorneys decision not to call him as a witness,
he waives the right to testify, . . . and to claim ineffective assistance of counsel due to his
counsel's failure to call him as a witness. . . .") (internal quotations and citations omitted).

judge's failure to inquire about the waiver does not merit habeas relief.[128]

Furthermore, this is not a case where a defendant was unaware of his right to testify because counsel failed to inform the client of the same. To the contrary, Bartlett asserts that "[t]hroughout this case Petitioner was clear in his desire to testify" and "repeatedly" asked defense counsel to prepare him for his testimony. *State Petition* at 100.[129] Therefore, I recommend that the "failure to testify" aspect of Claim 3 be dismissed. *See Doc. 1* at 9A1.

**3. Bartlett's "Prior Bad Acts"**

Bartlett asserts that "bad acts" or other "highly prejudicial and inadmissible evidence" was introduced during trial (or to the grand jury) to his detriment, either due to ineffective assistance of counsel or prosecutorial misconduct or trial court error. These fall into three categories: testimony that Bartlett pointed a gun at "Josh;" naming Clabaugh as the alleged victim in the indictment charging Bartlett

---

[128]   *See Harris v. Everett,* 2000 WL 504731 at * 3 (10th Cir. 2000) ("Mr. Harris also contends that he should be granted habeas relief because the trial court did not advise him of his right to testify and inquire upon the record if he voluntarily waived that right. The Wyoming Supreme Court rejected this claim because Mr. Harris was advised at arraignment of his right to testify. . . . While the right to testify in one's own defense is a constitutional right, . . . Mr. Harris's complaints about the state's procedure for ensuring compliance with that right are not of constitutional dimension.").

[129]   *Compare Owens v. United States,* 483 F.3d 48, 58 (1st Cir. 2007) ("Where counsel has failed to inform a defendant of his right to testify, we do not believe that a waiver of that right may be implied from defendant's silence at trial").

with intimidation; and explicit or implicit mention during trial that Bartlett was a
felon or drug dealer.[130]  The trial court addressed the "Josh" claim on the merits,
*Record Proper* at 1826-28, but dismissed the other claims as duplicative or
procedurally defaulted, *see id.* at 1715-17.

One of the firearms used to murder the victims was a .38 caliber.  *See, e.g.,*
*Trial Transcript Vol. XI* at 148.  On direct examination, Clabaugh mentioned that
he had seen Bartlet with a ".38 Special Smith & Wesson snub nose with rubber
grips."  *Trial Transcript Vol. XIII* at 5.  Clabaugh said that Bartlett kept the gun in a
holster on a chair that he sat in, positioned so that he could grab it while sitting, *id.*
at 5-6, 14-15, and that Bartlett "pulled it out several times.  He was wanting to

---

[130]  *See State Petition* at 130 (Ground 21 – defense counsel was ineffective during voir dire
when Petitioner's "escorts" were introduced, thereby alerting the jury panel that he was in
custody); *id.*  (Ground 21 – defense counsel was ineffective during trial by telling the jurors
Bartlett was a convicted felon and not allowed to have guns because he was on probation); *id.*
(Ground 21 – defense counsel was ineffective by stipulating to consolidate the charge of
threatening or intimidating a witness); *id.* at 132 (Ground 22 – defense counsel should have
moved for a mistrial or sought a curative instruction when Claybaugh testified that Bartlett
pointed a gun at Josh); *id.* at 156 (Ground 35 – prosecutorial misconduct before the grand jury by
mentioning Bartlett's prior felony offense); *id.* at 203 (Ground 42 – prosecutorial misconduct at
trial by allowing Sergeant Witt to say Bartlett had prior dealings with the police); *id.*  (Ground 42
– prosecutorial misconduct at trial by referring to Bartlett as a drug dealer); *id.*  (Ground 42 –
prosecutorial misconduct at trial by allowing Clabaugh to testify that Bartlett pointed gun at
Josh); *id.* at 211 (Ground 43 – prosecutorial misconduct at trial by referring to Bartlett as a drug
dealer); *id.*  (Ground 43 – prosecutorial misconduct at trial by placing Clabaugh's name in the
indictment on the intimidation charge); *id.* at 233 (Ground 47 – trial court erred by not
sustaining the objection or giving a curative instruction or declaring a mistrial over the "pointing
gun at Josh" testimony); *id.* at 241 (Ground 47 – trial court erred by reading indictment that
mentioned intimidation of Clabaugh by name).

kind of play with the guns more or less," *id.* at 15.  When the prosecutor asked

Clabaugh to indicate the last time he had seen Bartlett's .38 gun, the exchange

clearly referred to Clabaugh's immediately proceeding testimony that, on the night

of the murders, Bartlett threatened him by pointing his finger as if he was firing a

gun and saying "this [conversation is] between, me, you and this fencepost or your

life."  *See id.* at 13-14.  In that context, this testimony resulted:

> Q.     . . . What was the most recent time that you saw
>         this 38 at the Defendant's house?
> A.      He usually always kept it right here on the side of
>         the chair.  Whenever I had gone over there, it was
>         always there.
> Q.      Okay.  Do you recall the last time you saw that
>         gun?
> A.      No, I don't.
> Q.      I mean, in relation to this time?
> A.      It was probably about a week and a half before, I
>         would assume.

*Id.* at 14-15.

On cross-examination, defense counsel asked a Clabaugh about his week and

a half estimate, *id.* at 34, but nothing about Bartlett threatening anyone other than

Clabaugh, with a gun or otherwise, *see id.* at 31-39.  On redirect, the prosecutor

asked about his estimate and Clabaugh testified that he was "[p]retty positive" of it.

*Id.* at 41.  Then this exchange took place:

> Q.      Okay.  Do you recall anything happening that

186

>would make you remember?
>A.   No, I don't.
>Q.   Did you ever see that gun in relation to a Josh?
>A.   It was pointed at him.
>Q.   Okay.  About how long before this period of time
>      did you see the gun?

*Id.* at 42.  Defense counsel objected and a bench conference took place where the trial judge sustained the objection to any reference to pointing a gun at Josh, but not to establishing the time frame.  *Id.* at 42-44.

As the trial judge noted, he did not advise the jury that the objection had been sustained or caution them in any way, nor did counsel ask for a cautionary instruction or a mistrial.  *See id.* at 44-49; *Record Proper* at 1826.  In rejecting the claim that counsel was ineffective for failing to ask for the instruction or a mistrial, the trial court found Bartlett had not established prejudice because Clabaugh's testimony as "ambiguous . . . as to whether Bartlett pointed the gun at Josh." *Record Proper* at 1827-28.  It further held that the "testimony did not merit declaring a mistrial."  *Id.* at 1827.

As with other evidentiary matters, failure to request or give a cautionary instruction does not warrant habeas relief unless the absence of the instruction

187

rendered the trial fundamentally unfair.[131]  And as the Tenth Circuit has held

under similar circumstances, Bartlett "has not cited, nor have we found, any case

that imposes a cautionary instruction as a constitutional requirement" [under the

circumstances here, *see State Petition* at 133, and, therefore Bartlett's "burden . . . is

a heavy one" – he must show that the failure to give the cautionary instruction

"had the effect of rendering the trial so fundamentally unfair as to cause a denial of

a fair trial." *Foster v. Ward*, 182 F.3d 1177, 1193 (10th Cir. 1999) (internal

quotations omitted), *cert. denied*, 529 U.S. 1027 (2000).

     In light of the fact the Clabaugh did not say precisely who pointed the gun,

that a cornerstone to the defense was that Clabaugh's testimony was incredible,

and the jurors were given instructions on evaluating credibility of witnesses and

bias, *see Record Proper* at 207, I do not find the conclusion unreasonable even if the

court and counsel did err.[132]  Moreover, there was a patent tactical reason for not

---

    [131]  *E.g., Fisher v. Cowley*, 1992 WL 252418 at * 3 (10th Cir. 1992) ("petitioner claims
that the trial court abused its discretion in refusing to give his requested cautionary instruction
regarding the identification by the victim.  Habeas corpus relief is not available to set aside a
conviction on the basis of erroneous jury instructions unless the error has such an effect on the
trial that it is rendered fundamentally unfair.").

    [132]  *E.g., Smith v. Gibson*, 197 F.3d 454, 460 (10th Cir. 1999) ("Because petitioner has
failed to assert a recognized federal constitutional right to a cautionary jury instruction [of the
sort asserted] he will be entitled to habeas relief on this claim only if the trial court's refusal to
give the instruction resulted in a fundamentally unfair trial. . . . Petitioner fails to make this
showing.  Defense counsel had ample opportunity to attack Dickson's credibility and was able to
bring to the jury's attention the fact that Dickson was not a disinterested witness. . . .  In

asking for such an instruction, which was to not focus the jurors' attention on the unclear testimony.

Count 6 of the amended indictment charged Bartlett with intimidating Clabaugh from reporting the crime or from testifying by threatening "great bodily injury." *E.g., Record Proper* at 169, 203.  Evidently, this count referred to the conversation Clabaugh said they had with the finger pointing incident and "fencepost or your life" comment.  However, neither the prosecutor nor the defense focused on it in opening or closing arguments, and Bartlett suffered no prejudice whatsoever, because he was acquitted of the charge.  *E.g., id.* at 176.  Evidently the jurors thought the prosecution did not show anything that constituted intimidation, or they disbelieved Clabaugh's testimony on this point.  Therefore, I independently find the claims in this regard without merit.

I also independently reject the claims that Bartlett was adversely affected by references that he was a drug dealer and/or a felon and on probation.  Mentioning those things at the outset was a reasonable trial tactic.  In reversing a Ninth Circuit decision that found counsel ineffective, the Supreme Court explained:

> The Ninth Circuit . . . criticized [counsel] for mentioning

---

addition, the trial court instructed jurors that it remained their responsibility to determine a witness's credibility, after considering, among other things, any bias, prejudice or interest the witness might have in the outcome of the trial."), *cert. denied,* 531 U.S. 839 (2000).

"a host of details that hurt his client's position, none of which mattered as a matter of law." . . . Of course the reason counsel mentioned those details was precisely to remind the jury that they were legally irrelevant. That was not an unreasonable tactic. See F. Bailey & H. Rothblatt, Successful Techniques for Criminal Trials § 19:23, p. 461 (2d ed. 1985) ("Face up to [the defendant's] defects ... [and] call upon the jury to disregard everything not connected to the crime with which he is charged"). The Ninth Circuit singled out for censure counsel's argument that the jury must acquit if Gentry was telling the truth, even though he was a "bad person, lousy drug addict, stinking thief, jail bird." . . . It apparently viewed the remark as a gratuitous swipe at Gentry's character. While confessing a client's shortcomings might remind the jury of facts they otherwise would have forgotten, it might also convince them to put aside facts they would have remembered in any event. This is precisely the sort of calculated risk that lies at the heart of an advocate's discretion. By candidly acknowledging his client's shortcomings, counsel might have built credibility with the jury and persuaded it to focus on the relevant issues in the case. See J. Stein, Closing Argument § 204, p. 10 (1992-1996) ("[I]f you make certain concessions showing that you are earnestly in search of the truth, then your comments on matters that are in dispute will be received without the usual apprehension surrounding the remarks of an advocate").

*Yarborough,* 540 U.S. at 9-10.

Bartlett's counsel plainly used this tactic to underscore the presumption of

190

innocence[133] and to proactively deal with the facts of the case.  For all the reasons

discussed in more detail throughout these recommended findings, it may have been

ineffective had defense counsel not dealt with these two aspects to Bartlett's life at

the outset because:  Bartlett possibly would have testified and opened the door to

such questions anyway; information about the drug culture in which he lived was

the purported basis for the transaction with the motorcycle and was going to come

in through other witnesses; this drug culture bolstered a significant facet of the

defense because it explained how others could have ready access to Bartlett's

trailer; and/or the prior conviction and probation gave the jury reason to credit a

defense witness when she testified that Bartlett disposed of his guns and discredit

Clabaugh when he testified Bartlett had them.  As such, Bartlett suffered no

prejudice from this trial tactic either.

       Finally, even if jurors suspected Bartlett was in custody that would have had

no effect given the extensive voir dire and instructions on reasonable doubt.  *See*

*e.g., Record Proper* at 206.

       Therefore, I recommend that the "bad act" aspects of Claims 3, 5, and 7 be

---

    [133]  *See, e.g., Trial Transcript Vol. XV* at 106 ("You folks know the fact that you're a big guy with an ugly face or a mean looking guy who wears biker clothes and calls himself Shadow, doesn't mean that you killed somebody, and it doesn't mean that you're entitled to less than the presumption of innocence than anybody else.").

dismissed.  *See Doc. 1* at 9A6, 10B, 10B7, 10B9, 10D1.

## 4.  Opening & Closing Arguments

Bartlett complains generally that counsel either "failed to present the testimony promised in opening statement" or said things that "supported the State's case with unreliable non-disclosed testimony."  *State Petition* at 122 (quote from title to "Ground 19(A-K)").  The trial judge summarily dismissed these claims as duplicative of other ineffectiveness claims.  *See Record Proper* at 1715.  Again, for all the reasons discussed in more detail throughout these recommended findings, the majority of the claims are based on issues that have been rejected on other grounds.[134]  In addition, Bartlett's characterization of defense counsel as having not

---

[134]  *See State Petition* at 122 (counsel was "boastfully extravagant of the victims' character," citing Volume 10 of the trial transcript at pages 12-14, evidently referring to counsel saying the victims led double lives – well-liked, decent, hard-working, and engaged, but also using methamphetamine and associating with people who used drugs); *id.* (counsel "unfavorably demoralized Petitioner," citing Volume 10 of the trial transcript at pages 18-20, evidently referring to counsel describing Bartlett as immaculate housekeeper and careful about his house but no saint, dressing like a biker, using drugs, and was on probation so could not have any guns); *id.* (counsel "unconceivably (sic) supported the States's case in chief with fraudulent testimony which had not been previously disclosed or that was contrary to State witnesses' prior statements or interviews," citing Volume 10 of the trial transcript at pages 22-24, 29, 33, but not clear what assertion means); *id.* (counsel "misled the jury to factual evidence," citing Volume 10 of the trial transcript at pages 14, 20, 23, 25, 26, 27, 29, 36 but not clear what the assertion means); *id.* at 123 (since counsel said the evidence was conflicting and pointed to different people, "counsel had a duty" to bring in all of the evidence noted Bartlett noted in Grounds 1 and 4); *id.* (Dallas Labrum did not leave the motorcycle on the Unser property as "payment"); *id.* at 123-24 (counsel mentioned only a few drops of blood on Petitioner, not the amount expected for someone who shot victims and close range and moved them, but "lost any an all credibility to the jury with this statement" because of the "altered" jeans); *id.* at124 (counsel said Petitioner left open his back door so Roberts could access the washer and dryer, but Roberts testified he had

carried out a defense based on others committing the crimes, alibi, and lack of

physical evidence is not supported by the record.  Thus, even if counsel had failed

to deliver on every single promise in opening statement, it would not warrant

habeas relief, particularly in light of the trial court's overall conclusion that counsel

was not ineffective nor was Bartlett prejudiced.[135]  Furthermore, before opening

statement, the jurors were instructed that "what is said in the opening statement is

not evidence.  The opening statement is simply the lawyers' opportunity to tell you

---

his own key; "the jury would wonder why Petitioner would leave the back door open for Roberts, if Petitioner was in fact aware that Roberts had his own key to Petitioner's home."); *id.* (counsel said Granger would testify that the victims were killed sometime "after" midnight, when Granger said in his interview that it was "around" midnight); *id.* at 124-25 (counsel said Roberts said Petitioner needed two body bags and a shovel, when he said only a shovel and Clabaugh was the one who mentioned the body bags); *id.* at 125 (counsel said Roberts was living rent-free when Roberts said otherwise in pretrial statement but then testified as counsel indicated: "counsel's failing to impeach this simple, meaningless fact and letting this go uncontested, it turned counsel into a liar before the jury and supported the credibility of this witness when counsel to the jury their story is a lie."); *id.* at 125 (counsel said Petitioner got rid of his gun with a laser sight, but a State evidentiary photo showed one that looked like that on a coffee table in Petitioner's home); *id.* at 126 (counsel said it was unclear when the bodies were dumped, but that time could be ascertained from Granger's interview); *id.* (counsel said Roberts made an anonymous call about the truck but Roberts testified otherwise); *id.* (counsel said Granger did "hundreds, perhaps thousands of investigations," when Granger had done many more than that and McFeely was the one who had done "hundreds").

[135]   *E.g., Williams v. Bowersox,* 340 F.3d 667, 671 -672 (8th Cir. 2003) (citing federal decisions where failure to "fulfill a promise made in an opening statement to call a witness or to present evidence has amounted to ineffective assistance of counsel" but noting that "[d]espite these cases, other courts have reached the opposite result and illustrate that failing to present witnesses promised in an opening is not always an error of a constitutional dimension," and concluding that "we are left with the impression different federal courts may resolve the question before us differently. This diversity of opinion alone suggests the Missouri Court of Appeals did not unreasonably apply *Strickland*").

what he or she intends to prove." *Trial Transcript Vol. X* at 7.  Thus, the jurors

would not have factored any deficiencies in counsel's argument against the defense.

Bartlett also faults many aspects of the prosecution's closing argument, and

the claims were summarily dismissed as procedurally defaulted.  *See Record Proper*

at 1717.  I will not point out in exacting detail all of the places where a great

number of these assertions simply misrepresent the record either outright or by

taking testimony out of context.  Bartlett has done the same with these claims as

others discussed previously.  In any event, again, the basis for most of these claims

have been rejected elsewhere in these findings.[136]  I thus independently find all of

---

[136]  In Ground 44, Bartlett contends that the prosecutor "went beyond the 'four corners'
of the evidence by:

- "obliquely" referring to his failure to testify by saying that Bartlett did not
explain the blood stains on this pants and that Roberts looked the jurors in the
eye and denied killing the victims, *State Petition* at 213;
- saying the victims were dragged from Bartlett's home when there was no
evidence of "dragging," *id.;*
- saying the victims "ripped" off Bartlett, when Roberts testified that the
"brotherhood" does not do that, *id.;*
- saying Bartlett was unable to say in his interview with the police when he was at
a barbeque when Marquez testified 9am to 9pm.;
- trying to strengthen Clabaugh's credibility by referencing that he is now a
correctional officer, *id.* at 213-14;
- mispeaking and saying the truck was Bartlett's, *id.* at 214;
- saying there could be no cross-contamination when Petitioner's clothing was
taken, when on re-cross-examination an officer admitted he was not sure if he
changed his gloves; *id.;*
- misstating testimony and trying to discredit the alibi defense by saying Piper saw
both Bartlett and Cassie on both nights when Cassie did not recall whether being
at the bar on both nights and by saying Piper and Bartlett were friends when Piper

these claims without merit for those reasons.

Two of the assertions bear more discussion.  Bartlett asserts that the

prosecutor "obliquely" remarked on his failure to testify referring to the fact that he

_____

said they were "acquaintances," *id.;*
• saying Piper came forward just two days before trial when the prosecutor knew Petitioner told the officers in his interview that Piper could vouch for his whereabouts, *id.* at 214-15;
• saying the time frames "don't make sense," when Hooven's testimony did, *id.* at 215;
• saying the stains on Bartlett's jeans were made by bleach even though the crime lab expert said he could not tell what caused them, *id.;*
• suggesting that the news Ruthanne Jojola remembered was the early news even though she testified it was the late news, *id.;*
• saying Byroad testified Bartlett was a dear friend, when she clarified her testimony on this point, *id.* at 216;
• asking where Bobbi Jo Shultz was when the prosecutor failed to secure her medical release as she was in custody, not trying to contact the prosecutor's hairdresser, not disclosing the GSW until late, not giving the results of the "bloody palm print" to the defense, not mentioning that in his supplementary report Detective Ortiz said Roberts identified Bobbie Jo Schultz as being in Bartlett's trailer, *id.;*
• saying "how convenient" it was that Bartlett got rid of his guns a few days before the murders, *id.* at 216-17;
• failing to mention after recounting the large number of bullets shot that one was left in the gun recovered, *id.* at 217;
• saying the tarp was used to drag the bodies when there was no evidence of "dragging," *id.;*
• saying Bartlett "aided and abetted" in disposing of the bodies where there was no physical evidence connecting Bartlett to where they were dumped and pointing jurors to the aiding and abetting instruction, *id.* at 217-18;
• knowing that some jurors wanted to hear testimony from Roberts and Clabaugh again, pointed out similarities in their stories where there were inconsistencies, *id.* at 218;
• shifting the burden of proof "by arguing that Petitioner failed to produce available witnesses who could have strengthened the evidence," *id. at* 219; and
• surprising Bartlett with the aiding and abetting theory in closing argument, *id.*

Bartlett did not explain the blood stains on this pants while Roberts looked the jurors in the eye and denied killing the victims. *State Petition* at 213. The comment about the blood stain on the pants did not refer to Bartlett, however. It occurred in rebuttal closing argument and referred to what Bartlett's attorney had said in his closing argument.[137] "Although a prosecutor may not comment on a defendant's decision to refrain from testifying, . . . he is otherwise free to comment on a defendant's failure to call certain witnesses or present certain testimony. . . . Because the comment was not aimed at [Bartlett's] failure to testify, . . . it did not violate [his] constitutional rights." *Trice v. Ward*, 196 F.3d 1151, 1167 (10th Cir. 1999), *cert. denied,* 531 U.S. 835 (2000).

Also, the jury was instructed that it "must not draw any inference of guilt from the fact that the defendant did not testify in this case, nor should this fact be discussed by you or enter into your deliberations in any way." *Record Proper* at 212. Taking the remark in context with the instructions, I do not find that it infringed

---

[137] *See Transcript Vol. XV* at 107 (prosecutor's rebuttal begins); *id.* at 108-09 ("Now, if you'll recall, Mr. Odenwald [defense counsel] also mentioned the drop of blood from Jeff on Defendant's boot and Mr. Odenwald also said some of Lee Benjamin's on a sheet. Funny I don't remember anybody saying exactly how that got there. I don't remember him having an explanation for that, but somehow the blood got there.").

on Bartlett's Fifth Amendment right.[138]

Bartlett also asserts the prosecutor shifted the burden of proof to him "by arguing that Petitioner failed to produce available witnesses who could have strengthened the evidence," *id. at* 219, referring to places in the closing argument where the prosecutor referred to the absence of Bobbie Joe Schultz, the U.S. West message retrieval, and the primer residue test, *see Trial Transcript Vol.* XV at 113, 115, 121. Again, all of these comments occurred in rebuttal, all specifically responded to an argument made by defense counsel in closing, and, as such, are fair commentary.[139] Likewise, the jury was properly instructed on the burden of proof. *See Record Proper* at 193-206. Nothing about the prosecutor's remarks "so infected

_____

[138] *See Portuondo v. Agard,* 529 U.S. 61, 67 (2000) ("The defendant's right to hold the prosecution to proving its case without his assistance is not to be impaired by the jury's counting the defendant's silence at trial against him--and upon request the court must instruct the jury to that effect. *See Carter v. Kentucky,* 450 U.S. 288 (1981). It is reasonable enough to expect a jury to comply with that instruction since . . the inference of guilt from silence is not always 'natural or irresistible.'"); *United States v. Robinson,* 485 U.S. 25, 33 (1988) ("The principle that prosecutorial comment must be examined in context is illustrated by our treatment of a Fifth Amendment claim in *Lockett v. Ohio,* 438 U.S. 586 (1978).").

[139] *See Trial Transcript Vol.* XV at 113 ("Mr. Odenwald makes a good point about some of the things. Where's Bobbi Joe? . . . They've got all that information. They – if they thought it helped, they could have called [the witnesses] any time. . .. I would submit that if there was anything helpful to be gained, the defense would have called the same people they've been complaining haven't been called."); *id.* at 115-16 ("Those phone records. There again, if they make a big thing about the phone records . . . I guess the cops could have checked it out . . . . The defense could have subpoenaed phone records."); *id.* at 121-22 ("Another thing Mr. Odenwald was talking about tests, primer residue tests and so forth. Like I said before, they have access to everything we have. They had access to primer residue tests. We don't present their case. It's their choice whether they want to present it or not. If it's advantageous or not . . .").

the trial" to render it "fundamentally unfair." *Duvall v. Reynolds,* 39 F.3d 768, 794

(10th Cir.), *cert. denied,* 525 U.S. 933 (1998).  Therefore, I recommend that the

opening and closing argument aspects of Claims 3 and 5 be dismissed.  *See Doc. 1* at

9A5, 9A6, 10B10.

# VIII.  Cumulative Error

The trial judge found that because none of the claims he did address had

merit, Bartlett's cumulative error claim likewise was without merit.  *Record Proper*

at 1828-29.   I independently reviewed the cognizable claims that the trial court

and also found none with merit.   Because of the sheer volume of claims, it is

possible that I may have inadvertently overlooked a specific claim or two.

However, the substance of all the claims have been addressed and any such

overlooked claim would be without merit for all the reasons above.

Thus, I find the state court's result is not "contrary" or "unreasonable."

"Cumulative error analysis does not apply to the cumulative effect of non-errors."

*Moore v. Reynolds,* 153 F.3d 1086, 1113 (10th Cir. 1998), *cert. denied,* 526 U.S. 1025

(1999).  Because the trial court committed no errors, there can be no cumulative

error."  *Robison v. Ward,* 232 Fed. Appx. 785, 791 (10th Cir. 2007); *see also e.g.,*

*Knight v. Spencer,* 447 F.3d 6, 18 (1st Cir. 2006) ("even were the argument of

cumulative effect properly before us, it would be an uphill battle for appellant.  *See United States v. Franklin*, 321 F.3d 1231, 1241 n. 4 (9th Cir. 2003) (no individual errors, hence no cumulative error).").

Wherefore,

**IT IS HEREBY RECOMMENDED that** Respondents' motion to dismiss *(Doc. 13)* be granted, and Bartlett's § 2254 petition be dismissed with prejudice.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the ten-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

---

UNITED STATES MAGISTRATE JUDGE

# APPENDIX

In a nutshell, the separately-numbered "grounds" raised in the State Petition are:

Ground 1 (Confrontation Clause)
Ground 2 (newly discovered evidence)
Ground 3 (ineffective assistance of trial counsel or "IAOTC" re: investigation/subpoenas)
Ground 4 (IAOTC re: confidential informants with exculpatory information)
Ground 5 (IAOTC re: expert witnesses)
Ground 6 (IAOTC re: alibi defense)
Ground 7 (IAOTC re: jury instructions on alibi/motive)
Ground 8 (IAOTC re: investigation)
Ground 9 (IAOTC re: handling trial witnesses)
Ground 10 (IAOTC re: negligence in pretrial proceedings)
Ground 11 (IAOTC re: right to testify)
Ground 12 (IAOTC re: speedy trial)
Ground 13 (IAOTC re: change of venue)
Ground 14 (IAOTC re: altered evidence)
Ground 15 (IAOTC re: suppression)
Ground 16 (IAOTC re: dismiss indictment)
Ground 17 (IAOTC re: evidence)
Ground 18 (IAOTC re: jury instruction on aiding and abetting)
Ground 19 (IAOTC re: counsel statements)
Ground 20 (IAOTC re: complete record for appellate review)
Ground 21 (IAOTC re: prejudicial trial evidence)
Ground 22 (IAOTC re: mistrial/curative instruction)
Ground 23 (IAOTC re: allocution)
Ground 24 (IAOTC re: cumulative effect)
Ground 25 (ineffective assistance of appellate counsel or "IAOAC" re: Petitioner review)
Ground 26 (IAOAC re:  facts in brief in chief)
Ground 27 (IAOAC re: raising all issues requested)
Ground 28 (IAOAC re: failing to communicate)
Ground 29 (IAOAC re: amended brief)
Ground 30 (IAOAC re: motion for rehearing)
Ground 31 (IAOAC re: petition United States Supreme Court)
Ground 32 (IAOAC re: complete record for appellate review)
Ground 33 (IAOAC re: cumulative effect)
Ground 34 (ineffective assistance of post-conviction counsel)
Ground 35 (Prosecutorial Misconduct Re: grand jury)
Ground 36 (Prosecutorial Misconduct re: altered/tampered evidence at trial)
Ground 37 (Prosecutorial Misconduct re: exigent circumstances)
Ground 38 (Prosecutorial Misconduct re: trial testimony)

Ground 39 (Prosecutorial Misconduct re: exculpatory evidence)
Ground 40 (Prosecutorial Misconduct re: officers' handling evidence)
Ground 41 (Prosecutorial Misconduct re: discovery and delay)
Ground 42 (Prosecutorial Misconduct re: prejudicial and inadmissible evidence)
Ground 43 (Prosecutorial Misconduct re: misleading and unreliable facts)
Ground 44 (Prosecutorial Misconduct re: closing argument)
Ground 45 (Prosecutorial Misconduct re: cumulative effect)
Ground 46 (Prosecutorial Misconduct re: direct appeal)
Ground 47 (trial court errors)
Ground 48 (New Mexico Supreme Court errors)
Ground 49 (cumulative error).

The nine categories of claims that he raises in his federal petition are:

Claim 1 (Confrontation Clause)
Claim 2 (newly-discovered evidence)
Claim 3 (ineffective assistance of trial counsel)
Claim 4 (ineffective assistance of appellate counsel)
Claim 5 (prosecutorial misconduct at trial)
Claim 6 (prosecutorial misconduct on direct appeal)
Claim 7 (trial court errors)
Claim 8 (New Mexico Supreme Court errors)
Claim 9 (cumulative error).